Jay W. Eisenhofer
Geoffrey C. Jarvis
Matthew P. Morris
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York  10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Special Litigation Counsel to Refco Group Ltd., LLC*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| REFCO GROUP LTD., LLC, <br><br> Plaintiff, <br><br> v. <br><br> CANTOR FITZGERALD, L.P., et al., <br><br> Defendants. | C.A. No. 1:13-cv-01654-RA <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

VERIFIED AMENDED COMPLAINT ...................................................................... 1

INTRODUCTION ......................................................................................................... 1

JURISDICTION, VENUE AND DEMAND FOR TRIAL BY JURY ......................... 3

PARTIES ........................................................................................................................ 4

FACTUAL ALLEGATIONS RELATING TO ALL CLAIMS ................................... 8

    A.    THE CORPORATE STRUCTURE OF THE KEY ENTITIES ............................ 8

        1.    The CIH Entities ...................................................................... 8

        2.    The Cantor Nevada Entities .................................................... 9

        3.    The CIH Entities And The Cantor Nevada Entities Share
            Management ............................................................................ 13

    B.    CANTOR PURSUES BETTING VENTURES THROUGH SUBSIDIARIES AND, IN
        EXCHANGE FOR A 10% LIMITED PARTNERSHIP INTEREST, OBTAINS AN $8
        MILLION INVESTMENT IN CIH FROM RGL ............................................. 14

    C.    CIH DRAMATICALLY GROWS ITS BUSINESSES ..................................... 17

        1.    Cantor Index's Business Grows, Including Through Its Creation Of
            Mobile Betting Technology ..................................................... 17

        2.    CIH Operates On-Line Casino Gaming Sites  Through Its Cantor
            Gaming UK Subsidiaries ......................................................... 20

    D.    THE DEFENDANTS CAUSE THE CIH ENTITIES TO RELINQUISH THEIR
        BUSINESSES AND ASSETS FOR NO OR NOMINAL CONSIDERATION ...................... 22

        1.    The 2006 License Agreement ................................................. 23

        2.    Cantor Index Closes Spreadfair ............................................. 25

        3.    Cantor Index's Profitable UK Businesses Are Sold For £1 ..................... 27

            (a)    A Cantor Nevada Entity Files A UK License Application
                As Part Of The Process Of Taking Cantor Index's
                Profitable FFO Business ............................................. 28

            (b)    The Defendants Cause Cantor Index To Sell Its FFO
                Business And Assets And Transfer Its Key Employees To
                Cantor G&W For Only £1.00 ...................................... 31

        4.    The Defendants Transfer Out The Remainder Of Cantor Index's
            Trading Activity ...................................................................... 33

        5.    The Defendants Again Cause Cantor Index LLC To License Its
            Intellectual Property For No Consideration ............................. 34

    E.    THE CANTOR NEVADA ENTITIES ......................................................... 36

      1.     Cantor Forms Cantor Nevada And Obtains A Change In Nevada Law To Allow For Mobile Gambling ...................................................... 36

      2.     Cantor Nevada Operates Mobile Gambling In Nevada Casinos ............. 37

      3.     The Defendants Seek To Capitalize On Their Nevada Business Through An Initial Public Offering ........................................................ 39

  F.     CANTOR ADMITS THAT CANTOR NEVADA'S BUSINESS IS BASED ON TECHNOLOGY DEVELOPED BY, AND TAKEN FROM, THE CIH ENTITIES ............... 42

  G.     THE DEFENDANTS UNFAIRLY INCREASED FEES PAID TO CANTOR AFFILIATES ................................................................................................ 47

PLAINTIFF'S CLAIMS ARE TIMELY ..................................................................... 48

DERIVATIVE ALLEGATIONS.................................................................................. 50

DEMAND IS EXCUSED AS FUTILE ....................................................................... 50

CIHLLC'S CONDUCT IS NOT EXCULPATED ....................................................... 51

COUNT I (BREACH OF FIDUCIARY DUTY AGAINST  CIHLLC, LUTNICK, MERKEL AND AMAITIS) ........................................................................................ 52

COUNT II (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE DEFENDANTS OTHER THAN CIHLLC) ...................................... 53

COUNT III (UNJUST ENRICHMENT AGAINST DEFENDANTS) ......................... 55

COUNT IV (WASTE OF ASSETS AGAINST CIHLLC, LUTNICK, MERKEL AND AMAITIS)............................................................................................................ 56

COUNT V (BREACH OF PARTNERSHIP AGREEMENT AGAINST CIHLLC) ................... 56

COUNT VI (CONVERSION AGAINST DEFENDANTS) ......................................... 58

COUNT VII (FRAUDULENT CONVEYANCE UNDER N.Y. DEBTOR  & CREDITOR LAW § 276 AGAINST DEFENDANTS) ............................................... 58

COUNT VIII  (FRAUDULENT CONVEYANCE UNDER 6 DEL. C. § 1304(a)(1) AGAINST DEFENDANTS) ....................................................................................... 59

COUNT IX  (ACCOUNTING AGAINST CIHLLC) ................................................. 60

PRAYER FOR RELIEF ............................................................................................. 61

## VERIFIED AMENDED COMPLAINT

Plaintiff Refco Group Ltd, LLC ("**RGL**" or "**Plaintiff**"), for its direct complaint and derivative adversary complaint on behalf of nominal defendants Cantor Index Holdings, L.P. ("**CIH**"), Cantor Index Limited ("**Cantor Index**"), Cantor Index LLC, Cantor Gaming Limited, and Cantor Fitzgerald Game Holdings, LLC, against defendants Cantor Fitzgerald, L.P. ("**Cantor LP**"), Cantor Fitzgerald Securities ("**CFS**" and together with Cantor LP and all of CFS' and Cantor LP's officers, directors, partners, members and/or employees (in their capacity as such) and all of their subsidiaries and affiliates, "**Cantor**"), Lee Amaitis ("**Amaitis**"), Stephen M. Merkel ("**Merkel**"), Howard W. Lutnick ("**Lutnick**" and, together with Amaitis and Merkel, the "**Individual Defendants**"), Cantor Index Holdings Limited Partnership LLC ("**CIHLLC**"), Cantor Gaming & Wagering Limited ('**Cantor G&W**') , Cantor Fitzgerald Europe, and Cantor G&W (Nevada) L.P. ("**Cantor Nevada**" and, together with Cantor, the Individual Defendants, CIHLLC, Cantor G&W, and Cantor Fitzgerald Europe, the "**Defendants**"), hereby allege, upon knowledge as to themselves and upon information and belief (including the investigation of counsel and review of discovery and publicly available information) as to all other matters, as follows:

## INTRODUCTION

1.      Approximately a decade ago, Cantor, with Lutnick at the helm, determined to enter the gambling business and apply its securities trading experience to the gambling world. Cantor began pursuing this new line of business in the U.K. and Europe, given the U.K.'s regulatory openness to gambling ventures and Cantor's presence in London, through CIH and CIH's subsidiaries.

2.      As described in greater detail below, in 2002, RGL invested $8 million in CIH in return for a 10 percent partnership interest. Over the course of the next several years, CIH

and its subsidiaries were very successful.  Indeed, these entities developed revolutionary gaming technology and formats.  For example, they developed technology to permit customers to place bets on single occurrences during sporting events as they happened, devices for remote gambling, and opportunities to gamble on movements in financial indices.

3.      After CIH and its subsidiaries successfully developed and deployed these technologies and enterprises, Cantor secretly decided to shut them down in favor of Cantor's new focus on Nevada's gambling markets.  In doing so, unbeknownst to Plaintiff, Cantor not only destroyed or took profitable CIH business lines, but it also took the rights to key technology and other assets for the benefit of Cantor's Nevada business, for zero compensation or, in one instance, for the nominal consideration of £1.00.  Having taken those assets and business lines from CIH, Cantor used them to create incredibly valuable businesses in Nevada and elsewhere.  Indeed, Cantor has repeatedly admitted to regulators, analysts and the press that the technology developed by CIH and its subsidiaries in the U.K. was critical to the build-out of Cantor's Nevada operations.  For example, Amaitis, one of Lutnick's close associates at Cantor and a critical officer at both of CIH's subsidiaries and at Cantor's Nevada businesses, has explained that not only had a "tremendous amount of money" been spent developing the technology for remote gambling devices, but that the "mobile technology developed" by and for the CIH businesses "was well ahead of its time for the wholesale market industry and that started the underpinning of the application … in Nevada."

4.     Now, Cantor appears to be pursuing an initial public offering of its Nevada businesses (the "**IPO**").[1]  Upon information and belief, if the IPO is successful, it will result in a cash infusion to Defendants of approximately $100 million.   This will result in a substantial gain to Cantor, as well as Lutnick and Amaitis.  Of course, critical to that IPO will be the technology and businesses developed by, and taken from, CIH.  Yet, while Cantor is pursuing the IPO, CIH is left as a mere husk, stripped of its businesses and assets as the result of the contractual and fiduciary duty breaches, conversion, waste and fraudulent conveyance of assets that Plaintiff seeks to remedy through this action.

### JURISDICTION, VENUE AND DEMAND FOR TRIAL BY JURY

5.     This adversary proceeding has been commenced to determine an actual controversy between Plaintiff RGL and the Defendants.

6.     The United States District Court for the Southern District of New York (the "**District Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), as this adversary proceeding is related to the Refco Inc. chapter 11 cases.

7.     In addition, the Partnership Agreement (as defined below), § 9.12, provides for consent to jurisdiction and venue in "any court of the State of New York or any federal court sitting in the city of New York, NY."  The chapter 11 cases were filed in the United States Bankruptcy Court for the Southern District of New York, Manhattan division.

8.     Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] On May 25, 2012, Cantor Entertainment (defined below) filed a request to withdraw its Form S-1/A (defined below) with respect to the IPO, with the statement that it would "submit a new draft registration statement pursuant to the confidential submission process available to 'emerging growth companies'" under Section 6(e) of the Securities Act of 1933, thereby implying that Cantor will continue to pursue the IPO.

9.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure (the "**Civil Rules**"), RGL hereby demands a trial by jury as to all matters triable thereby.

## PARTIES

10.     Plaintiff RGL is a limited liability company organized under the laws of the State of Delaware, is one of the reorganized Debtors, and has a principal place of business c/o Capstone Advisory Group LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey 07663. It is a subsidiary of Refco, Inc., a corporation organized under the laws of the State of Delaware, and one of the reorganized debtors in the chapter 11 bankruptcy case captioned *In re: Refco Inc., et al.*, No. 05-60006 (RDD). It was a limited partner of nominal defendant CIH at the time of the wrongs complained of herein, and continues to own a limited partnership interest in CIH.

11.     Defendant Cantor LP is a limited partnership organized under the laws of the State of Delaware. At all relevant times, Cantor LP was the sole member of CIHLP II (defined below), which in turn owned an 89% limited partnership interest in nominal defendant CIH following RGL's limited partnership investment in CIH.

12.     Defendant CFS is a partnership organized under the laws of the State of Tennessee, and maintains its principal place of business at 499 Park Avenue, New York, New York 10022. At all relevant times, CFS was the sole member of defendant CIHLLC, which in turn was the general partner of nominal defendant CIH.

13.     Defendant Amaitis is a citizen of the state of Nevada, and has residences at 2700 Las Vegas Blvd. S., Unit 4302, Las Vegas, Nevada 89109 and 139 Prospect Hill Road Clinton Corners, New York, New York 12514. Amaitis joined Cantor Fitzgerald, L.P. in 1995 as Senior Managing Director and moved to London in 1996, becoming President and CEO of Cantor Fitzgerald International. Defendant Amaitis served as a director and/or

4

officer of one or more of the CIH Entities (defined below), including Cantor Index (defined

below), of CIHLLC and CIHLP II (defined below), and of one or more of the Cantor Nevada

Entities (defined below), at the time of wrongs complained of herein.  For example, Amaitis

executed the 2011 License Agreement as chief executive officer of Cantor Nevada and

executive managing director of Cantor Index LLC.  In addition, discovery revealed that,

since 2002, Amaitis served and/or is serving as a director and/or employee of at least the

following entities:

Cantor G&W Holdings, LLC
Cantor G&W International Holdings, LLC
Cantor G&W Special Assets Holdings, LLC
Cantor G&W Special Assets, L.P.
Cantor G&W, L.P.
Cantor Gaming Limited
Cantor Index Holdings, L.P.
Cantor Index Limited
Cantor Index LLC
CIHLP II LLC
CIHLP LLC
Hollywood Stock Exchange, LLC

2575 S Highland Drive Holdings, LLC
2575 S Highland Drive, L.P.
Cantor G&W (Nevada) Holdings, L.P.
Cantor G&W (Nevada), L.P.
Cantor G&W (Nevada), LLC
Cantor Gaming and Wagering Limited
Las Vegas Sports Consultants, Inc.
Las Vegas Sports Mobile, LLC
PlayWizard Holdings, L.P.
PlayWizard Holdings, LLC

14.     Defendant Merkel is a citizen of the state of New York, and resides at 75

Remsen Street, Apt. 1, Brooklyn, New York 11201.  Defendant Merkel served as a director

and/or officer of one or more of the CIH Entities, including Cantor Index, and upon

information and belief of one or more of the Cantor Nevada Entities, at the time of wrongs complained of herein.

15.     Defendant Lutnick is a citizen of the state of New York, and resides at 11 E. 71st Street, New York, New York 10021.  The amended Form S-1 (the "**Form S-1/A**") filed by Cantor Entertainment Technology, Inc. ("Cantor Entertainment") with the Securities and Exchange Commission (the "**SEC**") provides that "Mr. Lutnick . . . controls [Cantor Fitzgerald, L.P. and its subsidiaries]."  The Form S-1/A also provides that Lutnick "is the President and sole stockholder of CF Group Management, Inc., [which is] the managing general partner of Cantor [LP]."  Defendant Lutnick served as a director and/or officer of one or more of the CIH Entities, including Cantor Index, as well as of one or more of the Cantor Nevada Entities, at the time of wrongs complained of herein.  For example, Lutnick executed the 2006 License Agreement (defined below) as Chairman and Chief Executive Officer of both Cantor Nevada and of Cantor Index LLC.

16.     Defendant CIHLLC is a limited liability company organized under the laws of the State of Delaware, and maintains its principal place of business at 499 Park Avenue, New York, New York 10022.  At all relevant times, CIHLLC was the general partner of nominal defendant CIH.  Following RGL's limited partnership investment in CIH, CIHLLC owned a 1% limited partnership interest in nominal defendant CIH.

17.     Defendant Cantor G&W (Nevada) L.P. is a limited partnership organized under the laws of the State of Nevada, and maintains its principal place of business at 2575 South Highland Drive, Las Vegas, Nevada 89109.

18.     Defendant Cantor G&W is is a company organized under the laws of England and Wales.  Its registered office is located at One Churchill Place, London E14 5RD.

19.     Defendant Cantor Fitzgerald Europe is a company organized under the laws of England and Wales, and maintains its principal place of business at Cantor Capitol, One Churchill Place, Canary Wharf, London E14 5RD.

20.     Nominal defendant Cantor Index Holdings, L.P. is a limited partnership organized under the laws of the State of Delaware, and maintains its principal place of business at 135 East 59th Street, New York, New York 10022.

21.     Nominal defendant Cantor Index is a limited liability company organized under the laws of the State of Delaware.  At all relevant times, nominal defendant Cantor Index was a subsidiary of nominal defendant CIH.

22.     Nominal defendant Cantor Index LLC is a limited liability company organized under the laws of the State of Delaware.  At all relevant times, nominal defendant Cantor Index LLC was a subsidiary of nominal defendant CIH.

23.     Nominal defendant Cantor Gaming Limited is a company organized under the laws of England and Wales., and maintains a registered office at One Churchill Place, Canary Wharf, London, E14 5RD.

24.     Nominal defendant Cantor Fitzgerald Game Holdings, LLC is a limited liability company organized under the laws of the State of Delaware.  At all relevant times, nominal defendant Cantor Fitzgerald Game Holdings, LLC was a subsidiary of nominal defendant CIH.

25.     At all relevant times, Cantor (including the CIH Entities, as defined below, and the Cantor Nevada Entities, as defined below) was controlled by Lutnick, including through and with the assistance of Amaitis and Merkel.

## FACTUAL ALLEGATIONS RELATING TO ALL CLAIMS

### A.   THE CORPORATE STRUCTURE OF THE KEY ENTITIES

26.   The allegations in this Complaint relate primarily to two sets of entities, which are referred to herein as the CIH Entities and the Cantor Nevada Entities.

### 1.   The CIH Entities

27.   The "**CIH Entities**" are the direct and indirect wholly-owned subsidiaries of nominal defendant CIH.

28.   The CIH Entities are comprised of the following entities: (a) nominal defendant CIH; and (b) CIH's wholly-owned subsidiaries: (i) Hollywood Stock Exchange, LLC ("**HSX**"), Cantor Index, Cantor Fitzgerald Game Holdings, LLC, and Cantor Index LLC; and (c) Cantor Fitzgerald Game Holdings, LLC's wholly-owned subsidiary, Cantor Gaming Limited, which, together with its direct parent Cantor Fitzgerald Game Holdings, LLC, is referred to herein as "**Cantor Gaming UK**".

29.   CIH's general partner is CIHLLC.

30.   CIH's limited partners are CIHLLC (with a 1% limited partner interest), CIHLP II LLC ("**CIHLP II**") (with an 89% limited partner interest), and RGL (with a 10% limited partner interest).

31.   CIHLLC's sole member is CFS.

32.   CIHLP II's sole member is Cantor LP.  According to the Form S-1, filed by Cantor Entertainment with the SEC, "Lutnick . . . controls [Cantor Fitzgerald, L.P. and its subsidiaries]."

33.   Further, Lutnick, Amaitis and Merkel served as directors of CIH at the time of the wrongs complained of herein.

34. An organizational chart for the CIH Entities and for CIH's ownership structure follows below:



### 2. The Cantor Nevada Entities

35. The "**Cantor Nevada Entities**" refers to Cantor Nevada and its direct and indirect parent and subsidiary entities.

36. At all relevant times, the general partner of Cantor Nevada was Cantor G&W (Nevada), LLC ("**Cantor G&W LLC**").

37. The sole managing member of Cantor G&W LLC, and the sole limited partner of Cantor Nevada, was Cantor G&W (Nevada) Holdings LP ("**Cantor G&W Holdings**"). Cantor G&W Holdings' limited partners were Merkel, Amaitis and Lutnick. The general

partner of Cantor G&W Holdings was Cantor G&W (Nevada) Holdings, LLC, whose

managing member was the Howard W. Lutnick Family Trust.

    38.    The Cantor Nevada Entities are reflected in the following organizational chart:



    39.    As noted above, and as reflected in the previous chart, at all relevant times,

the general partner of Cantor Nevada was Cantor G&W LLC, whose sole managing member

was Cantor G&W Holdings.  The general partner of Cantor G&W Holdings was Cantor

G&W (Nevada) Holdings, LLC, whose managing member was the Howard W. Lutnick

Family Trust.

40.     The Howard Lutnick Family Trust is controlled by defendant Lutnick, as reflected in the following chart submitted by Cantor to the UK's Financial Services Authority:



41.     At all relevant times, Lutnick, along with Amaitis and Merkel, owned Cantor Nevada.

42.     At all relevant times, Lutnick, including through and with the assistance of Amaitis and Merkel, controlled Cantor Nevada.

43.     Following Cantor Entertainment's IPO, Cantor Nevada will be a wholly-owned indirect subsidiary of Cantor Entertainment.

### 3.     The CIH Entities And The Cantor Nevada Entities Share Management

44.     The CIH Entities and the Cantor Nevada Entities share numerous directors, officers, and managers.

45.     For example, Lutnick has been chairman of the board of directors of Cantor Nevada since 2004, and served as its CEO from 2004 to January 2009.  During this same time, Lutnick also served as, *inter alia*, (1) Cantor Index LLC's Chairman and CEO, (2) Chairman of CFS, which is the sole member of CIH's general partner CIHLLC; and (3) Chairman and CEO of Cantor LP, which is the sole member of CIH's limited partner CIHLP II.

46.     Similarly, Amaitis served as President of Cantor Nevada from 2004 to January 2009, and as its CEO from January 2009 to the present.   Simultaneously, Amaitis served as, *inter alia*, the Executive Managing Director of Cantor Index LLC.  Likewise, Merkel has served as the Executive Vice President, Chief Legal Officer, General Counsel and Secretary of Cantor Nevada since 2004, and as its Chief Legal Officer since November 2010, while also serving as the Executive Managing Director, General Counsel, and Secretary of Cantor LP.

47.     Moreover, materials submitted by Cantor to the UK's Financial Services Authority recite that "a number of the directors of Cantor [Cantor G&W] are also main directors of Cantor Group companies, including the Cantor Group's president, Howard Lutnick."

**B.    CANTOR PURSUES BETTING VENTURES THROUGH SUBSIDIARIES AND, IN EXCHANGE FOR A 10% LIMITED PARTNERSHIP INTEREST, OBTAINS AN $8 MILLION INVESTMENT IN CIH FROM RGL**

48.     Throughout its history, Cantor has been a financial services firm.   Over approximately the last decade, however, the CIH Entities developed technology, subsequently built-upon in connection with Cantor's Nevada businesses, for betting on, among other things, financial markets and sporting events.   Through that investment, Cantor's subsidiaries made forays into remote and internet gambling, including "Spread Betting" and financial fixed-odds ("**FFO**") betting.

49.     With Spread Betting on financial instruments, for example, a bettor predicts whether the price of the financial instrument will rise or fall, without having to physically buy or sell the instrument.   The bettor "stakes" an amount of money that he will win or lose each time the price of the instrument on which he is betting moves by one "point."   A point is the unit of price of the instrument.   Depending on the instrument, this could be movements of 1, 0.1 or 10, for example.   Spread Betting allows the bettor to bet in both directions, since the bettor does not physically have to buy or sell the instrument.   The bettor simply speculates on whether he thinks the price of the instrument will rise or fall.   If he is right, he moves into profit; and if he is wrong, the bettor incurs losses.   In Spread Betting, the "spread" is the cost to the bettor to open and close the spread bet.   The spread is the difference between the price at which the bettor can buy (i.e., the offer price) and the price at which the bettor can sell (i.e., the bid price).   The closer these two prices are (i.e., the "tighter" the spread), the less the

14

cost to the bettor.  The bettor's winnings and losses are then determined by the number of points difference between the price at which the bettor entered his bet and the price at which the better closed the bet, multiplied by the bettor's stake for the bet.  In other words, the bettor wins more the more the price for the instrument moves in the direction predicted, and loses more the more the price for the instrument moves away from the direction predicted. Spread bets are a leveraged product, which means that the bettor can open a proportionally larger position than the capital the bettor has to invest.  This also means that the bettor's liabilities can be bigger than his initial stake.

50.     With FFO betting, the bettor similarly predicts whether a financial market will finish above or below a specified level at the time the market expires.  If the bettor is correct, he wins.  If not, he loses.  However, with FFO betting, the bettor's risk is limited to the stake the bettor is prepared to bet.

51.     These ventures allow customers to wager on future events, such as the movement of stock prices and indexes, the outcome of sporting events, and even individual plays during sporting events.

52.     In or around 2000, Cantor began pursuing ventures for betting in the U.K., including by forming in May 2000 Cantor Index, as a wholly-owned subsidiary of nominal defendant CIH.

53.     Thereafter, Cantor Index obtained a bookmaker's permit from the British government and opened a bookmaker's business.  In December 2000, Cantor Index launched an online gaming platform and website for bookmakers.

54.     CIH's efforts to expand Cantor Index were successful.  In the year prior to November 23, 2001, Cantor Index Spread Betting customers doubled.

55.     In or around the winter of 2001, Cantor had discussions with Refco concerning an investment by Refco in CIH.

56.     These discussions culminated in a transaction on or about January 1, 2002, whereby RGL invested $8 million in CIH in exchange for a 10% limited partnership interest in CIH.

57.     In connection with RGL's $8 million investment, CIHLLC, CIHLP II and RGL executed an Amended and Restated Limited Partnership Agreement, dated January 1, 2002 (the "**Partnership Agreement**") and attached as Exhibit A hereto, which sets forth the relevant rights, powers and responsibilities of the general and limited partners of CIH.

58.     Lutnick executed the Partnership Agreement on behalf of both CIHLLC and CIHLP II.

59.     Importantly, Section 3.03 of the Partnership Agreement requires the unanimous approval of all of CIH's limited partners (including RGL) prior to any action by CIHLLC with respect to any sale of all or substantially all of the business or assets of CIH.

60.     The Partnership Agreement also provides that RGL may enforce its rights under the Partnership Agreement through litigation in any court of the State of New York or any federal court sitting in the city of New York, New York, that RGL is entitled to recover reasonable attorneys' fees as the successful party in any such litigation in addition to any other available remedy, and that the Partnership Agreement is governed by Delaware law.

### C.   CIH DRAMATICALLY GROWS ITS BUSINESSES

61.     Throughout the next several years, CIH expanded its businesses, including an expansion of Cantor Index and its Spread Betting business and an expansion of Cantor Gaming UK's business.

### 1.   Cantor Index's Business Grows, Including Through Its Creation Of Mobile Betting Technology

62.     Cantor Index continued its positive growth and development of its business. On or about January 30, 2002, Cantor Index became the first Spread Betting firm to offer round-the-clock trading, which it did through its website.

63.     CIH and Cantor Index understood the need for better and innovative technology in their business.  Indeed, in March 2003, Amaitis, then the president and CEO of Cantor Fitzgerald International, among other positions within Cantor, stated: "Technology is a must.  Unless you have effective technology, you are a prime target for take over."

64.     In September 2003, years before the introduction of the first iPhone by Apple, Cantor Index introduced a key new technology, "Cantor Mobile," the first real-time mobile trading device in the world.  Cantor Mobile, using a handheld PC called an "XDA," gave mobile access to real-time finance and sports news, charting, continuous streaming of live prices and instant trading, and allowed users of the handheld devices to wager on financial indices and sporting events with Spread Betting.

65.     The mobile wagering was hugely successful within a few years.  Within the first few months, Cantor Index expected to distribute over 10,000 XDAs.  By April 2005, Cantor Mobile represented a significant percentage of all of Cantor Index's business.

66.     In connection with the growth of Spread Betting using mobile, handheld devices, in June 2004, Cantor Index launched "Spreadfair," an online Spread Betting

exchange designed to allow for customer to customer betting ("**Spreadfair**").  Spreadfair was the world's first sports Spread Betting exchange.  Cantor Index made profits on the bets made by customers through Spreadfair.

67.   Over the years, Spreadfair successfully expanded into numerous different areas.  For example, in January 2005, Spreadfair included horseracing spreads.  On or about May 10, 2005, Spreadfair included betting on movement of the prices of homes in the United Kingdom residential housing market.

68.   By February 2006, all sports betting at Cantor's United Kingdom operations had been switched to Spreadfair.  According to Dominic Crosthwaite, then chief operating officer of Cantor Index, the move was in direct response to the continuing growth of Spreadfair.  Crosthwaite said at this time that Spreadfair was growing at a rate of 15 per cent per month.  Indeed, on March 19, 2006, the Mail on Sunday in London proclaimed Spreadfair "stunningly successful."

69.   Importantly, while many companies provided opportunities for customers to bet on the outcome of a sports game, Cantor Index also allowed people to bet on events taking place during a game.

70.   As reported in a November 1, 2008 article from Casino Journal, Cantor employee John Buyacheck explained that in-game wagering in the U.K. had "taken off like a rocket."  For example, according to Buyacheck, the amount wagered after the first serve at the Wimbledon men's tennis finals was £30 million in 2007 and was £42 million in 2008.

71.   Also, on July 27, 2004, Cantor Index LLC, a subsidiary of CIH, and Scientific Games Corporation, announced the formation of a "global joint venture to implement and market new, proprietary pari-mutuel bets.  Cantor Index [LLC] has developed new forms of

pari-mutuel wagering [on horse races] and Scientific Games Racing will create the bet software and write the code enabling it to run on tote systems worldwide."   In the press release, Amaitis stated: "We believe that content, in this case the type of betting option, is fundamentally important to the future of horse racing."

72.     In August 2005, Cantor Index teamed up with another company, Ladbrokes, to launch an FFO betting service, which allowed clients to bet on a range of financial markets, including how the market would fluctuate during certain intervals (e.g., five minutes).   In a podcast interview with Global Gaming Business on or about November 11, 2011, Amaitis described that "as a very successful product."

73.     Cantor Index derived substantial revenues from its business activities.   For the fiscal year ended December 31, 2006, Cantor Index reported revenue of approximately $76.4 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)." For the fiscal year ended December 31, 2007, Cantor Index reported revenue of approximately $51.0 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)."

74.     During 2008, however, Cantor caused Spreadfair to be discontinued as part of its process (described in greater detail below) of transferring the CIH Entities' business and assets to the Cantor Nevada Entities.   Thus, for the fiscal year ended December 31, 2008, Cantor Index reported revenue of approximately $34.6 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)."   For the fiscal year ended December 31, 2009, Cantor Index reported revenue of approximately $9.2 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)."

75.     During early 2010, Cantor caused Cantor Index to transfer its FFO business and assets to the control of the Cantor Nevada Entities (as also described in greater detail below).  Thus, for the fiscal year ended December 31, 2010, Cantor Index reported revenue of approximately $8.1 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)."

76.     Cantor Index's reduced revenues in these later years resulted in large part from the Defendants raiding the CIH Entities' business and assets and transferring them to the Cantor Nevada Entities, as explained in greater detail below.

### 2.     CIH Operates On-Line Casino Gaming Sites Through Its Cantor Gaming UK Subsidiaries

77.     In addition to CIH's business ventures described above which it operated through its subsidiary Cantor Index, CIH also simultaneously launched valuable business ventures through its Cantor Gaming UK subsidiaries, which created and ran on-line and wireless gambling sites, including on behalf of third parties.  These subsidiaries are subject to RGL's 10 percent ownership interest in CIH.

78.     On or about September 30, 2005, Cantor Gaming UK launched an online casino named Cantor Casino.  According to the press release announcing the launch, Cantor Casino would offer customers "a range of games including roulette, blackjack, video poker, video slots, mini baccarat as well as two popular Asian games, Pai Gow and Sic Bo."  The press release further explained that "Cantor Casino is the first product to emerge from newly formed Cantor Gaming, an online and mobile gaming business, which will offer managed facilities for online casinos to a variety of companies in the UK and Europe."  The press release also provided:

Cantor Casino will initially be offered to the existing sophisticated and knowledgeable investors associated with both the Cantor Fitzgerald and Cantor Index groups, as well as tapping into the existing pool of online gamers.

Tom Kenny, Chief Operating Officer of Cantor Gaming said today:

"Cantor Fitzgerald already has access to a considerable and knowledgeable client base so it makes sense to offer a new product that compliments some of our activities in both spread and fixed odds betting."

Cantor Gaming will develop and operate online and mobile casinos on behalf of a range of major companies in consumer related sectors. Cantor Gaming, in line with the US Department of Justice's position on remote gambling, has made it its policy not to accept casino customers from the US. This policy should enable companies who are cautious of acting contrary to the Department of Justice's position to offer an on-line casino to their client base via Cantor Gaming's 'white label' solution.

Tom Kenny continued:

"Historically, the Cantor Index group has successfully white labelled a number of services including CFDs, spread betting, and most recently a financial fixed odds service through Ladbrokes. Cantor Gaming is in discussion with a number of companies who want to develop relationships with their customer base by taking advantage of the current popularity of online casinos."

79.     As with Cantor Index, CIH aggressively sought to expand Cantor Gaming UK's business. In February 2006, Cantor Gaming UK attended the International Casino Exhibition in London, England. There, Cantor Gaming UK pushed the white-label casino service it was running in partnership with Australia-based Gaming & Entertainment Group, a developer of software for Internet casino sites. Cantor Gaming UK also demonstrated its mobile gaming devices. According to an article reporting on Cantor's presentation, "Cantor claim[ed] a considerable lead on the competition, having launched its mobile device in the U.K. in September 2003."

80.     On or about June 16, 2006, Cantor Gaming UK launched FHM Casino, an online casino, in partnership with media group Emap plc. The press release announcing the launch explained that "Emap's FHM.com is the leading men's lifestyle site in the UK" and

that the product launch "provides a complete FHM-branded online casino solution, offering the most popular casino games including blackjack and roulette.  This offering on www.fhmgaming.com is part of a fully operating end-to-end gaming service…."  The press release also explained:

> Following the launch of Cantor Gaming's own-brand casino in September of 2005, FHM Casino is the first in what Cantor Gaming anticipates will be a series of partnerships with leading brands in a range of sectors such as media, sports and consumer products sectors before the end of 2006.  The online gaming market is believed to be worth over US$15 billion per year with huge potential for growth, and is forecasted to double by 2010.

> Cantor's casino solution is specifically designed with larger companies, media groups and influential brands in mind, including companies that wish to leverage their brand whilst complying with US law….

> Cantor's casino solution offers companies an alternative way to retain customer loyalty whilst also achieving multiple marketing benefits.  These are generated by the data that customers supply when opening a casino account including name, address, date of birth, and payment information.  Cantor Gaming will focus on delivering its casino solution to FHM, with Emap focusing on marketing the casino to FHM's readers and digital users through a programme of on and off-line promotions and unique FHM prizes.

81.     Following the launch of FHM Casino, in November 2006, Aristocrat Technologies, Inc. licensed slot game content to Cantor Gaming UK.  In December 2006, the Las Vegas Sands Corp. announced a planned partnership with Cantor Gaming UK to launch an online gaming website.  On or about November 29, 2007, Cantor Gaming UK signed an agreement with 24hPoker Holding AB (Sweden) to launch a Cantor Gaming UK-powered site on 24hNetwork and to add poker to www.pub-casino.co.uk, operated by Cantor Gaming UK and Punch Taverns, which operated in 9,000 pubs in the U.K.

**D.     THE DEFENDANTS CAUSE THE CIH ENTITIES TO RELINQUISH THEIR BUSINESSES AND ASSETS FOR NO OR NOMINAL CONSIDERATION**

82.     Despite the success of the CIH Entities and their business ventures, the Defendants, with Lutnick at the helm, determined to transfer the CIH Entities' businesses and

assets for no or only nominal compensation to the control of the Cantor Nevada Entities, in which neither the CIH Entities nor RGL held any ownership interest.  The formation and operation of the Cantor Nevada Entities are described below in Section E.

### 1.    The 2006 License Agreement

83.    For example, the Defendants caused the execution of a License Agreement, dated February 7, 2006 (the "**2006 License Agreement**") and attached as Exhibit B hereto, among Cantor Index LLC, a wholly-owned subsidiary of CIH, CFPH LLC and Cantor Nevada. The 2006 License Agreement granted Cantor Nevada a "non-exclusive, non-transferable, perpetual, worldwide, royalty-free right and license to certain patent and patent applications indicated as held by each … Party in the attached Schedule A…."  Schedule A to the 2006 License Agreement identified the following intellectual property of Cantor Index, LLC covered by the 2006 License Agreement:



84.    The Defendants caused Cantor Index LLC to enter into the 2006 License Agreement only days before Cantor Nevada filed its licensing application with the Nevada Gaming Commission (as described in greater detail below).

23

85.     Importantly, the 2006 License Agreement provides that consideration for the perpetual licenses would "be determined within a reasonable time hereafter pursuant to arms-length negotiations in good faith…."

86.     Yet, the License Agreement was executed on behalf of all the parties thereto by the <u>same</u> individual – Lutnick – in his capacity as chairman and chief executive officer of Cantor Nevada and in his capacity as chairman and chief executive officer of Cantor Index LLC.  Given the Defendants' control over both Cantor Index LLC and Cantor Nevada, arms-length negotiations were and are impossible.

87.     Indeed, upon information and belief, no good faith attempt to conduct arms-length negotiations has ever occurred, nor have Cantor Index or Cantor Nevada ever sought an independent appraisal to determine appropriate compensation.

88.     Upon information and belief, Cantor Index LLC has received <u>no</u> compensation for the perpetual licenses set forth in the 2006 License Agreement.

89.     Nevertheless, the licenses are valuable intellectual property of Cantor Index LLC.

90.     For example, an abstract for the patent titled ███████████████

███████████████



91.     In other words, upon information and belief, this patent underlies the highly valuable real-time betting technology.

92.     As indicated above, the 2006 License Agreement, which Plaintiff first learned of as a result of the Defendants' May 7, 2012 production of documents, resulted in the effective transfer of valuable technologies to an entity, Cantor Nevada, in which neither the CIH Entities nor RGL hold any ownership interest. By contrast, according to Cantor G&W's 2009 Application (defined below) with the UK's Gambling Commission, Defendant Lutnick holds an approximately 66% equity interest in Cantor Nevada, while Defendants Amaitis and Merkel hold 7.43% and 2.6% ownership interests, respectively.  Further, as noted above in Section A.3, all of the Individual Defendants have operated Cantor Nevada since at least 2004.

93.     The 2006 License Agreement is unfair, as a matter of price and process, to CIH and its wholly-owned subsidiary, Cantor Index LLC, and constituted a breach of fiduciary duty, conversion and waste.

### 2.      Cantor Index Closes Spreadfair

94.     With their focus changed to building Cantor Nevada's operations (as described in greater detail below at Section E) and the businesses of other Cantor Nevada Entities, the Defendants determined to begin shutting down many of the CIH Entities' valuable businesses, in addition to taking their businesses and assets.  On information and belief, these efforts served at least the dual purposes of bolstering the Cantor Nevada Entities' operations and eliminating certain of the Cantor Nevada Entities' competition in the gaming industry.

95.     At the end of February 2008, Cantor Index withdrew credit facilities from users of Spreadfair, and, the following month, managing director Dominic Crosthwaite abruptly left the company.

96.     Then, on November 30, 2008, Amaitis resigned from his position with Cantor in the UK and moved to Nevada to focus on Cantor Nevada's operations.

97.     On December 1, 2008, one day after Amaitis's resignation, and just one week after the Nevada Gaming Commission approved Cantor Nevada's mobile gaming system on November 24, 2008, Cantor Index closed Spreadfair.

98.     Indeed, Cantor Index's Report and Financial Statements for the fiscal year ended December 31, 2008, confirms that "the sports spread betting business [*i.e.*, Spreadfair] was discontinued" on December 1, 2008.

99.     According to one commentator in The Racing Post, "Cantor's recent success in getting the regulatory nod in Nevada for its handheld wireless casino gaming device EDeck ... was the final tolling of the bell" for Spreadfair.

100.    Similarly, on or about November 28, 2008, Cantor Gaming UK's CantorCasino.com was also closed.  Players were notified that, "[f]rom now on, Cantor's gaming interests will focus on wholesale markets with the licensing of its proprietary technology, software, content, intellectual property and data to online casino operators and resort-based casino operators, the latter following extensive trials and the authorities' approval of its eDeck mobile gaming device in Nevada.  As such, a decision has been taken to scale back retail-oriented gaming businesses in the United Kingdom and focus on core whole market operations around the world."

101.    Days later, Cantor Gaming UK's CantorPoker.com was also closed.

102.    The Defendants' termination of valuable businesses of the Cantor Entities' was unfair as a matter of process and price and constituted a breach of fiduciary duty, conversion and waste.

### 3.    Cantor Index's Profitable UK Businesses Are Sold For £1

103.    Next, the Defendants determined to take Cantor Index's profitable FFO betting business, by transferring it to Cantor G&W, a Cantor Nevada Entity, for only nominal consideration.   While neither the CIH Entities nor RGL hold any ownership interest in Cantor G&W, according to Cantor G&W's 2009 Application (defined below) with the UK's Gambling Commission, Lutnick holds an 89.97% equity interest in Cantor G&W, while Amaitis and Lutnick hold 7.43% and 2.6% ownership interests in the company, respectively.

104.    As described below, in connection with this scheme the Defendants caused Cantor G&W to file an application for a gambling license with UK authorities in late 2009, which clearly explained that Cantor G&W would be the successor to Cantor Index's FFO business as part of a purported corporate reorganization and that Cantor G&W needed a quick decision on its license application so that it could seamlessly take over operations by the time Cantor Index's license expired on January 29, 2010.  A few months later, to paper over this raid on Cantor Index's FFO business, the Defendants caused Cantor Index to enter into an asset purchase agreement with Cantor G&W for only £1.00 for the sale of Cantor Index's FFO business and assets to Cantor G&W, with a retroactive effective date of midnight on February 1, 2010.  Again, Plaintiff first learned of the asset purchase agreement in connection with the Defendants' April 13, 2012 production of documents.

      (a)      **A Cantor Nevada Entity Files A UK License Application As Part Of The Process Of Taking Cantor Index's Profitable FFO Business**

      105.    On November 19, 2009, Hammonds LLP, counsel to Cantor G&W, a direct subsidiary of Cantor Nevada, filed an "application for a non-remote gambling software license and a remote general betting license together with supporting documentation" (the "**2009 Application**") with the UK's Gambling Commission (the "**Gambling Commission**"). A copy of the 2009 Application is attached as Exhibit C hereto.

      106.    The cover letter to the 2009 Application explains:

Cantor G&W is a newly incorporated company. It is part of the Cantor Fitzgerald Group of companies, which is one of the largest financial institutions in the world. By way of background, a number of Cantor companies hold or have held gambling licenses both in the UK and other jurisdictions such as Nevada. Currently, for example, Cantor Index Ltd conducts betting business in the UK under license no. 02997.

The purpose of this application is as part of a corporate restructuring. Essentially, Cantor Index currently operates both fixed odds betting on financial indices and also spread betting (which is regulated by the FSA). It is proposed that the new company, Cantor G&W, will take over the Financial Fixed Odds operations of Cantor Index Ltd. Some staff and assets as well as the benefit of a contract with Ladbrokes will be transferred to Cantor G&W once it has its license – and it will essentially carry on the Financial Fixed Odds business conducted currently by Cantor Index. Equally, Cantor Index will surrender its license to offer fixed odds betting once Cantor G&W is operational. It is for this reason that we are able to give quite accurate predictions of the likely business streams of the new business.

The license currently held by Cantor Index Ltd is due to expire on 29 January 2010, ideally we would like the Cantor G&W license to be in place on or before this date….

      107.    Consistent with the cover letter to the 2009 Application, Cantor G&W's Business Plan enclosed in the 2009 Application further explains:

Recently, Cantor has decided to re-organi[z]e and consolidate its gambling-related businesses. The objective is to concentrate more resources in the USA (Nevada) and to focus more heavily on the development of software products for use in the gambling industry. As part of this re-organi[z]ation (relevant to the UK), it is

proposed that Cantor Index should cease to offer the FFO Product and that a new company, Cantor G&W Ltd should take over that responsibility."

The Business Plan states that, "[u]nder this new arrangement, Cantor G&W would offer its services to the end-user exclusively through partnerships with third parties holding a relevant gambling license."

108.    The Business Plan also emphasizes:

It should be recogni[z]ed that Cantor G&W is effectively taking over the business of Cantor Index…. Cantor Index operated not only through a partnership with Ladbrokes but also on its own account through the website www.cantorindex.com. Although the direct servicing of customers was discontinued at the end of 2008 [*i.e.*, with the closing of Spreadfair, as described above], all of the processes relating to customer identification and social responsibility remain in place, and the knowledge and experience of operating directly with customers remains within Cantor Index and can be deployed to ensure that business conducted through Cantor G&W's partners complies with the standards that the Commission would expect.

109.    The Business Plan further states:

Cantor Index intends to surrender its license as a general betting operator and for the business which it currently conducts in relation to Fixed Odds products to be transferred to Cantor G&W. Cantor G&W will remain within the Cantor Group of companies but will be solely responsible for its UK gambling activities. Cantor Index will continue to offer spread betting under the regulatory regime run by the Financial Services Authority.

\* \* \*

**It should be stressed that although this will be a new license application, it arises essentially from a corporate re-organi[z]ation rather than from any fundamental shift in the business being conducted. Consequently, many of the details (in terms of the software used, the management and staff of the company and so on) will be the same as applied in the period during which the service was offered by Cantor Index.** [Bolding in original.]

110.    Another form included with the 2009 Application expressly provides: "The software which will be used to provide the services is **<u>identical</u>** to the software currently used by Cantor Index Limited under license number 002997, the plans for technical compliance are as set out in the application for license 002997." (Emphasis added.)

29

111. In other words, as the 2009 Application materials make clear, Cantor had determined to transfer **in its entirety** Cantor Index's profitable FFO business and related assets and employees to Cantor G&W, a Cantor Nevada Entity in which neither the CIH Entities nor RGL hold any ownership interest.

112. In addition, the Business Plan states that "[t]he historic trading risk for the provider of financial fixed odds wagers is very low" and sets forth the following "conservative" revenue forecasts for the FFO business:

| 2009 | FINANCIAL FIXED ODDS | TOTAL |
|---|---|---|
| September 2009 | £93,018 | £1,555,444 |
| October 2009 | £105,493 | £1,764,101 |
| November 2009 | £98,687 | £1,650,288 |
| December 2009 | £82,807 | £1,384,724 |
| Total: | £380,003 | £6,354,556 |

| 2010 | FINANCIAL FIXED ODDS | TOTAL |
|---|---|---|
| January 2010 | £71,084 | £1,188,703 |
| February 2010 | £87,017 | £1,455,137 |
| March 2010 | £117,657 | £1,987,509 |
| April 2010 | £94,371 | £1,578,109 |
| May 2010 | £107,852 | £1,803,550 |
| June 2010 | £109,078 | £1,824,045 |
| July 2010 | £102,950 | £1,721,570 |
| August 2010 | £125,011 | £2,090,478 |
| September 2010 | £100,490 | £1,680,581 |
| October 2010 | £113,980 | £1,906,024 |
| November 2010 | £106,677 | £1,783,055 |
| December 2010 | £89,466 | £1,496,127 |
| Total: | £1,225,594 | £20,404,886 |

113. Given the foregoing, Cantor Index's FFO business, assets and employees were very valuable, and the Defendants expected substantial revenues as a result over the subsequent years.

114.    The UK Gambling Commission ultimately granted Cantor G&W's its requested license.

115.    The Form S-1/A confirms that Cantor G&W now "holds both a Remote Gambling Operator's License and a Gambling Software License from the Gambling Commission." The Form S-1/A explains that, as a result of the licenses, Cantor G&W "can offer FFO online in the United Kingdom as bookmaker and that we can also white label FFO to other bookmakers in the United Kingdom to offer to their customers." Notably, the Form S-1/A also provides that "[o]ur white label arrangements in Gibraltar with 32 Red, PartyGaming and Victor Chandler do not require us to be licensed in the United Kingdom."

> **(b)    The Defendants Cause Cantor Index To Sell Its FFO Business And Assets And Transfer Its Key Employees To Cantor G&W For Only £1.00**

116.    On or about April 30, 2010, Cantor Index and Cantor G&W, a wholly-owned subsidiary of Cantor Nevada, entered into an Asset Purchase Agreement (the "**FFO APA**"), with an "Effective Time" of "midnight on 1 February 2010." A copy of the FFO APA is attached as Exhibit D hereto. Amaitis, in his capacity as Director of Cantor G&W, executed the FFO APA.

117.    Pursuant to the FFO APA, Cantor Index sold its FFO business as a going concern, including all of the relevant customer lists, intellectual property, goodwill, and other assets, and then transferred its key employees, to Cantor G&W.

118.    Among other things, the FFO APA provides:

Unless expressly provided in this agreement, [Cantor Index] shall sell with full title guarantee, and [Cantor G&W], with a view to carrying on the Business as a going concern, shall purchase free from all Encumbrances and with effect from the Effective Time:

     (a)    the Business and Assets;[2]

     (b)    the Goodwill;

     (c)    the Records;[3]

     (d)    all (if any) of the other assets, property or rights of [Cantor Index] relating to or connected with, or belonging to or required or intended for use in, the Business.

119.    The FFO APA also provides that the Cantor Index's "Employees" "shall be transferred to [Cantor G&W] … with effect from the Effective Time."

120.    The "Employees" transferred to Cantor G&W pursuant to the FFO APA were critical employees of Cantor Index.  For example, the list of "Employees" includes David Puckeridge, who Cantor G&W's Business Plan describes as having been "responsible for the IT and software development of the FFO Product with Cantor Index…."  The Business Plan also explains that Puckeridge was "a part of the Cantor Index FSA-regulated spread-betting system development team, and since 2004 he has managed the development of the Cantor Financial Fixed Odds (FFO) betting system."  The Business Plan provides that Puckeridge "will move his responsibilities to Cantor G&W" and the FFO APA made good on that promise.

121.    As consideration to Cantor Index for entering into the FFO APA and thereby selling its valuable FFO business and transferring its key employees, Cantor G&W paid nominal consideration of only £1.00.

---

[2] The FFO APA defines "Business" as "the financial fixed odds betting business carried on by [Cantor Index] at the Effective Time."  The FFO APA defines "Assets" as "the property, rights and assets of [Cantor Index] that comprise the Business including the Goodwill, Business Intellectual Property Rights, Book Debts, the IT System and the Contracts."

[3] The FFO APA defines "Records" as "the books, accounts, lists of Customers and suppliers and all the other documents, papers and records relating to the Business or any of the Assets."

122.    Also, confirming that the FFO APA was intended to effectuate the purported "re-organi[z]ation" described in the 2009 Application, the midnight on February 1, 2010 "Effective Time" for the FFO APA corresponds precisely with the January 29, 2010 expiration date for Cantor Index's UK Gambling Commission license, as stated in the cover letter to the 2009 Application discussed above.[4]

123.    Moreover, the Form S-1/A confirms that the Defendants were behind the FFO APA's unfair transfer.  The Form S-1/A provides that Cantor Nevada "acquired, through entities under common control, Cantor [G&W] … when it was contributed by Cantor [LP] to us from Cantor Index, Limited" on April 30, 2010, with an effective date of February 1, 2010.  (Emphasis added.)

124.    The FFO APA is unfair, as a matter of price and process, to CIH and its wholly-owned subsidiary, Cantor Index, and constituted a breach of fiduciary duties, conversion and waste.

**4.    The Defendants Transfer Out The Remainder Of Cantor Index's Trading Activity**

125.    Finally, to complete the process of gutting Cantor Index's profitable businesses, Cantor Index disclosed in its annual report and financial statements for the fiscal year ended December 31, 2010, that "[m]anagement of [Cantor Index] has conducted a review of its activities and has commenced a project to transfer all the trading activity of [Cantor Index] to Cantor Fitzgerald Europe.  It is intended that the transfer will be completed by the end of the second quarter of 2011.  [Cantor Index] will retain an economic interest in the trading activity transferred."

---

[4] Cantor Index's report to the UK's Financial Services Authority for the fiscal year ended December 31, 2010, also confirms that Cantor Index's "[FFO] business was transferred to Cantor [G&W] (a related company) on 1 February 2010."

126.    Upon information and belief, the retained economic interest referenced above is relatively nominal, constituting a 1% interest in Cantor Fitzgerald Services, LLP.

127.    By contrast, Cantor Fitzgerald Europe, in which RGL has no ownership interest, owns the other 99% interest in Cantor Fitzgerald Services, LLP.

128.    The foregoing transfer of Cantor Index's trading activity is unfair, as a matter of price and process, to CIH and its wholly-owned subsidiary, Cantor Index, and constituted a breach of fiduciary duties, conversion and waste.

**5.    The Defendants Again Cause Cantor Index LLC To License Its Intellectual Property For No Consideration**

129.    Similar to the 2006 License Agreement, the Defendants again in 2011, caused CIH's subsidiary Cantor Index LLC to license its intellectual property for no consideration.

130.    Amaitis, as Executive Managing Director of CIH's subsidiary Cantor Index LLC and as chief executive officer of Cantor Nevada, executed a License Agreement, dated June 23, 2011, between Cantor Index LLC, Cantor G&W (Nevada), L.P., and Shuffle Master, Inc. (the "**2011 License Agreement**").  A copy of the 2011 License Agreement is attached as Exhibit E hereto.

131.    The 2011 License Agreement licenses to Shuffle Master, Inc. certain "▆▆▆ ▆▆▆ Patents" owned by Cantor Index, which are listed on the following Schedule C to the 2011 License Agreement:



132.    The 2011 License Agreement also provides that ████████████████
████████████████████████████

133.    Importantly, the 2011 License Agreement provides that royalties and fees derived from this license of Cantor Index LLC's intellectual property are to be paid to Cantor Nevada, and not to Cantor Index LLC.

134.    The 2011 License Agreement does not specify any payment to, or right to payment for, Cantor Index LLC.

135.    Upon information and belief, no payment has been made to Cantor Index LLC for the license of its intellectual property under the 2011 License Agreement.

136.    As noted above, neither the CIH Entities nor RGL hold any ownership interest in Cantor Nevada, while all of the Individual Defendants own and operate Cantor Nevada.

137.    Thus, Cantor Nevada and the Individual Defendants unfairly appropriated for their own benefit revenues and/or the right to receive revenues that should be and/or have been paid to Cantor Index LLC.

138.    The 2011 License Agreement is unfair, as a matter of price and process, to CIH and its wholly-owned subsidiary, Cantor Index LLC, and constituted a breach of fiduciary duties, conversion, and waste.

### E.    THE CANTOR NEVADA ENTITIES

#### 1.    Cantor Forms Cantor Nevada And Obtains A Change In Nevada Law To Allow For Mobile Gambling

139.    On or about November 12, 2004, Cantor formed Cantor Nevada to operate a business that would, among other things, provide mobile betting, including sports betting, to casinos using hand-held gaming devices.  As part of its business model, Cantor Nevada would supply the central server system and devices.

140.    Cantor LP was intimately involved in Cantor Nevada from the very beginning. Shortly after Cantor Nevada's formation, Cantor LP purported to license, by an agreement dated December 8, 2004, certain mobile gaming technology to Cantor Nevada, and provided Cantor Nevada with a large line of credit to begin operations.  On or about December 8, 2004, Cantor Nevada executed a demand promissory note line of credit in favor of Cantor LP (the "**Cantor Note**"), which, as of September 30, 2011, was up to $144.4 million.  The Cantor Note is payable upon demand of Cantor LP as lender.

141.    At the time of Cantor Nevada's formation, Nevada law did not allow for mobile betting using hand-held devices in casinos.  As a result, Cantor conducted a lobbying effort in Nevada to permit mobile betting through handheld devices.

142.    Unbeknownst to Plaintiff, but as has been reported by Bloomberg Markets Magazine, "[b]y 2005, …, Amaitis began laying the groundwork for Cantor's move to [Las Vegas].  He hired one of the state's top gambling lobbyists, Bob Faiss, to write and push a bill through the Nevada legislature to allow mobile wagering."

143.    Indeed, on May 11, 2005, Bob Faiss, representing Cantor Nevada before the Nevada Assembly Judiciary Committee, stated that Cantor Nevada is "an affiliate of Cantor Fitzgerald LP," which "heralded the legislative action that puts Nevada on the way to apparently becoming the first state to allow wireless gambling."

144.    On or about May 3, 2006, Joe Asher ("**Asher**"), who was at all relevant times managing director of Cantor Nevada, recalled the lobbying effort by Cantor and stated that "we went through the process of sitting with the gaming board, drafting a bill with our attorneys, then moving the bill through the Legislature."

145.    Following these lobbying efforts, in June 2005, the Nevada Gaming Control Act was amended to allow for mobile gaming in Casinos using handheld devices.  However, the Nevada Gaming Control Board (the **"Gaming Control Board"**) still needed to issue appropriate regulations.

146.    In March 2006, the Gaming Control Board approved regulations governing mobile gaming in Nevada.  Cantor Nevada wasted no time getting licensed, filing its application shortly thereafter.

147.    On May 3, 2006, the Gaming Control Board recommended the approval of Cantor Nevada's mobile gaming license application.

148.    On May 18, 2006, Cantor Nevada and several "key" executives were granted the first ever licenses as a manufacturer, distributor and operator of mobile gaming systems by the Nevada Gaming Commission.

**2.      Cantor Nevada Operates Mobile Gambling In Nevada Casinos**

149.    On May 25, 2006, just a week after Cantor Nevada received its mobile gaming license, the Las Vegas Sands Corp. announced that it had entered a long-term agreement with Cantor Nevada for the provision of handheld gaming machines at the

Venetian Resort Hotel Casino (the **"Venetian"**) and the Palazzo Resort Hotel Casino (the **"Palazzo"**), then under construction.

150.    By February 2007, a Cantor Nevada mobile gaming system, including the eDeck portable gaming device ("**eDeck**"), was being tested at the Venetian.   In April 2008, Cantor Nevada began mobile gaming field trials at the Venetian and the Palazzo.

151.    On July 7, 2008, owners of the M Resort Spa Casino ("**M Resort**"), announced a deal by which Cantor Nevada would provide mobile gaming and operate a sports book when the resort opened in early 2009.

152.    On November 24, 2008, following extensive testing at the Venetian, Cantor Nevada announced that it had received approval from the Nevada Gaming Commission, on recommendation from the Gaming Control Board, to begin operating mobile gaming systems, and specifically eDeck, in Nevada.

153.    On March 1, 2009, Cantor Nevada commenced race and sports operations at M Resort.

154.    On March 21, 2009, In-Running wagers became available to guests at M Resort.  Cantor has explained that In-Running "is wagering on an event where the odds change dynamically based upon changes that occur within the sporting event and where the player can wager multiple times on events during the course of the event."  For example, In-Running, like Cantor Index's Spread Betting and Spreadfair, allows customers to bet on particular plays after a sporting event has begun, as opposed to betting only on the outcome of the event.  According to Cantor Nevada's Chief Technology Officer, Sunny Tara, in explaining wagering related to U.S. football games, "[o]ur patrons will have the opportunity to place wagers on the money line, point spread, totals for both the entire game and the first

half, as well as other proposition bets such as whether the next play yields 20 yards or a drive has another first down."

155.    In addition to M Resort, In-Running was then made available at the Venetian and Palazzo for the 2009 NFL season.

156.    By January 2010, mobile gaming generated approximately 75 percent of Cantor Nevada's revenue.

157.    Indeed, a 2010 article in Wired Magazine, reported that Amaitis "anticipate[d] that Cantor Gaming will control 15 percent of Nevada's sports betting this year.  Judging by 2009's numbers, that would make for about $375 million in bets taken."  The article also reported that, "[b]y 2012, Amaitis predicts, his company's revenue will be $20 million."

158.    In February 2011, Cantor Nevada opened sports books at the Hard Rock Hotel & Casino and the Tropicana Las Vegas.  In March 2011, Cantor Nevada opened the Cosmopolitan Race and Sports Book at the Cosmopolitan of Las Vegas.  In November 2011, Cantor Nevada opened a sports book at the Venetian.

### 3.    The Defendants Seek To Capitalize On Their Nevada Business Through An Initial Public Offering

159.    Having rapidly grown Cantor Nevada's business based on the CIH Entities' businesses and assets (including the CIH Entities' technology), the Defendants now appear to be seeking to capitalize on this growth by pursuing an IPO of Cantor Entertainment.

160.    Cantor Entertainment was incorporated in Delaware on November 10, 2011. On December 22, 2011, Cantor Entertainment filed a Form S-1 with the SEC in contemplation of its IPO.

161.    On February 14, 2012, Cantor Entertainment filed the Form S-1/A with the SEC.

162.     The Form S-1/A provides that, in connection with the completion of the IPO, Cantor Nevada will be contributed to Cantor Entertainment as its operating subsidiary.

163.     Additionally, upon information and belief, if the IPO is successful, it will result in a cash infusion to Defendants of approximately $100 million.  This would result in a substantial gain to Cantor, as well as Lutnick and Amaitis.  Indeed, according to the Form S-1/A, Lutnick will control Cantor Entertainment and serve as its Chairman.  Further, Amaitis will serve as President, CEO, and Director of Cantor Entertainment, while Merkel will serve as Executive Vice President, Chief Legal Officer, General Counsel, Secretary and Director of the company.

164.     The Form S-1/A explains that, as a result of the technology underpinning the businesses, Cantor Entertainment and Cantor Nevada believe they will have a substantial first-mover advantage over potential competitors and that there are substantial barriers to entry by any potential competitors.

165.     For example, the Form S-1/A provides that, "[d]ue to the significant historical capital investment in our technology platform and our leadership position within the industry, we believe substantial barriers to entry and brand equity have been created."

166.     The Form S-1/A also confirms that "[o]ur patents, trademarks, copyrights and other intellectual property rights are a significant asset.  We rely on the strength of our intellectual property portfolio in the development and commercialization of our products."

167.     With respect to FFO betting, the Form S-1/A provides that, "[t]hrough [Cantor Nevada's] subsidiary, Cantor [G&W], [Cantor Nevada] operates a financial fixed odds betting product…."

168.     With respect to mobile gaming, the Form S-1/A states:

We offer a complete mobile gaming solution, including a proprietary wireless gaming system, full back-office infrastructure and a portfolio of casino games. Players have the ability, with our mobile gaming technology, to play in all authorized areas of a property, including our race and sports books, and private areas such as pools, restaurants and lounges.

169.    Regarding the rapid growth of the mobile gaming market, the Form S-1/A

provides:

According to Juniper Research, the mobile entertainment industry, of which mobile gaming is a subset, was worth $33 billion in 2010 and is expected to be worth $54 billion in 2015. The mobile gaming industry is expected to make $8 billion in 2011 according to an article on Fool.com and will be earning $11.4 billion in 2014 according to Gartner, Inc. The biggest reason for the growth in these markets is the "rapid proliferation and quick adoption" of mobile devices such as smartphones and tablets. Casino Enterprise Management, in an article published February 1, 2011, indicated "….mobile gaming will change the gaming industry by adding convenience and a whole new spectrum to the industry. Mobile gaming is here today and is going to proliferate inside of casinos."

* * *

Adoption of mobile gaming is expected to be driven by the following trend:

*Rising use of mobile devices.* Tablet computers and smartphones provide a convenient, simple platform for users to play games. Goldman Sachs Equity Research estimates that tablet sales increased from $17.8 billion in 2010 to $51.2 billion in 2011 and are expected to increase further to $71.4 billion in 2012. Mobile gaming continues to grow driven by the rapid proliferation of smartphones and smartphones and tablets. According to BMO Equity Research, Apple has sold more than 250 million iOS devices and its online multiplayer social GameCenter platform has 67 million registered players while Google has activated more than 190 million Android devices globally. Games are the largest category of apps on tablets and smartphones and mobile gaming allows publishers to reach a wide global audience. Additionally, casino-style games rank in the top 5 top grossing iPhone games and top 20 for iPad games in the U.S., Canada, United Kingdom, and Germany.

170.    The Form S-1/A also states that, "[i]n addition to our current business in the

United Kingdom, we plan to further expand our operations throughout Europe, Asia and

elsewhere in the future."

41

171.    As set forth in the Form S-1/A, it is contemplated that Lutnick and his Trust will hold the only voting securities of Cantor Entertainment following the IPO, with the Class A common stock being offered through IPO having no voting rights unless required by law.

### F.    CANTOR ADMITS THAT CANTOR NEVADA'S BUSINESS IS BASED ON TECHNOLOGY DEVELOPED BY, AND TAKEN FROM, THE CIH ENTITIES

172.    Incredibly, Cantor Nevada has not even tried to hide that its business is based on technology developed by the CIH Entities.  For example, they have admitted repeatedly that their mobile technology was developed by Cantor Index.  On May 11, 2005, in connection with Cantor's lobbying efforts in Nevada, Cantor Nevada's managing director Asher testified before the Nevada Senate Judiciary Committee that, "[i]n September 2003, Cantor Index rolled out the first real-time mobile trading device anywhere in the world.  We call it Cantor Mobile and it now represents a significant percentage of all of Cantor Index's trading. … Having successfully deployed mobile technology, we are aggressively seeking to expand the areas in which we offer it.  And, that is what brings me before you today."

173.    On or about July 2, 2005, Cantor Nevada's managing director Asher admitted to the New York Times that, "[i]n 2003, Cantor's company in London introduced the first hand-held device that allows for wireless gambling in casinos in Britain....  'Since we spent a tremendous amount of money developing the technology, we were looking for other new applications, and so we approached Nevada.'"

174.    Similarly, on or about November 28, 2005, Asher stated that Cantor first introduced wireless gaming on hand-held devices in Great Britain in 2003.

175.    On or about May 4, 2006, the Las Vegas Review-Journal, after interviewing Lutnick, and again on May 25, 2006, after interviewing Amaitis, reported that Cantor "has supplied similar hand-held gaming devices for use in the United Kingdom."

176.    On or about October 1, 2008, Amaitis told the Casino Journal that betting during sporting events, Cantor Nevada's In-Running betting, was a service that Cantor had been offering as a licensed bookmaker in the U.K. for seven years.  Upon information and belief, the only licensed bookmaker affiliate of Cantor in the U.K. during that time period was CIH's subsidiary [Cantor Index].

177.    On or about June 1, 2009, Anthony Marnell, III, the chief executive officer of M Resort, told American Executive that Cantor has been using the software for In-Running betting for years in Europe.

178.    On or about December 28, 2009, Amaitis admitted to the New York Times that eDeck's "algorithms are variations of those created by a sister company, Cantor Index…."

179.    A November 1, 2010 article in Wired Magazine explains in detail the origins of critical components of the technology on which the Cantor Nevada Entities are relying.  Among other things, the article provides that Cantor's Nevada operations rely in significant part on a program called "Midas."  The article explains:

> Cantor has generated a lot of buzz with the original technology behind its sports book operation, especially the eDeck tablets—touchscreen wireless devices that can be used to bet from anywhere in the casino.  But the cornerstone of the operation is a piece of number-crunching software called Midas.  It functions like the predictive computer programs that Amaitis dealt with on Wall Street: Midas acquires information, processes it, finds mathematical patterns and correlations, and uses all of that to divine the ever-shifting odds of sporting events.

180.    The 2010 Wired Magazine article further explains that Midas was developed in part by Andrew Garrood.

43

181.    Notably, Garrood is listed in the Business Plan accompanying the 2009 Application as "the Managing Director of Cantor Index…."  The Business Plan also confirms that, "[p]rior to his role as Managing Director of Cantor Index, [he] was a proprietary interest rate derivatives trader for a number of investment banks with positions both in London and European financial cent[er]s."

182.    The 2010 Wired Magazine Article states:

By March 2000, [Garrood] was on the Cantor payroll.  Garrood was tasked with gathering the data and creating software that could calculate the in-running odds for an online sports-wagering operation.  He developed the algorithms, and an IT team turned them into code.  In 2004, the UK site Cantor Spreadfair was launched.  It was a peer-to-peer sports gambling site, allowing users to set their own bets, which would be taken by other players (or by Cantor).  The site allowed for spread betting, a volatile form of gambling in which the payoffs are based on how closely you predict the final point difference between two teams.  They also set up a site called Cantor Index for "financial fixed odds"—allowing people to bet on the moment-to-moment changes in the stock market—as well as financial spread betting.

183.    In other words, Garrood, as an employee of one or more CIH Entities, and his IT team developed key technology underpinning Spreadfair and Cantor Index's FFO business.

184.    The Wired Magazine article provides that Amaitis viewed the CIH Entities' success as "a proof of concept" and "used it to pitch Vegas casinos on the prospect of allowing him to lease their sports books and introduce in-running to American gamblers."  The article also reports that Amaitis "presented his UK setup to the Nevada Gaming Control Board as evidence that the wireless component of his master plan was sound and secure.  'When we applied for our gaming license, Nevada tried cracking into our UK system a couple hundred times,' Amaitis says.  'They bounced in from IP addresses in the States and off of other IP addresses around the world.  We always blocked them.'"

185.   The article further reports that Garrood "[w]ork[ed] out of a skyscraper in the Canary Wharf business district of London and found that he was able to port some elements of Cantor's British betting site into the nascent Midas," while using historical data on American sporting events as the inputs.  Given that "Americans wouldn't want to bet on rugby or cricket," the article quotes Garrood as stating: "**I had the perfect sauce recipe**, … but I need different ingredients."  (Emphasis added.)  The article reports that the historical sports data was provided through Cantor's purchase of Las Vegas Sports Consultants, whose "archive forms the bulk of the content that Midas analyzes."

186.   The 2010 Wired Magazine article additionally reports that "the final step of Midas' development was overseen by Cantor's CTO, Sunny Tara…."  The article quotes Tara as explaining: "The computer gets the info, the algorithm churns millions of combinations of calculations, it feeds out a price, and that gets displayed on the customer's terminal in just a few milliseconds…."  The article reports that this "was a logistical nightmare."  However, "'[t]he challenge was to do multiple games, simultaneously, with different rules and criteria and various inputs,' Tara says.  'Yet it's the same Midas doing all of them at the same time.  The code had to accommodate apples and oranges.  **But we were able to leverage what Andrew [Garrood] already had in England and what Cantor already had for its financial markets**.'"  (Emphasis added.)

187.   The article also reports: "[U]ltimately, the company is thinking beyond casinos, beyond Vegas, and beyond sports betting.  Someday soon, Amaitis hopes, Cantor will take bets on just about anything that a price can be attached to, and it will take them from just about anywhere in Nevada."  Indeed, the article reports that "Cantor Gaming is also

laying the groundwork to allow gamblers at its sports books to wager on movements within the stock market, **just like the Cantor Index in the UK**." (Emphasis added.)

188.   On or about November 11, 2011, Amaitis told Global Gaming Business during a recorded podcast that the mobile technology of Cantor Nevada originated in Cantor Index:

> So we had the bank as a client and then we have the traders as a client or – or other people within the bank as a client that want to take a - a bet, let's say, on the movement of an indice – the Dow Jones, the FTSE or whatever, you know ... And – and that is – that was done in Cantor Index.  Now, in order to make Cantor Index more, um, interesting we decided that we thought it was a good idea to start investing in mobile technology ... and we thought that the world would actually move to be out of the office sort of access ... So we spent years of development on mobile technology, which was – which was well ahead of its time for the wholesale market industry and that started the underpinning of the application here in Nevada.

189.   Amaitis also specifically referenced prior race and sports betting as something "we've been doing ... in the U.K."  In fact, he admitted that when Cantor came to Nevada, the technology already existed:

> five years ago when we came to Nevada to actually, uh, introduce the idea of mobile gaming ... It was with a much broader stroke than where we are today ... I mean we were – we were a little bit more ambitious in what we could actually do in terms of – although the technology existed ... the regulations didn't exist.

190.   Amaitis went on to say that the on-line gaming component in the U.K., referring to Cantor Gaming UK's business, was "sort of a test bed for our games and the popularity of games that we have created."  As for the FFO business, Amaitis said that Cantor Nevada would be able to build on business already done in the UK:  "Because what we've been able to do is build off of that investment in the UK...."

191.    Indeed, as described above, the software employed by Cantor G&W (a Cantor Nevada Entity) for providing FFO betting services was "identical" to the software previously used by Cantor Index (a CIH Entity) for its FFO betting business, until Cantor G&W took over that business from Cantor Index for only nominal consideration.

**G.    THE DEFENDANTS UNFAIRLY INCREASED FEES PAID TO CANTOR AFFILIATES**

192.    Not only did the Defendants strip the CIH Entities of profitable businesses and assets as described above, they also caused Cantor Index – the wholly-owned subsidiary through which CIH operated successful gambling ventures – to pay exorbitant sums to Cantor affiliates through a series of related party transactions and agreements.  As a result, what revenues CIH and Cantor Index did accrue were drastically reduced by unfair fees.

193.    For example, from 2003 to 2006, Cantor Index's revenues more than doubled, growing from $35 million in 2003 to $76.4 million in 2006.  However, over that same period, amounts paid by Cantor Index to Cantor affiliates quadrupled, growing from $9.3 million in 2003 to $38.3 million in 2006 – more than 50% of Cantor Index's total revenues that year.

194.    Even as Defendants began to transfer CIH's and Cantor Index's operations out of CIH, Defendants allowed Cantor affiliates to continue looting the company through related-party fees.  Indeed, from 2006 through 2007, Cantor Index's revenues declined by more than $15 million from $76.4 million to $59.9 million. Yet, over this same period, amounts charged to Cantor Index by Cantor Fitzgerald Europe *increased* by more than $10 million, doubling as a percentage of total Cantor Index revenue.  Similarly, and even more astoundingly, total amounts paid by Cantor Index to Cantor affiliates increased to a staggering $54.4 million, or **more than 91% of Cantor Index's 2007 revenue**.

195.    Accordingly, related-party fees did not increase merely because business in general increased or because the business became more profitable.  Instead, the hyper-

inflation of these fees was without correlation to any revenue-producing business of CIH or Cantor Index.

196.    Upon information and belief, these increases in related-party transactions were unfair, as a matter of price and process, to the CIH Entities and constituted a breach of fiduciary duties, conversion and waste.

## PLAINTIFF'S CLAIMS ARE TIMELY

197.    The Defendants hid from Plaintiff or otherwise improperly failed to disclose the facts relating to the theft of the CIH businesses.  Plaintiff first learned of the theft of the CIH businesses when they obtained information regarding the "Affiliate Transactions" as a result of Rule 2004 discovery in connection with Refco Inc's and Plaintiff's bankruptcy proceedings before this Court.  As used herein, the "**Affiliate Transactions**" refers to the (i) use of the CIH Entities' intellectual property, including technology and patents, for the benefit of the Cantor Nevada Entities, (ii) the 2006 License Agreement, (iii) the closing of Spreadfair to benefit the Cantor Nevada Entities, (iv) the taking of Cantor Index's FFO business and assets, including through the 2009 Application and the FFO APA, (v) the transfer of Cantor Index's remaining trading activity to Cantor Fitzgerald Europe, (vi) the 2011 License Agreement, (vii) the payment of unfair related-party fees, all as described herein, and any transactions relating to any of the foregoing.

198.    In particular, Plaintiff first learned of the Affiliate Transactions as a result of Rule 2004 document production that occurred in 2012.  Prior to such production, Plaintiff was not provided the necessary documents that could have reasonably placed Plaintiff on notice of such conduct.

199.    Upon information and belief, Defendants hid these matters from Plaintiff or otherwise improperly failed to disclose these matters to Plaintiff.

200.    Indeed, Cantor improperly failed to provide information to which Plaintiff was entitled under the Partnership Agreement.   Under Section 9.02 of the Partnership Agreement, Cantor was required to provide Plaintiff, *inter alia*, "a monthly report of business activity (including revenues), a quarterly unaudited profit and loss statement . . . [and] audited annual financial statements[.]"  Cantor failed to provide this information to Plaintiff. Additionally, under Section 3.07 of the Partnership Agreement, Cantor was required to form a management committee ("Management Committee"), which was to meet quarterly and include a member of RGL.  Cantor, however, failed to form the Management Committee or hold the required quarterly meetings.

201.    As a result, on July 7, 2010, Plaintiff served CFS and CIH with a notice of inspection (the "**Inspection Notice**") of CIH's books and records pursuant to Section 9.01 of the Partnership Agreement and a notice (the "**Demand Notice**") demand production of documents in accordance with Section 9.02 of the Partnership Agreement and Section 17-305(a) of the Delaware Revised Uniform Limited Partnership Act (the "**LP Act**"). Thereafter, as a result of CIH's longstanding refusals to produce requested documents, and the specific refusals to produce or permit inspection of any documents in response to the Inspection Notice and the Demand Notice, on August 30, 2010, Plaintiff commenced an adversary proceeding by filing a complaint against CIH and its other partners in this Court, Adv. Proc. No. 10-03527, in which Plaintiff expressly sought the production of audited financial statements and other documents including those requested in the Demand Notice. In May 2011, Plaintiff obtained summary judgment in the adversary proceeding directing that Plaintiff be provided audited annual financial statements as soon as practicable for the years 2003 onward.   However, Plaintiff's efforts to obtain those materials are ongoing.

Indeed, Plaintiff previously sought the Court's assistance with negotiations over an appropriate auditor for CIH.  Yet, only recently has Cantor agreed to direct work on the audits to commence.

## DERIVATIVE ALLEGATIONS

202.    In addition to Plaintiff's direct causes of action, Plaintiff brings this action derivatively to redress injuries suffered by CIH as a result of improper conduct, including breaches of fiduciary duties, by the Defendants.

203.    RGL has owned limited partnership interests in CIH continuously during the time of the wrongful course of conduct by Defendants alleged herein and continues to own limited partnership interests in CIH.

204.    Plaintiff will adequately and fairly represent the interests of CIH in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

205.    This action is not a collusive one designed to confer jurisdiction upon this Court that it would otherwise lack.

## DEMAND IS EXCUSED AS FUTILE

206.    Plaintiff has not made demand on CIH or its general partner to bring suit asserting the claims set forth herein because pre-suit demand was excused as a matter of law.

207.    First, the conduct challenged herein are plainly interested transactions and, as alleged above, are not entirely fair to CIH – in terms of both price and process.  Because such conduct is not entirely fair to CIH, it cannot be deemed a valid exercise of business judgment and demand is excused as a matter of law.

208.   Second, as of the date of the filing of this complaint, CIH's general partner is CIHLLC.  CIHLLC suffers from conflicts of interest and divided loyalties that preclude it from exercising independent business judgment.

209.   Pursuant to the Partnership Agreement, "[e]xcept as provided by the [LP] Act or in this [Partnership] Agreement, the General Partner shall have the sole power to make management decisions on behalf of [CIH] and to exercise the powers set forth in Section 3.02 [of the Partnership Agreement]."  Such powers include the power to commence litigation by CIH.

210.   However, CIHLLC is controlled by Lutnick, who was interested in the conduct challenged herein and who faces a substantial threat of liability as a result of the conduct described herein.  Indeed, Lutnick (i) controls the Defendants, (ii) executed one or more of the agreements challenged herein on behalf of the CIH Entities and the Cantor Nevada Entities, and (iii) clearly stood to gain from the transfer of businesses and assets of the CIH Entities to the Cantor Nevada Entities (which he controls), including through the planned IPO of Cantor Entertainment.

211.   In addition, Amaitis and Merkel, along with other employees of Cantor, acted in concert with Lutnick or at Lutnick's direction in effecting the conduct challenged herein.

212.   As such, CIHLLC cannot independently and disinterestedly consider demand.

213.   Under these circumstances, CIHLLC cannot be expected to bring the claims asserted herein, and the actions challenged herein are not protected from judicial scrutiny. Demand is therefore excused.

### CIHLLC'S CONDUCT IS NOT EXCULPATED

214.   The liability of CIHLLC is not exculpated since, *inter alia*, its conduct (i) is attributable to CIHLLC's willful misconduct, gross negligence and/or breach of duty, (ii) was

the result of active and deliberate dishonesty, and/or (iii) was clearly outside the scope of authority granted to CIHLLC under the Partnership Agreement or any other agreement to which CIHLLC was a party in its capacity as general partner of CIH.  Furthermore, upon information and belief, CIHLLC's acts or omissions were not done in reliance upon the opinion of independent legal counsel or public accountant selected with the exercise of reasonable care by CIHLLC on behalf of CIH.

## COUNT I
## (BREACH OF FIDUCIARY DUTY AGAINST CIHLLC, LUTNICK, MERKEL AND AMAITIS)

215.    Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

216.    As general partner of CIH, CIHLLC owed CIH fiduciary duties of good faith, care and loyalty.

217.    As officers and/or directors of one or more CIH Entities, Lutnick, Merkel, and Amaitis owed the CIH Entities fiduciary duties of good faith, care and loyalty.

218.    The Affiliate Transactions siphoned businesses and assets away from CIH and the other CIH Entities for no or nominal consideration.

219.    The Affiliate Transactions were not entirely fair, as a matter of both process and price, to CIH and the other CIH Entities and favored the Defendants at the expense of CIH and the other CIH Entities.  Under the circumstances, CIHLLC, Lutnick, Merkel and Amaitis did not act in the interests of CIH and the other CIH Entities, even though they knew or were reckless in not knowing that their conduct would result in harm to CIH and the other CIH Entities.  At a minimum, they were willfully blind to the foreseeable harm of the Affiliate Transactions, and acted grossly negligently and/or recklessly in approving and/or

facilitating transactions that drained CIH and the other CIH Entities of their valuable property.

220.    CIHLLC, Lutnick, Merkel and Amaitis failed to exercise the necessary care and breached their respective duties of good faith, care and loyalty.

221.    CIHLLC, Lutnick, Merkel and Amaitis are not entitled to the protection of the business judgment rule for the breach of their duties.  CIHLLC, Lutnick, Merkel and Amaitis failed to act in good faith and instead acted in their own interest or in the interests of entities and/or individuals other than CIH and the other CIH Entities, or in a manner that cannot be attributed to a rationale business purpose.  Finally, in reaching the decisions complained of herein, CIHLLC, Lutnick and Amaitis were grossly negligent and/or willfully blind by, among other things, failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring their duties owed to CIH and the other CIH Entities.

222.    By reason of the foregoing actions, CIHLLC, Lutnick, Merkel and Amaitis engaged in self-dealing, did not act in good faith, and breached their fiduciary duties.

223.    CIH and the other CIH Entities have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by CIHLLC, Lutnick, Merkel and Amaitis.  Additionally, since, *inter alia*, CIHLLC, Lutnick, Merkel and Amaitis engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

224.    Plaintiff has no adequate remedy at law.

## COUNT II
### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE DEFENDANTS OTHER THAN CIHLLC)

225.    Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

226.    As general partner of CIH, CIHLLC owed CIH fiduciary duties of good faith, care and loyalty.

227.    As officers and/or directors of one or CIH Entities, Lutnick, Merkel and Amaitis owed the CIH Entities fiduciary duties of good faith, care and loyalty.

228.    The Affiliate Transactions siphoned substantial businesses and assets from CIH and the other CIH Entities for no or nominal consideration and deprived CIH and the other CIH Entities of substantial value.

229.    The Defendants other than CIHLLC knew that CIHLLC owed the fiduciary duties alleged herein to CIH and are liable for aiding and abetting CIHLLC's fiduciary breaches as set forth herein.

230.    The Defendants other than Lutnick, Merkel and Amaitis knew that Lutnick, Merkel and Amaitis owed the fiduciary duties alleged herein to the CIH Entities and are liable for aiding and abetting the fiduciary breaches of Lutnick, Merkel and Amaitis as set forth herein.

231.    The Defendants other than CIHLLC colluded in or aided and abetted the breaches of fiduciary duties alleged herein, and were active and knowing participants in those breaches of fiduciary duties by, among other things, intentionally orchestrating and steering CIHLLC toward a corporate strategy of siphoning away businesses and assets from CIH and the other CIH Entities for their own benefit.

232.    By and through the Affiliate Transactions, the Defendants other than CIHLLC received substantial proceeds and other benefits in connection with the Affiliate Transactions.

233.   CIH and the other CIH Entities have been substantially damaged as a direct and proximate result of the actions of the Defendants other than CIHLLC in aiding and abetting the breaches of fiduciary duties alleged herein.  Additionally, since, *inter alia*, the Defendants other than CIHLLC engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

234.   Plaintiff has no adequate remedy at law.

### COUNT III
### (UNJUST ENRICHMENT AGAINST DEFENDANTS)

235.   Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

236.   By orchestrating and executing the Affiliate Transactions, and through the wrongful siphoning away of valuable businesses and assets of CIH and the other CIH Entities for no or nominal consideration, including in connection with breaches of fiduciary duty, aiding and abetting such breaches, conversion, waste and fraudulent transfer of assets as alleged herein, the Defendants have unjustly retained benefits that belong to CIH and the other CIH Entities, and Defendants' retention of those benefits violates fundamental principles of justice, equity and good conscience.

237.   Defendants are therefore liable to the CIH Entities for unjust enrichment.

238.   Plaintiff seeks restitution from the Defendants for the benefit of the CIH Entities and an order of this Court disgorging to the CIH Entities all payments, profits, fees, benefits, incentives and other compensation obtained by the Defendants as a result of their wrongful conduct.  Additionally, since, *inter alia*, Defendants engaged in intentional, willful,

reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

239.     Plaintiff has no adequate remedy at law.

## COUNT IV
## (WASTE OF ASSETS AGAINST CIHLLC, LUTNICK, MERKEL AND AMAITIS)

240.     Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

241.     By orchestrating and executing the Affiliate Transactions, and through the wrongful siphoning away of valuable businesses and assets of CIH and the other CIH Entities for no or nominal consideration, CIHLLC and the Individual Defendants engaged in waste of the CIH Entities' assets.

242.     The CIH Entities have been substantially damaged as a direct and proximate result of the conduct of CIHLLC and the Individual Defendants.

243.     Additionally, since, *inter alia*, CIHLLC and the Individual Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

244.     Plaintiff has no adequate remedy at law.

## COUNT V
## (BREACH OF PARTNERSHIP AGREEMENT AGAINST CIHLLC)

245.     Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

246.     Section 1.01 of CIH's Partnership Agreement provides, in pertinent part, that the partnership was formed to "own, operate, develop and invest in businesses which are connected with, or involved in, games, gaming, betting, lotteries, contracts for differences,

futures, options and financial and commodity products (the 'Products')" and to "realize the income and gains to be derived from the Products, for the mutual benefit of the Partners."

247.    CIHLLC orchestrated and executed the Affiliate Transactions to siphon valuable business and assets away from CIH for no or nominal consideration and thereby prevented it from realizing substantial income and gains from such business and assets.

248.    In addition, Section 3.03 of the Partnership Agreement ("Actions Requiring Unanimous Consent") provides: "Notwithstanding any other provision of this [Partnership] Agreement, no action will be taken by the General Partner with respect to or within the scope of any of the decisions or actions specified below in relation to the Partnership unless such decision or action shall have first been approved unanimously by all of the Partners: … (a) . . . taking any . . . action[] to wind up, dissolve or liquidate the Partnership; . . . and (c) Selling all, or substantially all, of the business or assets of the Partnership or Hollywood Stock Exchange, LLC."

249.    Through the Affiliate Transactions, CIHLLC sold or permitted the sale of all or substantially all of the business or assets of CIH (including, without limitation, through the sale of all or substantially all of the business or assets of CIH's subsidiaries) and/or wound up CIH.

250.    RGL did not provide its approval for the sale of all or substantially all of the business or assets of CIH (including, without limitation, all or substantially all of the business or assets of CIH's subsidiaries) or for the winding up of CIH.

251.    The Affiliate Transactions were in violation of the Amended and Restated Limited Partnership Agreement and constitute a breach of the Amended and Restated Limited Partnership Agreement.

252.    Accordingly, Plaintiff is entitled to judgment against CIHLLC and damages to be awarded to RGL and CIH in an amount to be determined at trial.  Additionally, since, *inter alia*, CIHLLC engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for itself and for the benefit of CIH and the CIH entities.

## COUNT VI
### (CONVERSION AGAINST DEFENDANTS)

253.    Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

254.    The CIH Entities' valuable business and assets were the property of CIH and the other CIH Entities.

255.    By wrongfully orchestrating and executing the Affiliate Transactions, and through the wrongful siphoning away of the CIH Entities' valuable businesses and assets for no or nominal consideration, Defendants engaged in conversion of the CIH Entities' assets.

256.    The CIH Entities have been substantially damaged as a direct and proximate result of Defendants' conduct.

257.    Additionally since, *inter alia*, Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities against Defendants.

## COUNT VII
### (FRAUDULENT CONVEYANCE UNDER N.Y. DEBTOR
### & CREDITOR LAW § 276 AGAINST DEFENDANTS)

258.    Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

259.    Plaintiffs are appropriately deemed to have claims and therefore be creditors in the context of this litigation in light of the claims and causes of action set forth herein.

260.    Defendants acted with an actual intent to hinder, delay, and/or defraud RGL, CIH, and the other CIH entities when they wrongfully orchestrated and executed the Affiliate Transactions, and wrongfully siphoned away all of the CIH Entities' valuable businesses and assets.

261.    Defendants' actual intent is established by, *inter alia*, (1) the lack of or inadequate consideration received by Defendants through the transactions and/or transfers; (2) the close relationship between Defendants' and the transferees; (3) Defendants' retention of present and future benefits from the transactions and/or transfers; (4) the cumulative nature of the transactions and transfers, including Defendants' pattern of siphoning away and disposing of property belonging to CIH and the other CIH entities for no or nominal consideration; (5) the questionable nature of the transactions and/or transfers; and (6) the fact that Defendants conducted the transactions and/or transfers in secrecy, without RGL's knowledge, and without the consent of RGL as required under the Partnership agreement.

262.    The CIH Entities and RGL have been substantially damaged as a direct and proximate result of Defendants' conduct.

263.    Additionally since, *inter alia*, Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for RGL and for the benefit of CIH and the other CIH Entities against Defendants.

**COUNT VIII**
**(FRAUDULENT CONVEYANCE UNDER 6 DEL. C. § 1304(a)(1)**
**AGAINST DEFENDANTS)**

264.    Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

59

265.   Plaintiffs are appropriately deemed to have claims and therefore be creditors in the context of this litigation in light of the claims and causes of action set forth herein.

266.   Defendants acted with an actual intent to hinder, delay, and/or defraud RGL, CIH, and the other CIH entities when they wrongfully orchestrated and executed the Affiliate Transactions, and wrongfully siphoned away all of the CIH Entities' valuable businesses and assets.

267.   Defendants' actual intent is established by, *inter alia*, (1) the fact that the transactions and/or transfers were to entities controlled by Defendants and/or for the benefit of Defendants; (2) Defendants' maintenance of control over CIH's and the other CIH entities' property after its transfer; (3) Defendants' non-disclosure and concealment of the transactions and/or transfers; (4) Defendants' transfer of substantially all of the assets of CIH and the other CIH entities; (5) Defendants' removal of CIH's and the other CIH entities' assets; and (6) the lack of or inadequate consideration received by Defendants through the transactions and/or transfers.

268.   The CIH Entities and RGL have been substantially damaged as a direct and proximate result of Defendants' conduct.

269.   Additionally since, *inter alia*, Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for RGL and for the benefit of CIH and the other CIH Entities against Defendants.

**COUNT IX**
**(ACCOUNTING AGAINST CIHLLC)**

270.   Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

271.    As a limited partner of nominal defendant CIH, Plaintiff was and is entitled to, *inter alia*, monthly reports of business activity, quarterly profit and loss statements, and audited financial statements.  Plaintiff has not been provided this information.

272.    As a limited partner of nominal defendant CIH, Plaintiff is entitled to a full accounting of the finances and activities of CIH and its subsidiaries, including, but not limited to, monthly reports of business activity, quarterly profit and loss statements, audited financial statements, and an accounting of the transactions conducted by CIH and the CIH Entities and/or conducted on CIH's and the other CIH Entities' behalves.

273.    Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

(1)     An order declaring that CIHLLC, Lutnick, Merkel, and Amaitis breached their fiduciary duties to CIH and the other CIH Entities in connection with the Affiliate Transactions;

(2)     An order declaring that the Defendants other than CIHLLC aided and abetted the breaches of fiduciary duties alleged herein in connection with the Affiliate Transactions;

(3)     An order declaring that the Defendants were unjustly enriched in connection with the breaches of fiduciary duty to CIH and the other CIH Entities by CIHLLC, Lutnick, Merkel, and Amaitis and the aiding and abetting of such breaches by the Defendants other than CIHLLC;

(4)     An order declaring that CIHLLC breached the Partnership Agreement in connection with the Affiliate Transactions, including an order declaring that the Affiliate Transactions constituted the sale of all or substantially all of CIH's business and assets;

(5)     An order declaring that Defendants actions in connection with the Affiliate Transactions constituted conversion;

(6)     An order declaring that the actions of CIHLLC, Lutnick, Merkel, and Amaitis in connection with the Affiliate Transactions constituted waste;

(7)     And order declaring that Defendants' actions in connection with the Affiliate Transactions constituted a fraudulent conveyance and/or transfer of assets;

(8)     An order declaring that, pursuant to Sections 9.08 and 9.12 of the Partnership Agreement, and Delaware Law, RGL is entitled to reasonable attorneys' fees and expenses;

(9)     An order awarding disgorgement of profits and/or monetary damages, including punitive damages, together with pre- and post-judgment interest, to CIH and/or the other CIH Entities for the foregoing breaches of fiduciary duty, aiding and abetting such breaches, unjust enrichment, breaches of the Partnership Agreement, conversion, waste, and fraudulent conveyances and/or transfers;

(10)    An order requiring a full accounting of the finances and activities of CIH and the other CIH Entities;

(11)    An order awarding RGL its reasonable attorneys' fees pursuant to the Partnership Agreement and Delaware law;

(12)    An order awarding Plaintiff its costs and expenses incurred in this proceeding, including experts' and attorneys' fees; and

(13)    An order granting such other and further relief as this Court deems just and proper.

Dated: April 15, 2013

**GRANT & EISENHOFER P.A.**

Jay W. Eisenhofer
Geoffrey C. Jarvis
Matthew P. Morris

485 Lexington Avenue
New York, New York  10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Special Litigation Counsel to
Refco Group Ltd., LLC*

## VERIFICATION

I, Marc S. Kirschner, am the Chapter 11 Trustee for plaintiff Refco Group Ltd., LLC ("RGL"). I have reviewed the foregoing Verified Amended Complaint (the "Complaint"). The facts set forth in the Complaint that relate to my own acts and those of RGL are true to my knowledge. With respect to the facts set forth in the Complaint that relate to the acts and deeds of others, as to those matters, I believe them to be true.

I further verify that RGL was a limited partner of nominal defendant Cantor Index Holdings, L.P. at the time of the wrongs complained of in the Complaint, and that this action is not a collusive one to confer jurisdiction upon this Court that it would otherwise lack.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _11_ th day of April, 2013, in New York, New York.

_____
Marc S. Kirschner