UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                   :

REFCO GROUP LTD., LLC,             :

                          :

                   Plaintiff,   :

                          :

          -v-               :

                          :

CANTOR FITZGERALD, L.P., et al.,    :

                          :

                 Defendants.  :

                          :
------------------------------------------------------------X

No. 13 Civ. 1654 (RA)

OPINION AND ORDER

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/10/2014

RONNIE ABRAMS, United States District Judge:

      Plaintiff Refco Group Ltd., LLC ("RGL") brings a variety of claims under Delaware and New York law on behalf of nominal Defendants in this action as well as its own behalf, alleging that Defendants orchestrated self-interested transactions to siphon assets away from the subsidiaries of a limited partnership in which RGL held a 10% interest.  Defendants move to dismiss all of RGL's claims for lack of personal jurisdiction, lack of standing, failure to make demand on the general partner, and failure to state a claim.  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## BACKGROUND

### I.    Procedural History

      RGL is one of the reorganized debtors in the Chapter 11 bankruptcy case captioned In re Refco Inc., et al., Ch. 11 Case No. 05-60006 (RDD) (Bankr. S.D.N.Y.).  The Modified Chapter 11 Joint Bankruptcy Plan (the "Plan") applicable to RGL was confirmed on December 15, 2006.  On December 6, 2012, RGL commenced an adversary proceeding against a number of the Defendants in this action by filing a complaint in bankruptcy court.  On March 22, 2013, this

Court approved a stipulation between the parties withdrawing the reference of the adversary proceeding and allowing the matter to proceed in district court. RGL filed the Amended Complaint that is the subject of Defendants' motion to dismiss on April 15, 2013.

## II.   The Allegations of the Amended Complaint

### A. The Partnership

Defendants are individuals and entities in the Cantor group of companies, which over a decade ago sought to take advantage of its expertise in financial services in order to enter the gambling business. (Amended Complaint ("AC") ¶¶ 1, 48.) Nominal Defendant Cantor Index Holdings, L.P. ("CIH"), a limited partnership organized under Delaware law, was formed in connection with this venture. (Id. ¶¶ 1, 20, 48.)

In 2002, RGL invested $8 million in CIH in exchange for a 10% limited partnership interest. (Id. ¶¶ 2, 55-56.) The rights, powers, and responsibilities of the partners in CIH are set forth in an Amended and Restated Limited Partnership Agreement (the "LPA"),[1] which was executed at the time of RGL's investment. (Id. ¶ 57.) Defendant Cantor Index Holdings Limited Partnership LLC ("CIHLLC") and non-party CIHLP II LLC ("CIHLP II") hold 1% and 89% limited partnership interests in CIH, respectively, with CIHLLC serving as general partner. (Id. ¶¶ 29-30.) With certain exceptions, the LPA bestows on the general partner "the sole power to make management decisions on behalf of the Partnership." (Id. Ex. A § 3.01.)

CIH has four wholly owned subsidiaries: Hollywood Stock Exchange ("HSX") and nominal Defendants Cantor Index Limited ("CIL"), Cantor Index LLC ("CILLC"), and Cantor Fitzgerald Game Holdings, LLC ("CFGH"). (Id. ¶ 28.) Nominal Defendant Cantor Gaming Limited ("CGL") is a wholly owned subsidiary of CFGH. (Id.)

---

[1] The LPA is attached to the Amended Complaint as Exhibit A.

**B. Relationships Between the Defendants**

Defendant Cantor Fitzgerald, L.P. ("CFLP") is the sole member of CIHLP II, the limited

liability company ("LLC") that holds an 89% limited partnership interest in CIH.  (Id. ¶¶ 11, 32.)

Defendant Cantor Fitzgerald Securities ("CFS") is the sole member of CIH's general partner

CIHLLC.  (Id. ¶¶ 12, 31.)  Through a series of intermediate entities, CFLP has managerial power

over both CFS and Defendant Cantor Fitzgerald Europe ("CFE").  (Jarvis Decl. Ex. 1 at 1 n.2; id.

Ex. 2 at 9.)

Defendant Howard W. Lutnick ("Lutnick") is President and sole stockholder of CF

Group Management, Inc., which is the managing general partner of CFLP.  (AC ¶ 15.)  The

amended Form S-1 ("Form S-1/A") filed with the Securities and Exchange Commission ("SEC")

by Cantor Entertainment Technology, Inc. ("CET"), another company in the Cantor group, states

that Lutnick "controls" CFLP and its subsidiaries.  (Id.)  Indeed, at the time of the wrongs

alleged by RGL, Lutnick also served as (1) Chairman and Chief Executive Officer ("CEO") of

CFLP; (2) Chairman of CFS; (3) a director of CIH; (4) a director and/or officer of CIL; (5)

Chairman and CEO of CILLC; (6) Chairman of Defendant Cantor G&W (Nevada) L.P. ("Cantor

Nevada"), as well as its CEO from 2004 to 2009; and (7) a director of Cantor Nevada's wholly

owned subsidiary Defendant Cantor Gaming & Wagering Limited ("CGWL (UK)").  (Id. ¶¶ 15,

33, 45, 47.)

Defendant Lee Amaitis ("Amaitis") joined CFLP in 1995 as Senior Managing Director

and moved to London the following year to serve as President and CEO of Cantor Fitzgerald

International.  (Id. ¶ 13.)  At the time of the wrongs alleged by RGL, he also served as (1) a

director and/or officer of CIL, CIHLLC, and CIHLP II; (2) Executive Managing Director of

CILLC; (3) a director of CIH; (4) an officer of Cantor Nevada, namely, as its President from

3

2004 to 2009 and as its CEO from 2009 to the present; and (5) a director of CGWL (UK). (Id. ¶¶ 13, 33, 46, 116.)

Defendant Stephen M. Merkel ("Merkel") also served as a director of CIH and as a director and/or officer of CIL, Cantor Nevada, and CFLP during the relevant time period. (Id. ¶¶ 14, 33, 46.)

Defendant Cantor Nevada is owned by Lutnick, Amaitis, and Merkel. (Id. ¶¶ 38, 40.) Although the complaint states that Lutnick has an equity interest of "approximately" 66% in Cantor Nevada, (id. ¶ 92), the precise figure appears to be 69.17%,[2] and he also indirectly holds a 20.8% interest via the Howard Lutnick Family Trust, (id. ¶ 40). Indeed, this seems to be why the complaint alleges that Lutnick has an 89.97% interest in Defendant CGWL (UK), which is a wholly owned subsidiary of Cantor Nevada. (Id. ¶ 103). Amaitis and Merkel hold 7.43% and 2.6% ownership interests, respectively, in Cantor Nevada and thus CGWL (UK). (Id. ¶¶ 40, 92, 103.)

## C. CIH's Success

CIH and its subsidiaries developed, among other things, "technology to permit customers to place bets on single occurrences during sporting events as they happened, devices for remote gambling, and opportunities to gamble on movements in financial indices." (Id. ¶ 2.) For example, in "spread betting," the bettor predicts whether the price of a financial instrument will rise or fall, winning more the more the price moves in the direction predicted and losing more the more the price moves in the opposite direction. (Id. ¶ 49.) In financial fixed-odds ("FFO") betting, the bettor similarly predicts whether a financial market will finish above or below a

---

[2] Lutnick holds a 68.08% limited partnership interest in the holding company that owns Cantor Nevada and also holds a 5% interest in an LLC with a 21.89% limited partnership interest in that holding company. (AC ¶ 40.)

specified level but risks only his or her initial stake. (Id. ¶ 50.)

In September 2003, CIL introduced "Cantor Mobile," the first real-time mobile trading device in the world, which gave users mobile access to finance and sports news, continuously streamed live prices, and allowed instant wagering on financial indices and sporting events with spread betting. (Id. ¶ 64.) The following year, CIL launched "Spreadfair," the first sports spread-betting exchange in the world, which permitted online customer-to-customer betting. (Id. ¶ 66.) Over the next few years, Spreadfair was expanded to allow users to bet on horseracing and on movements in the United Kingdom's residential housing market. (Id. ¶ 67.) The business grew rapidly and was described in the *Mail on Sunday* as "stunningly successful." (Id. ¶ 68.) In August 2005, CIL teamed up with another company, Ladbrokes, to launch an FFO betting service. (Id. ¶ 72.) Amaitis described the FFO service as "a very successful product" in a 2011 interview with *Global Gaming Business*. (Id.) As a result of these business activities, CIL reported revenue of $76.4 million in 2006 and $51 million in 2007. (Id. ¶ 73.)

In July 2004, CILLC and another company, Scientific Games Racing, announced the formation of a global joint venture to offer new forms of pari-mutuel wagering on horse races, which Amatis described as "fundamentally important to the future of horse racing." (Id. ¶ 71.) CFGH and its wholly owned subsidiary CGL were active as well, partnering with various companies in Europe, Australia, and the United States to offer online casinos and poker sites in 2006 and 2007. (Id. ¶¶ 79-81.)

Thus, CIH and its subsidiaries developed and deployed revolutionary gaming technology, enjoying great success primarily in the United Kingdom. (Id. ¶¶ 1-3.) RGL alleges that Defendants, perceiving the opportunity to capitalize on CIH's investments in their effort to enter Nevada's gambling markets, engaged in a series of transactions (the "Challenged Transactions")

that took lines of business, intellectual property, and other assets from CIL and CILLC for no or nominal consideration. (Id. ¶ 3.) These Challenged Transactions allegedly contributed to the growth of the Defendant companies and enriched the individual Defendants at the expense of CIH, diminishing the value of RGL's 10% partnership interest.

### D. The Challenged Transactions

#### 1. The 2006 License Agreement

On February 7, 2006, CILLC, Cantor Nevada, and another company named CFPH LLC executed a license agreement (the "2006 License Agreement")[3] that granted Cantor Nevada a "non-exclusive, non-transferable, perpetual, worldwide, royalty-free right and license to certain patent[s] and patent applications" held by CILLC. (Id. ¶ 83.) Lutnick executed the agreement for CILLC and Cantor Nevada in his capacity as Chairman and CEO of both companies. (Id. ¶ 86.) A few days after the Agreement was executed, Cantor Nevada filed its licensing application with the Nevada Gaming Commission. (Id. ¶ 84.)

The Agreement provided that the consideration for the licenses would "be determined within a reasonable time [t]hereafter pursuant to arms-length negotiations in good faith." (Id. ¶ 85.) According to RGL, however, no negotiations have occurred, there has been no appraisal to determine appropriate compensation, and CILLC has received nothing in exchange for the licenses. (Id. ¶¶ 87-88.)

#### 2. The Closure of Spreadfair

The second action RGL challenges is the decision to close CIL's Spreadfair business. CIL withdrew credit facilities from users of Spreadfair in February 2008, and according to CIL's report and financial statements for that year, Spreadfair was discontinued on December 1, 2008.

---

[3] The 2006 License Agreement is attached to the Amended Complaint as Exhibit B.

(Id. ¶¶ 95, 98.)

One commentator in *The Racing Post* wrote that "Cantor's recent success in getting the regulatory nod in Nevada for its handheld wireless casino gaming device EDeck . . . was the final tolling of the bell for Spreadfair." (Id. ¶ 99.)  Indeed, Amaitis had resigned from his position in the United Kingdom in November 2008 and moved to Nevada to focus on Cantor Nevada's operations.  (Id. ¶ 96.)

The closure of Spreadfair was associated with a substantial decline in CIL's revenues. While CIL reported revenue of $51 million in 2007 and $34.6 million in 2008, its revenue dropped to $9.2 million in 2009.  (Id. ¶¶ 73-74.)

### 3.  The Sale of CIL's FFO Business via the Asset Purchase Agreement

In November 2009, CGWL (UK) filed an application with the United Kingdom's Gambling Commission for a non-remote gambling software license and a remote betting license.[4]  (Id. ¶ 105.)  The cover letter to the application explained that

> [CGWL (UK)] is a newly incorporated company.  It is part of the Cantor Fitzgerald Group of companies, which is one of the largest financial institutions in the world.  By way of background, a number of Cantor companies hold or have held gambling licenses both in the UK and other jurisdictions such as Nevada. Currently, for example, [CIL] conducts betting business in the UK under license no. 02997.

> The purpose of this application is as part of a corporate restructuring.  Essentially, [CIL] currently operates both fixed odds betting on financial indices and also spread betting . . . .  It is proposed that the new company, [CGWL (UK)], will take over the Financial Fixed Odds operations of [CIL].  Some staff and assets as well as the benefit of a contract with Ladbrokes will be transferred to [CGWL (UK)] once it has its license – and it will essentially carry on the Financial Fixed Odds business conducted currently by [CIL].  Equally, [CIL] will surrender its license to offer fixed odds betting once [CGWL (UK)] is operational.  It is for this reason that we are able to give quite accurate predictions of the likely business streams of the new business.

> The license currently held by [CIL] is due to expire on 29 January 2010, ideally

---

[4] This license application is attached to the Amended Complaint as Exhibit C.

we would like the [CGWL (UK)] license to be in place on or before this date . . . .

(Id. ¶ 106.) The business plan enclosed in the application further explained that

> [r]ecently, Cantor has decided to re-organi[z]e and consolidate its gambling-related businesses. The objective is to concentrate more resources in the USA (Nevada) and to focus more heavily on the development of software products for use in the gambling industry. As part of this re-organi[z]ation (relevant to the UK), it is proposed that [CIL] should cease to offer the FFO Product and that a new company, [CGWL (UK)] should take over that responsibility.

(Id. ¶ 107 (second and third alterations in original).)  Given that "[t]he historic trading risk for the provider of financial fixed odds wagers is very low," the business plan forecasted over £1 million in revenues attributable to the FFO business for 2010.  (Id. ¶ 112.)  The Gambling Commission ultimately granted the license.  (Id. ¶¶ 114-15.)

Around April 30, 2010, CIL and CGWL (UK) entered into an agreement (the "Asset Purchase Agreement")[5] by which CIL sold its FFO business to CGWL (UK), including the assets, goodwill, and records associated with the FFO service.  (Id. ¶¶ 117-18.)  The Asset Purchase Agreement also provided for the transfer of key CIL employees to CGWL (UK).  (Id. ¶¶ 119-20.)  As consideration, CGWL (UK) paid CIL only £1.00.  (Id. ¶ 121.)

Although the Agreement was executed on or about April 30, 2010, the "Effective Time" was set at midnight on February 1, 2010, (id. ¶ 122), and CIL's 2010 report to the United Kingdom's Financial Services Authority confirmed that CIL's "[FFO] business was transferred to [CGWL (UK)] (a related company) on 1 February 2010."  (Id. ¶ 122 n.4 (first alteration in original).)

CET's Form S-1/A states that Cantor Nevada "acquired, through entities under common control, [CGWL (UK)] . . . when it was contributed by [CFLP] to [Cantor Nevada] from [CIL]." (Id. ¶ 123; see also Jarvis Decl. Ex. 4 at 59, 67.)  Given that CGWL (UK) had been created in

---

[5] The Asset Purchase Agreement is attached to the Amended Complaint as Exhibit D.

part to take over CIL's FFO business, (id. ¶¶ 106-09), it is reasonable to interpret this statement to mean that CFLP caused CIL to contribute its FFO business to CGWL (UK).

CIL received $9.2 million in revenue in 2009. (Id. ¶ 74.) In 2010, after the sale of its FFO business, CIL reported revenue of $8.1 million. (Id. ¶ 75.)

### 4. The Transfer of CIL's Trading Activity

CIL's annual report and financial statements for 2010 disclosed that "[m]anagement of [CIL] ha[d] conducted a review of its activities and ha[d] commenced a project to transfer all the trading activity of [CIL] to [CFE]." (Id. ¶ 125.) Although CIL retained a 1% economic interest in this activity, CFE owned the remaining 99%. (Id. ¶¶ 125-27.)

### 5. The 2011 License Agreement

In June 2011, CILLC entered into another license agreement (the "2011 License Agreement")[6] with Cantor Nevada and another company, Shuffle Master, Inc. (Id. ¶ 130.) Amaitis executed the 2011 License Agreement as Executive Managing Director of CILLC and as CEO of Cantor Nevada. (Id.) The Agreement licensed certain gambling-related patents to Shuffle Master but provided that any royalties and fees derived from the licenses would be paid to Cantor Nevada rather than CILLC. (Id. ¶¶ 131, 133.) CILLC received no payment. (Id. ¶ 134-35.)

### 6. The Increase in Related-Party Fees Charged to CIL

The final action that RGL challenges is Defendants' alleged "looting" of CIL through fees CIL owed to Cantor affiliates, including CFE, as a result of various related-party transactions and agreements. (Id. ¶¶ 192, 194.) While CIL's revenues doubled from 2003 to 2006, the amounts it paid to Cantor affiliates quadrupled, and in 2006 these fees constituted more

---

[6] The 2011 License Agreement is attached to the Amended Complaint as Exhibit E.

than 50% of CIL's total revenues. (Id. ¶ 193.) Furthermore, CIL's revenues declined by $15 million between 2006 and 2007, but the amount it was charged by CFE increased by $10 million. (Id. ¶ 194.) By 2007, the total amounts paid to Cantor affiliates increased to more than 91% of CIL's revenue. (Id.) Thus, the fees evidently were not correlated to revenues earned by CIL. (Id. ¶ 195.)

### E. The Growth of Cantor Nevada[7]

Cantor Nevada was formed in November 2004 to "operate a business that would, among other things, provide mobile betting, including sports betting, to casinos using hand-held gaming devices." (Id. ¶ 139.) In December 2004, CFLP licensed certain mobile gaming technology to Cantor Nevada and provided Cantor Nevada with a large line of credit in the form of a demand promissory note in order for Cantor Nevada to begin operations. (Id. ¶ 140.) *Bloomberg Markets Magazine* reports that in 2005, Amaitis hired a top gambling lobbyist to "write and push a bill through the Nevada legislature to allow mobile wagering." (Id. ¶ 142.)

These efforts were successful, and in May 2006, the Nevada Gaming Commission granted Cantor Nevada and several of its executives licenses to manufacture, distribute, and operate mobile gaming systems. (Id. ¶¶ 145, 148.) Shortly thereafter, Cantor Nevada entered into agreements to provide handheld gaming machines at a number of casinos. (Id. ¶¶ 149-51.)

---

[7] At one point, the Amended Complaint appears to identify the "use of the CIH Entities' intellectual property, including technology and patents, for the benefit of the Cantor Nevada Entities" as a Challenged or "Affiliate" Transaction independent of the 2006 and 2011 License Agreements. (AC ¶ 197.) It is unclear how these allegations could independently support any of RGL's claims, however, and RGL does not assert a claim of patent infringement. In addition, RGL's brief repeatedly omits this supposed transaction when it lists the Challenged Transactions, (Pl. Mem. 21-22, 27, 30-31, 34), and in one instance expressly provides an exhaustive list of Challenged Transactions that includes only the six described above, (id. at 35). Consequently, the Court interprets these allegations to describe the benefits that accrued to Cantor Nevada as a result of the Challenged Transactions but not to constitute an independent Challenged Transaction.

By 2009, Cantor Nevada began operating "In-Running," a wagering operation similar to Spreadfair, at these casinos. (Id. ¶¶ 154-55.)

Cantor Nevada's success was due at least in part to technology developed by CIH's subsidiaries. In statements to the Nevada State Judiciary Committee and the *New York Times* in 2005, Cantor Nevada's managing director explained that the foundation for his company's mobile technology was CIL's handheld device, Cantor Mobile. (Id. ¶¶ 172-74.) Similarly, statements by Amaitis and other Cantor Nevada employees to various news and gaming business organizations suggested that (1) CIL had been offering a service similar to In-Running in the United Kingdom for years and that (2) the program used by Cantor Nevada's mobile device was a variation of programs created by CIL. (Id. ¶¶ 176-86.) Indeed, in a 2011 podcast, Amaitis stated that CIL's mobile technology "started the underpinning of the application here in Nevada." (Id. ¶ 188-89.) In addition, one of the CILLC patents covered by the 2006 License Agreement appears to underlie the real-time betting technology used by Cantor Nevada. (Id. ¶¶ 90-91.)

### III. RGL's Claims

RGL brings this action against Defendants Lutnick, Merkel, Amaitis, CFLP, CFS, CIHLLC, Cantor Nevada, CGWL (UK), and CFE on its own behalf and on behalf of nominal Defendants CIH, CIL, CILLC, CFGH, and CGL.

RGL's complaint contains nine claims. Count I asserts that CIHLLC, Lutnick, Merkel, and Amaitis breached their fiduciary duties to CIH and its subsidiaries. Count II asserts that all Defendants other than CIHLLC aided and abetted these breaches of fiduciary duty. RGL brings a claim of unjust enrichment against all Defendants in Count III. Count IV asserts that CIHLLC, Lutnick, Merkel, and Amaitis engaged in a waste of assets. Count V asserts that CIHLLC

11

breached the LPA. RGL brings a claim of conversion against all Defendants in Count VI.

Counts VII and VIII assert claims of fraudulent conveyance against all Defendants under New

York and Delaware law, respectively. In Count IX, RGL alleges that it is entitled to a full

accounting of the finances and activities of CIH and its subsidiaries. Defendants move to

dismiss all of RGL's claims.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Id. In making this

determination, the Court must "accept[] the complaint's factual allegations as true and draw[] all

reasonable inferences in the plaintiff's favor." Starr Int'l Co., Inc. v. Fed. Reserve Bank of N.Y.,

742 F.3d 37, 40 (2d Cir. 2014).

To the extent that certain aspects of Defendants' motion to dismiss require the application

of other standards of review, they are articulated below.

## DISCUSSION

**I.    Personal Jurisdiction**

Defendants contend that the Court lacks personal jurisdiction over the foreign entities

named as defendants: CIL, CGWL (UK), CFE, and CGL. "'Prior to discovery, a plaintiff

challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith,

legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie*

showing may be established solely by allegations.'" Dorchester Fin. Sec., Inc. v. Banco BRJ,

S.A., 722 F.3d 81, 84-85 (2d Cir. 2013) (quoting Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990)).  The Court finds that RGL has failed to make the required showing.[8]

Constitutional principles of due process permit "a State [to] authorize its courts to exercise personal jurisdiction over an out-of-state defendant [only] if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"  Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2853 (2011) (second alteration in original) (quoting Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945)). "To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction."  In re Terrorist Attacks on September 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013).

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." Goodyear, 131 S. Ct. at 2851 (quoting Int'l Shoe, 326 U.S. at 317).  Essentially, the foreign entity must be "comparable to a domestic enterprise in that State."  Daimler AG v. Bauman, 134 S. Ct. 746, 758 n.11 (2014).  Because the paradigm fora for general jurisdiction are "the place of incorporation and the principal place of business . . . . even a company's 'engage[ment] in a substantial, continuous, and systematic course of business' is alone insufficient to render it at home in a forum."  Sonera Holding B.V. v. Çukurova Holding A.Ş., 12-4280-cv(L), 2014 WL

---

[8] Counsel for RGL suggested at oral argument that rebriefing may be warranted in light of the Supreme Court's recent decision in Daimler AG v. Bauman, 134 S. Ct. 746 (2014).  Having reviewed the decision, which reiterates the stringent requirements for general personal jurisdiction, the Court does not perceive any need for rebriefing.

1645255, at *3-4 (2d Cir. Apr. 25, 2014) (second alteration in original) (quoting Daimler, 134 S. Ct. at 761).

"Specific or conduct-linked jurisdiction . . . 'depends on an affiliation[] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation.'" Id. at *3 (quoting Goodyear, 131 S. Ct. at 2851). Specific jurisdiction therefore exists where "'the claim arises out of, or relates to, the defendant's contacts with the forum.'" Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013) (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)). Even where the defendant has "purposefully directed its activities at the forum state," however, it may be the case that "'other considerations would render jurisdiction unreasonable.'" Id. at 173 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

The parties dispute whether RGL must plead sufficient contacts with the State of New York or with the United States as a whole. As this case stems from a bankruptcy proceeding, "only a federal 'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits [the] court's exercise of personal jurisdiction over a defendant." In re Enron Corp., 316 B.R. 434, 444 (Bankr. S.D.N.Y. 2004); see also In re J.T. Moran Fin. Corp., 124 B.R. 931, 934, 941-44 (S.D.N.Y. 1991) (noting the existence of nationwide personal jurisdiction in bankruptcy proceedings "even if the reference is withdrawn"). In any event, because the foreign Defendants have insufficient contacts with the United States, they necessarily have insufficient contacts with the State of New York.

General jurisdiction over the foreign Defendants does not exist. CIL, CGWL (UK), CFE, and CGL are entities organized under the laws of England and Wales and located in London.

14

(AC ¶¶ 18-19, 23; Riley Decl. Ex. A.)[9]  The complaint does not allege any "continuous and systematic" contacts between these entities and the United States, let alone contacts that would "render them essentially at home" here. See Goodyear, 131 S. Ct. at 2851.  To be sure, these entities have ownership and management relationships with companies in the Cantor family that are based in the United States.  The Supreme Court has made clear, however, that the foreign subsidiaries of a United States company are not subject to general jurisdiction solely by virtue of that relationship, even if they regularly sell a substantial quantity of goods in the forum. See id. at 2850-51, 2856.[10]

RGL's attempt to establish specific jurisdiction fails as well.  None of the Challenged Transactions in which the foreign Defendants were involved are alleged to have occurred in the United States.  Instead, it appears that all of the entities participating in those transactions were

---

[9] The complaint alleges that CIL is "organized under the laws of the State of Delaware."  (AC ¶ 21.)  However, the allegations regarding CIL's activities indicate that it was based in the United Kingdom, (id. ¶¶ 104-10, 172-76, 187), and the Asset Purchase Agreement attached as an exhibit to the complaint states that CIL is "incorporated and registered in England and Wales," (id. Ex. D at 1).  In addition, according to a publicly available report submitted by Defendants, CIL's country of origin is the United Kingdom, and its registered office is located in London. (Riley Decl. Ex. A.)  As RGL does not contest Defendants' characterization of CIL, and this characterization is supported by RGL's own allegations, the Court assumes that CIL is an English entity.

[10] RGL argues that "jurisdiction exists over a subsidiary that is a mere department of a parent corporation which has a presence in New York."  In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 230 F. Supp. 2d 403, 409 (S.D.N.Y. 2002).  However, the "mere department" test is a means of establishing general jurisdiction under New York law, see id. at 407, which may not be fully consistent with the constitutional principles articulated in Daimler, see Sonera Holding B.V., 2014 WL 1645255, at *3 n.2, *4.  In any event, RGL alleges only that the foreign entities are owned and controlled by CFLP and Lutnick and that certain of the individual Defendants were officers and directors in the foreign entities at the time of the Challenged Transactions. (Pl. Opp'n 46-47.)  "Common ownership" is indeed one of the four factors of the "mere department" test, but RGL's failure to allege any facts relevant to the other three factors is fatal to its argument. See In re Ski Train Fire, 230 F. Supp. 2d at 409-12.  Significantly, "overlapping officers and directors are intrinsic to the parent-subsidiary relationship[] and . . . are not determinative as to whether the subsidiary is a mere department of the parent." Id. at 412 (internal quotation marks omitted).

located in the United Kingdom.  (AC ¶¶ 18-19, 96-98, 116-17, 125, 194; see also supra note 9.)

RGL argues that CFE and CGWL (UK) maintain interactive websites accessible in the United

States that "market the very technologies that are at the heart of this case." (Pl. Opp'n 47.)  In

the cases RGL cites, however, the websites facilitated the transactions that gave rise to the

plaintiff's claims.  See Hsin Ten Enter. USA, Inc. v. Clark Enterprises, 138 F. Supp. 2d 449, 456

(S.D.N.Y. 2000) (patent and trademark claims arose in part out of the sale of infringing products

on the websites and the use of an infringing mark on the websites); Citigroup Inc. v. City

Holding Co., 97 F. Supp. 2d 549, 565-67 (S.D.N.Y. 2000) (trademark infringement claim arose

in part out of the transaction of business on defendant's website).  Here, there is no allegation

that the Challenged Transactions made use of the foreign entities' websites in any way.  RGL's

claims thus cannot be said to "arise[] out of, or relate[] to, [CGWL (UK) or CFE's] contacts with

the forum."  Licci, 732 F.3d at 170 (internal quotation marks omitted).

    As the exercise of personal jurisdiction over CIL, CGWL (UK), CFE, or CGL would

violate due process, they are dismissed from this action.[11]

## II.    Direct Claims and Derivative Claims

    Essential to the resolution of most of RGL's claims is their proper classification as either

"direct" or "derivative"—that is, brought on behalf of another entity.  Whether a claim is direct

or derivative "is a question of state law," and consequently the Court would normally "apply the

choice of law principles of the forum state."  Seidl v. Am. Century Cos., Inc., 713 F. Supp. 2d

---

[11] RGL argues that the Court should permit it to take jurisdictional discovery in the event that its
allegations are deemed insufficient to establish a *prima facie* case of personal jurisdiction.  (Pl.
Opp'n 48.)  While the Court recognizes its discretion to allow jurisdictional discovery, see
Ehrenfeld v. Mahfouz, 489 F.3d 542, 550 n.6 (2d Cir. 2007), it denies RGL's request.  RGL has
not identified any hitherto inaccessible information that might aid it in establishing personal
jurisdiction.  The Court therefore sees little reason to burden the foreign entities with even
narrowly tailored discovery.

249, 255 (S.D.N.Y. 2010), aff'd, 427 F. App'x 35 (2d Cir. 2011).  Here, however, "[t]he parties'

briefs assume that [Delaware] law controls, and such 'implied consent . . . is sufficient to

establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)

(third alteration in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-

McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

    In the corporate context, the Delaware Supreme Court has held that "whether a

stockholder's claim is derivative or direct" depends solely on "(1) who suffered the alleged harm

(the corporation or the suing stockholders, individually); and (2) who would receive the benefit

of any recovery or other remedy (the corporation or the stockholders, individually)." Tooley v.

Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).  Under the first prong, a

stockholder may bring a direct claim only if "he or she has suffered an injury that is not

dependent on an injury to the corporation." Id. at 1036.  The same analysis applies in the context

of limited partnerships. See Brinckerhoff v. Enbridge Energy Co., Inc., C.A. No. 5526-VCN,

2011 WL 4599654, at *5-6 (Del. Ch. Sept. 30, 2011), aff'd, 67 A.3d 369 (Del. 2013); Litman v.

Prudential-Bache Properties, Inc., 611 A.2d 12, 15 (Del. Ch. 1992).

    RGL does not dispute Defendants' contention that, with the exception of its accounting

claim, RGL is asserting causes of action derivatively on behalf of CIH and its subsidiaries.  (Pl.

Opp'n 16.)  Indeed, RGL's claims for breach of fiduciary duty, aiding and abetting breach of

fiduciary duty, unjust enrichment, waste, conversion, and fraudulent conveyance are all premised

on harm to CIH resulting from the allegedly improper transfer of its subsidiaries' assets to other

entities.  The injury to RGL, "[t]he diminution in the value of [its] partnership interest[,] clearly

is not a direct injury, because '[t]he diminution in the value of [its] interest[] flows from the

damage inflicted directly on the Partnership.'" Saltz v. First Frontier, LP, 782 F. Supp. 2d 61, 79

(S.D.N.Y. 2010) (fourth alteration in original) (quoting <u>Litman</u>, 611 A.2d at 16), <u>aff'd</u>, 485 F. App'x 461 (2d Cir. 2012). Conversely, the accounting claim asserts RGL's entitlement to various reports and financial statements; it is RGL, rather than CIH, that would receive the full accounting of CIH's finances and activities.

Although the parties agree that RGL's cause of action for breach of the LPA is derivative, (Def. Mem. 17; Pl. Opp'n 16), "[i]n every case the court must determine from the complaint whether the claims are direct or derivative and may not rely on either party's characterization." <u>Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.</u>, 829 A.2d 143, 150 (Del. Ch. 2003). RGL alleges in part that CIHLLC breached the LPA by siphoning away CIH's valuable assets, "thereby prevent[ing] it from realizing substantial income." (AC ¶ 247.) This aspect of the claim is undoubtedly derivative. RGL also alleges, however, that CIHLLC wound up the partnership or sold substantially all of its assets without the unanimous consent required by the LPA. (<u>Id.</u> ¶¶ 248-50.) This component of the claim alleges injury to RGL's veto rights as a limited partner and does not appear to require injury to CIH. RGL presumably could assert this claim irrespective of whether the transactions at issue adequately compensated CIH, making it a direct claim. Indeed, "[i]f a limited partnership agreement prohibits the actions that were taken, then the limited partners have standing to enforce the limited partnership agreement directly." <u>Allen v. El Paso Pipeline GP Co., L.L.C.</u>, C.A. No. 7520-VCL, 2014 WL 2198369, at *11 (Del. Ch. May 19, 2014); <u>see also</u> <u>Anglo Am. Sec. Fund, L.P.</u>, 829 A.2d at 150 ("When a plaintiff alleges . . . an injury . . . that involves a contractual right of shareholders (or partners) that is independent of the entity's rights, the claim is direct.").

## III.   Standing

Defendants argue that RGL does not have standing to maintain this action because the

18

Plan governing RGL's bankruptcy assigned all of RGL's claims to a Litigation Trust. RGL

contends that, while the Plan could be read as assigning RGL's direct claims to the Litigation

Trust, it could not have assigned RGL's derivative claims. Given the Plan's ambiguous

treatment of derivative claims, the Court concludes that only RGL's direct claims can be

dismissed for lack of standing at this stage in the litigation.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v.

United States, 201 F.3d 110, 113 (2d Cir. 2000). An "essential aspect" of Article III's

delineation of federal-court jurisdiction is that "any person invoking the power of a federal court

must demonstrate standing to do so. This requires the litigant to prove that he has suffered a

concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely

to be redressed by a favorable judicial decision." Hollingsworth v. Perry, 133 S. Ct. 2652, 2661

(2013). Thus, the litigant "must possess a 'direct stake in the outcome' of the case." Id. at 2662

(quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997)). Contrary to RGL's

assertion, standing is a jurisdictional matter and therefore "not subject to waiver." United States

v. Hays, 515 U.S. 737, 742 (1995).

"In a bankruptcy-related proceeding, the terms of a confirmed plan of reorganization are

binding on parties to the plan and should be considered by a court when deciding a motion to

dismiss." Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 80, 88 (S.D.N.Y. 2008),

aff'd, 379 F. App'x 10 (2d Cir. 2010). On the effective date of the Plan at issue here, all

"Contributed Claims" were "transferred to [a] Litigation Trust" established "for pursuit of the

Contributed Claims," and "the Debtors" were deemed to "have no interest in or with respect to

the Contributed Claims." (Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct

and Indirect Subsidiaries ("Plan") ¶¶ 5.7(a)-(b), In re Refco, Inc., et al., Case No. 05-60006, ECF No. 3948.) RGL is a "Debtor" under the Plan. (Plan ¶¶ 1.13, 1.66, Ex. A.) The definition of "Contributed Claims" includes "Litigation Claims." (Id. ¶ 1.48.) The Plan defines "Litigation Claims" as "the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor . . . may hold against any Person," with certain exceptions that the parties do not argue are applicable here. (Id. ¶ 1.112.)

Defendants argue that the definition of "Litigation Claims" is broad enough to encompass all of RGL's claims in this litigation. The Court agrees that RGL's direct claims for an accounting and for breach of the LPA are "claims . . . in law or in equity" held by RGL, (id. ¶ 1.112), and RGL does not argue otherwise. Because these claims were transferred to the Litigation Trust, and RGL no longer has any interest in them, RGL cannot be said to have a "direct stake" in their resolution. Accordingly, these direct claims—Count IX and part of Count V—are dismissed for lack of standing. Cf. Clarex Ltd. v. Natixis Sec. Am. LLC, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) (holding that assignors of property interests had no interest in the litigation and therefore lacked standing to bring suit); Adelphia Recovery Trust, 390 B.R. at 94-95 (dismissing a plaintiff trust's claims for lack of standing because the claims had been paid in full under the bankruptcy plan).

The Court is unable to reach the same conclusion with respect to RGL's derivative claims. "A shareholder derivative suit is a uniquely equitable remedy in which a shareholder asserts on behalf of a corporation a claim belonging not to the shareholder, but to the corporation." Levine v. Smith, 591 A.2d 194, 200 (Del. 1991), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000). It is true that, although the claims are the corporation's, the derivative suit has a "dual nature," as "the stockholder asserts in the suit not

20

only a right belonging to the corporation but also a right individual to himself." Maldonado v.
Flynn, 413 A.2d 1251, 1262 (Del. Ch. 1980), rev'd on other grounds sub nom. Zapata Corp. v.
Maldonado, 430 A.2d 779, 784 (Del. 1981) (clarifying the circumstances under which a
"'stockholder may sue in equity in his derivative right to assert a cause of action in behalf of the
corporation'" (quoting McKee v. Rogers, 156 A. 191, 193 (Del. Ch. 1931)). RGL's power to
bring a derivative suit for injuries to CIH could therefore be considered a "right[] of action . . . in
equity" that RGL holds for purposes of ¶ 1.112 of the Plan.

It does not follow, however, that this power was transferred from RGL to the Litigation
Trust. The Delaware Revised Uniform Limited Partnership Act ("DRULPA") imposes strict
limits on derivative standing: "[i]n a derivative action, the plaintiff must be a partner or an
assignee of a partnership interest at the time of bringing the action." 6 Del. C. § 17-1002; see
also CML V, LLC v. Bax, 6 A.3d 238, 246 (Del. Ch. 2010) (noting that the "derivative standing
provisions in the LP Act facially bar any party other than a limited partner or assignee from
suing derivatively"), aff'd, 28 A.3d 1037 (Del. 2011). Under the Plan, RGL retains its entire
10% limited partnership interest in CIH. (Id. ¶¶ 1.18, 1.53; Ex. H at 2, In re Refco, Inc., et al.,
Case No. 05-60006, ECF No. 4090-5.) The Litigation Trust is neither a partner in CIH nor an
assignee of any partnership interest[12] and therefore appears to lack standing to bring RGL's
derivative claims on behalf of CIH. It is implausible that the Plan would transfer RGL's
derivative claims separately from the underlying partnership interest and thereby extinguish them

---

[12] Defendants suggested at oral argument that, under the Plan, RGL "assign[ed] the right to bring
th[e] [derivative] claim[s] to the [L]itigation [T]rust." (Jan. 30, 2014 Tr. 3:15-16, ECF No. 37.)
However, the Delaware Code grants derivative standing only to the "assignee of a *partnership
interest*." 6 Del. C. § 17-1002 (emphasis added). It further defines a "partnership interest" as "a
partner's share of the profits and losses of a limited partnership and the right to receive
distributions of partnership assets." Id. § 17-101(13). Thus, the derivative claims are not a
"partnership interest" that could have been assigned independently of RGL's 10% stake in CIH,
and the Litigation Trust would not have derivative standing as the transferee of those claims.

entirely.

Indeed, the Plan explicitly provides for claims that cannot be transferred:

> To the extent that any Contributed Claims cannot be transferred to the Litigation
> Trust because of a restriction on transferability under applicable non-bankruptcy
> law that is not superseded or preempted by section 1123 of the Bankruptcy Code
> or any other provision of the Bankruptcy Code, such Contributed Claims shall be
> deemed to have been retained by the Reorganized Debtors and RCM, as
> applicable, and the Litigation Trustee shall be deemed to have been designated as
> a representative of the Estates pursuant to section 1123(b)(3)(B) of the
> Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of the
> Estates.

(Plan ¶ 5.7(b).) As RGL is one of the "Reorganized Debtors," (id. ¶¶ 1.13, 1.191-92, Ex. A), it is

"deemed to have . . . retained" any non-transferable claims, (id. ¶ 5.7(b)), including the

derivative claims at issue here. RGL therefore has Article III standing to pursue the derivative

claims notwithstanding the Plan.[13]

## IV.    Demand Futility

Defendants argue that RGL's derivative claims must be dismissed because the complaint

fails to "allege with particularity the reasons why, at the time of the filing of the complaint, it

was futile to demand CIH's general partner, CIHLLC, take appropriate remedial action to

address the Challenged [Transa]ctions." (Def. Mem. 17 (emphasis removed).) Because demand

was futile with respect to certain of the Challenged Transactions (namely, the 2006 License

Agreement, the Asset Purchase Agreement, and the 2011 License Agreement) but not others

(namely, the closure of Spreadfair, the transfer of CIL's trading activity to CFE, and the increase

in related-party fees paid by CIL), only the former transactions may form the basis of RGL's

claims.

---

[13] As the parties did not brief the effect of designating the Litigation Trustee as a "representative"
of RGL's estate under ¶ 5.7(b) of the Plan, the Court does not address the question here.

## A. Applicable Law

Under Delaware law, a limited partner may bring a derivative action "in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed." 6 Del. C. § 17-1001. As RGL has not made pre-suit demand on CIHLLC, it alleges that demand was excused as futile. (AC ¶ 206.)

"Demand is excused under Delaware law if the derivative plaintiff can meet the Delaware standard for demonstrating the futility of such a demand." RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991). The conventional "Aronson test" asks "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the [general partners] are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984), overruled on other grounds by Brehm, 746 A.2d 244.[14] "These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused." Brehm, 746 A.2d at 256.

The Aronson test does not apply, however, "where the [general partners] that would be considering the demand did not make a business decision which is being challenged in the derivative suit." Rales v. Blasband, 634 A.2d 927, 933-34 (Del. 1993). One such situation is a "double derivative suit" in which a limited partner in a parent entity seeks "to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled." Lambrecht v.

---

[14] The Delaware tests for demand futility were first articulated in context of derivative actions brought by corporate shareholders, in which demand on the corporation's board of directors must be excused. However, in many respects, the "standard for demand futility in the limited partner context is 'substantially the same.'" Saltz, 782 F. Supp. 2d at 80 (quoting Gotham v. Hallwood Realty Partners, L.P., No. CIV. A. 15754-NC, 1998 WL 832631, at *4 (Del. Ch. Nov. 10, 1998)). The Court therefore substitutes the analogous terminology for limited partnerships where appropriate.

O'Neal, 3 A.3d 277, 282 (Del. 2010).  The applicable "Rales test" asks "whether the particularized factual allegations of the complaint create a reasonable doubt that the parent's [general partners] could properly have exercised [their] independent and disinterested business judgment in responding to a demand."  Id. at 285-86.  Demand is thus excused as futile where the parent's general partners are "shown to be incapable of making an impartial business judgment regarding whether to assert the subsidiary's claim."  Id. at 282.

Here, because RGL is a limited partner in CIH and asserts injuries to CIH's subsidiaries, it is proceeding "double derivatively."  Id.  It must therefore establish that CIHLLC, CIH's sole general partner, could not have evaluated the subsidiaries' potential claims with the required disinterest and independence.[15]  This analysis must be conducted on a "transaction-by-transaction" basis.  Khanna v. McMinn, No. Civ.A. 20545-NC, 2006 WL 1388744, at *14, *16 (Del. Ch. May 9, 2006); see also MCG Capital Corp. v. Maginn, Civil Action No. 4521-CC, 2010 WL 1782271, at *18 (Del. Ch. May 5, 2010) ("Just because demand is futile with respect to one of the board's challenged actions does not mean it is futile with respect to other challenged actions.").

A "disabling 'interest'" exists when the general partner "stands on both sides of the challenged transaction" or personally receives a material benefit from the challenged transaction

---

[15] The sole exception is, as explained below, CIHLLC's allegedly willful disregard of its duty to intervene in the sale of CIL's FFO business.  As a "conscious decision by [the general partner] to act or refrain from acting," this transaction is subject to evaluation under the business judgment rule, and the Aronson test applies.  Rales, 634 A.2d at 933.  The transaction satisfies the Rales test, however, and therefore necessarily satisfies the Aronson test.  See DiRienzo v. Lichtenstein, C.A. No. 7094-VCP, 2013 WL 5503034, at *29 (Del. Ch. Sept. 30, 2013) ("The first prong of Aronson is, for all intents and purposes identical, to the Rales standard."), appeal refused, 80 A.3d 959 (Del. 2013); Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003) (observing that the Rales test "makes germane all of the concerns relevant to both the first and second prongs of Aronson").  As a result, the applicability of Aronson to this transaction does not alter the Court's demand-futility analysis.

that is not generally shared with the other partners. Orman v. Cullman, 794 A.2d 5, 25 n. 50 (Del. Ch. 2002). In addition, a "substantial threat of personal liability as to the conduct alleged in the complaint [will] compromise [a general partner's] ability to act impartially on a demand." Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007); see also Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc., C.A. No. 1091-VCL, 2007 WL 2982247, at *6 (Del. Ch. Oct. 9, 2007). The central question is thus whether the general partner will "personally benefit or suffer as a result of the lawsuit." In re INFOUSA, Inc. Shareholders Litig., 953 A.2d 963, 985 (Del. Ch. 2007). However, even if the general partner is not directly interested in the lawsuit, it may be so "dominated" by or "beholden" to an interested party that its "'discretion would be sterilized.'" Id. (quoting Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1050 (Del. 2004)). This lack of "independence" will excuse pre-suit demand as well. See id.

While the substantive requirements for bringing a derivative action are determined by state law, "Rule 23.1 [of the Federal Rules of Civil Procedure] is a rule of pleading that creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a [limited partnership's general partners] to bring the action in question." RCM Sec. Fund, Inc., 928 F.2d at 1330. The complaint must "state with particularity" the reasons for not making an effort "to obtain the desired action" from the general partners. Fed. R. Civ. P. 23.1(b)(3). "[T]he Federal Rules are in accord with Delaware law that demand futility must be pled 'with particularity.'" In re Harbinger Capital Partners Funds Investor Litig., 12 Civ. 1244 (AJN), 2013 WL 5441754, at *17 n.8 (S.D.N.Y. Sept. 30, 2013), vacated in part on reconsideration, 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013); see also Del. Ch. Ct. R. 23.1(a). The Delaware Supreme Court has emphasized that, while "the pleader is not required to plead evidence," "factual particularity" is a "stringent requirement[]." Brehm, 746 A.2d at 254.

RGL alleges that it would have been futile to make demand on CIHLLC because "CIHLLC is controlled by Lutnick, who was interested in the [Challenged Transactions] and who faces a substantial threat of liability as a result of the [Challenged Transactions]." (AC ¶ 210.) Accordingly, the Court analyzes in turn whether CIHLLC is controlled by Lutnick, whether Lutnick was interested in the Challenged Transactions, and whether Lutnick or CIHLLC face a substantial threat of liability for the Challenged Transactions.

Demand will be excused for a particular Challenged Transaction if CIHLLC is dominated by or beholden to Lutnick and Lutnick received a material benefit from or faces a substantial threat of liability for the transaction. In that situation, CIHLLC would lack independence from an interested party and could not be expected to evaluate the Challenged Transaction objectively. In addition, demand will be excused with respect to any Challenged Transaction for which CIHLLC faces a substantial threat of liability.

## B. Lutnick's Domination of CIHLLC

To establish CIHLLC's lack of independence from Lutnick, RGL provides SEC filings that trace the relationship between the two.[16] Lutnick is the sole shareholder of CF Group

---

[16] "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013). "However, matters judicially noticed by the District Court are not considered matters outside the pleadings." Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 426 (2d Cir. 2008). As a general matter, courts take "'judicial notice of the *fact* that . . . regulatory filings contained certain information, without regard to the truth of their contents.'" Chechele v. Scheetz, 819 F. Supp. 2d 342, 348 (S.D.N.Y. 2011) (alteration in original) (quoting Staehr, 547 F.3d at 425), aff'd, 466 F. App'x 39 (2d Cir. 2012). However, judges in this district have taken judicial notice of the composition of corporate boards as set forth in SEC filings for the purpose of assessing demand futility. See In re Citigroup Inc. S'holder Derivative Litig., 788 F. Supp. 2d 211, 214 (S.D.N.Y. 2011); cf. Fink v. Weill, No. 02 Civ. 10250 (LTS) (RLE), 2005 WL 2298224, at *5 n.9 (S.D.N.Y. Sept. 19, 2005). Similarly, the corporate relationships between Cantor entities are the proper subject of judicial notice, as they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R.

Management, Inc., which is the managing general partner of Defendant CFLP. (Jarvis Decl. Ex. 2 at 9.) CFLP is the sole and managing member of CFLP CFS Holdings, LLC, which is in turn the managing general partner of CFLP CFS I Holdings, L.P. (Id.) That entity is the managing general partner of CFS, (id.), which is the sole member of CIHLLC, (AC ¶ 12).[17]  Essentially, Lutnick owns 100% of the corporation that manages CFLP, which itself manages a chain of entities, the last of which owns 100% of CIHLLC.

Defendants argue that allegations of "majority control" are inadequate to show that CIHLLC is dominated by or beholden to Lutnick. (Def. Reply 4-5.) It is true that, in the corporate context, Delaware courts have repeatedly held that directors are presumed "independent" notwithstanding the existence of a controlling stockholder. See, e.g., Beam, 845 A.2d at 1054; Heineman v. Datapoint Corp., 611 A.2d 950, 955 (Del. 1992), overruled on other grounds by Brehm, 746 A.2d 244; Aronson, 473 A.2d at 815-16; In re China Auto. Sys. Inc. Derivative Litig., C.A. No. 7145-VCN, 2013 WL 4672059, at *6, *9 (Del. Ch. Aug. 30, 2013). "[A] party attacking a corporate transaction must advance particularized factual allegations from which the [court] can reasonably infer that the board members who approved the transaction are acting at the direction of the allegedly dominating individual or entity." Heineman, 611 A.2d at 955.

That principle is not controlling here, however. Although the directors of a corporation

---

Evid. 201(b)(2). In any event, the primary purpose of confining a court's analysis to the four corners of the complaint is to protect plaintiffs from summary judgment motions in the guise of motions to dismiss, see Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991), a concern not present here. The Court further notes that Defendants have not objected to the consideration of these filings and that it would be inefficient to dismiss RGL's claims simply because it failed to attach the filings as exhibits to its complaint, especially as the Court could grant RGL leave to amend to do just that.

[17] These relationships are depicted in graphical form in Chart II in the Appendix to RGL's brief in opposition.

are invariably natural persons, see 8 Del. C. § 141(b), the general partner of a limited partnership may be a business entity, as CIHLLC is. Where the general partner is an entity, the plaintiff may plead the futility of making demand to that entity and need not analyze the entity's "internal decisionmaking apparatus." Gotham v. Hallwood Realty Partners, L.P., No. CIV. A. 15754-NC, 1998 WL 832631, at *5 (Del. Ch. Nov. 10, 1998); see also Gerber v. EPE Holdings, LLC, C.A. No. 3543-VCN, 2013 WL 209658, at *13 (Del. Ch. Jan. 18, 2013).

An entity general partner is beholden to its owner for purposes of demand futility. For example, in Gerber, the Delaware Court of Chancery excused demand on the general partner because "[t]he action that [the plaintiff] would have sought, had he made demand, would have been directed at" the interests of an individual who indirectly owned the general partner. 2013 WL 209658, at *1, *13. The general partner was deemed "control[led] and dominat[ed]" by the indirect owner even though the plaintiff had failed to create a reasonable doubt as to the impartiality or independence of the general partner's board. Id. at *13 & n.118. Similarly, in Brinckerhoff, the court held that it would have been futile for the plaintiff to demand that the general partner sue the corporation that indirectly owned 100% of the general partner. See 2011 WL 4599654, at *1, *7. And in Dean v. Dick, the court "f[ou]nd it very persuasive that where the general partner is 100% owned by one person, and the general partner would be required to bring suit against that person, there is at least *some* doubt as to the disinterest of that person." No. Civ.A. 16566, 1999 WL 413400, at *3 (Del. Ch. June 10, 1999). Significantly, the court concluded that the general partner was "beholden" to that person because it was 100% owned by him. See id.

It is not alleged that Lutnick owns 100% of CIHLLC. CFS is the sole member of CIHLLC, and between Lutnick and CFS lies an assortment of general partners—CF Group

Management, Inc.; CFLP CFS Holdings, LLC; and CFLP CFS I Holdings, L.P.—that manage other entities but are not alleged to have a substantial ownership interest in them. As one moves up the chain of entities from CIHLLC toward Lutnick, however, each entity is either managed by the next entity or beholden to it by virtue of being wholly owned. The chain terminates at CF Group Management, Inc., which is 100% owned by Lutnick and therefore beholden to him. Thus, as a result of Lutnick's control over each intermediate entity, RGL has adequately pled that Lutnick dominates CIHLLC for purposes of demand futility.

### C. Lutnick's Interest in the Challenged Transactions

For CIHLLC's lack of independence to be disabling, "[t]here must be some alleged nexus between the domination and the resulting personal benefit to the controlling party." Heineman, 611 A.2d at 955. If Lutnick did not plausibly benefit from a Challenged Transaction, his domination of CIHLLC would not excuse demand unless the transaction exposed him to liability.

RGL alleges that Lutnick had a personal interest in each of the Challenged Transactions, preventing CIHLLC from evaluating them objectively. Defendants contend that any benefit Lutnick received by virtue of his ownership interest in the entities that benefited from the Challenged Transactions cannot, as a matter of law, establish a disabling interest. They further argue that even if the indirect benefit to Lutnick could be considered, RGL has failed to plead sufficient facts from which the Court could infer that the benefit was "material." In fact, they contend, the allegations in the complaint establish that any benefit Lutnick received was outweighed by the decrease in the value of his ownership interest in CIH.

### 1. Whether Lutnick Benefited from the Challenged Transactions

As noted above, Lutnick is considered "interested" in a Challenged Transaction if he stood on both sides of the transaction or personally received a material benefit. See Orman, 794 A.2d at 25 n. 50. Generally, the benefit must have been "of such subjective material significance

29

to [Lutnick] that it is reasonable to question whether [he would have] objectively considered the advisability of the challenged transaction to [CIH]." Id. However, "whenever a[n] [individual] stands on both sides of the challenged transaction he is deemed interested and allegations of materiality have not been required." Id. The Court considers each Challenged Transaction in turn.

As to the first Challenged Transaction, the 2006 License Agreement, RGL alleges that the agreement granted Cantor Nevada a "perpetual, worldwide, royalty-free right and license" to certain of CILLC's patents. (AC ¶ 83.) Although the agreement provided that consideration for the perpetual licenses would "be determined within a reasonable time hereafter pursuant to arms-length negotiations," RGL alleges that no negotiations have occurred and that CILLC has received no compensation. (Id. ¶¶ 85, 87-88.) As Lutnick has an equity interest of at least 69.17% in Cantor Nevada, (id. ¶¶ 40, 92), it is plausibly alleged that he personally benefits from Cantor Nevada's free access to CILLC's intellectual property. By contrast, neither RGL nor CIH has any direct or indirect ownership interest in Cantor Nevada. (Id.)

The alleged benefit to Lutnick appears to be material, as detailed allegations support the notion that Cantor Nevada's growth is attributable in part to technology from CIH subsidiaries, including the patents licensed by CILLC in 2006. (AC ¶¶ 84, 89-91, 147-159, 172-91.) In any event, Lutnick executed the agreement on behalf of all parties in his capacity as Chairman and CEO of both Cantor Nevada and CIH subsidiary CILLC. (Id. ¶ 86.) He therefore stood on both sides of the 2006 License Agreement and is deemed interested.

By contrast, RGL does not sufficiently allege that Lutnick personally benefited from the closure of Spreadfair. While it is conceivable that Spreadfair was closed in order to "bolster[] the Cantor Nevada Entities' operations and eliminat[e] certain of the Cantor Nevada Entities'

competition in the gaming industry," (id. ¶ 94; see also id. ¶¶ 96, 99), this allegation—made on information and belief—is conclusory and does not suggest that the value of Lutnick's interest in Cantor Nevada increased by any appreciable amount.

Lutnick was, however, interested in the sale of CIL's FFO business to CGWL (UK), a subsidiary of Cantor Nevada. Under the Asset Purchase Agreement, CGWL (UK) paid a mere £1.00 for a valuable line of business and the transfer of key employees from CIL. (Id. ¶¶ 104, 112-13, 118-21.) While Lutnick holds an 89.97% equity interest in CGWL (UK), RGL and CIH have a stake only in CIL. (Id. ¶ 103.) The FFO business, now operated by CGWL (UK), generates substantial revenues and was described by Amaitis as a "very successful product." (Id. ¶¶ 72, 112-13.) Thus, it can hardly be said that the benefit to Lutnick is negligible. Moreover, it appears that CFLP, which Lutnick controls, arranged the sale of CIL's FFO business to CGWL (UK). (Id. ¶¶ 15, 123; Jarvis Decl. Ex. 4 at 35, 59, 67, 73, 107.) RGL has therefore adequately alleged that Lutnick stood on both sides of the Asset Purchase Agreement and received a material benefit from the transaction.

RGL's allegations fall short of establishing that Lutnick was interested in the transfer of CIL's trading activity to CFE. The nature and value of this trading activity is left unexplained. (Id. ¶¶ 125-28.) Furthermore, although Lutnick has the power to direct CFE's decisions, (Jarvis Decl. Ex. 1 at 1 n.2), the complaint contains no allegations concerning the extent of Lutnick's ownership interest in CFE or its size relative to Lutnick's interest in CIL. CFLP controls CFE through a chain of general partners and managing members that are not alleged to have substantial ownership interests in the limited partnerships or limited liability companies they control. (Id.; Pl. Opp'n, App'x. A, Chart I.) In addition, as explained in the next section, the size of Lutnick's ownership interest in CFLP is unclear. Consequently, RGL has failed to adequately

31

allege that Lutnick received a material benefit from any transfer to CFE.

Nor has RGL adequately alleged that Lutnick stood on both sides of the transaction. According to the complaint, CIL's annual report and financial statements disclosed that CIL "management" made the decision to transfer CIL's trading activity to CFE. (Id. ¶ 125.) It is not clear, however, whether Lutnick was a "director" or an "officer" of CIL, (id. ¶ 15), and there is no indication that he participated in the decision.

As to the fifth Challenged Transaction, the 2011 License Agreement, RGL has adequately alleged Lutnick's interest. The agreement licenses certain of CILLC's patents to Shuffle Master, Inc. and provides that any royalties are to be paid to Cantor Nevada, rather than to CILLC. (Id. ¶¶ 131-35.) Thus, Lutnick would personally benefit from these payments, but RGL and CIH would not. (Id. ¶ 136.) RGL does not allege that any royalty payments have been made to Cantor Nevada or that, if these payments were made, they would be substantial. However, Lutnick allegedly stood on both sides of the transaction. Although he did not execute the 2011 License Agreement, it is reasonable to infer that he participated in the transaction as Chairman and CEO of CILLC and Chairman of Cantor Nevada. Thus, even if Cantor Nevada's right to receive royalty payments from Shuffle Master is not of subjective material significance to Lutnick, he is nevertheless interested for purposes of demand futility.

The Court cannot reach the same conclusion with respect to the increase in related-party fees paid by CIL to CFE and other Cantor affiliates. RGL does not argue in its brief that Lutnick received a material benefit from this Challenged Transaction or that he stood on both sides. Indeed, it could not, as the complaint does not describe the extent of Lutnick's interest in CFE, as explained above, or his participation in the relevant decisions.

In sum, RGL has adequately alleged that Lutnick was interested in the 2006 License

Agreement, the Asset Purchase Agreement, and the 2011 License Agreement. Demand is therefore excused as to these three transactions. Lutnick cannot, however, be considered interested in the closure of Spreadfair, the transfer of CIL's trading activity to CFE, or the increase in related-party fees paid by CIL. Unless they expose Lutnick or CIHLLC to a substantial threat of liability, demand will not be excused with respect to these transactions.

### 2.  Whether Lutnick's Percentage Ownership Is Sufficient

Defendants' additional arguments concerning Lutnick's interest in the Challenged Transactions are unavailing. As the Court has concluded that Lutnick was interested in only the 2006 License Agreement, the Asset Purchase Agreement, and the 2011 License Agreement, it will focus on the application of Defendants' arguments to those transactions.

Defendants first argue that Lutnick cannot be considered interested because he benefits only "indirectly" by virtue of his percentage ownership of Cantor Nevada and CGWL (UK)—the direct beneficiaries of the three surviving Challenged Transactions. (Def. Reply 6.) None of Defendants' cited authority supports this proposition, and Delaware courts routinely find directors to be interested even in the absence of a "direct" payment. See, e.g., Heineman, 611 A.2d at 954 (holding that the majority of the board was interested in a transaction that "divert[ed] a substantial amount of the corporation's assets to an arbitrage pool whose participants include entities in which a majority of the directors hold an interest").

Defendants also contend that Lutnick did not materially benefit from the transactions because, while he has a 90% interest in CIH and its subsidiaries, he has only a 69.17% interest in Cantor Nevada and an 89.97% interest in CGWL (UK). Defendants reason that any transfer of assets from CIH subsidiaries to Cantor Nevada and CGWL (UK) would result in a loss to

Lutnick. (Def. Reply 8 n.13.) This argument fails as well.[18]

First, it is not clear from the documents before the Court that Lutnick owns 90% of CIH. CFLP is the sole member of CIHLP II, which has an 89% limited partnership interest in CIH. (AC ¶ 11.) Lutnick is the sole shareholder of CF Group Management, Inc., which is the general partner of CFLP. (Jarvis Decl. Ex. 2 at 9.) Although Lutnick is alleged to "control" CFLP, (AC ¶ 15), the precise extent of CF Group Management, Inc.'s ownership interest in CFLP is unclear. If, for example, CF Group Management, Inc. had only a 1% partnership interest in CFLP, and the limited partners owned the balance, Lutnick would own less than 1% of CIH.[19]

In any event, even if Lutnick owns a larger percentage of CIH (whether 90% or not) than of Cantor Nevada or CGWL (UK), it does not follow that the Challenged Transactions do not benefit him. The relevant question is whether Lutnick expected that the transactions would increase the value of his 69.17% interest in Cantor Nevada more than they would decrease the value of his 90% interest in CIH. RGL has pled sufficient factual matter from which the Court can infer that this is the case. The complaint alleges that the mobile gaming market is expected to expand, that the Cantor group's stated objective is to reallocate its resources toward Nevada, and that Cantor Nevada has experienced significant growth based in part on mobile gaming technology developed by CIH subsidiaries. (AC ¶¶ 84, 89-91, 107, 149-158, 169-70, 172-91). Moreover, it is further alleged that the individual Defendants planned to contribute Cantor Nevada to a new entity controlled by Lutnick, CET, which in 2011 and 2012 was considering an IPO. (Id. ¶¶ 159-71.) Thus, RGL has adequately alleged that Lutnick saw the Challenged Transactions as an opportunity to bolster a rapidly growing business in Nevada that he predicted

---

[18] If his family trust were included in the calculation, Lutnick would hold an 89.97% interest in Cantor Nevada, (AC ¶ 40), which approximates the percentage interest he has in CIH. Nevertheless, the Court would reject Defendants' argument even if this were not the case.

[19] There is no allegation that Lutnick is a limited partner of CFLP.

would become far more valuable than CIH.

### D. Lutnick's and CIHLLC's Potential Liability

As noted above, demand would be excused for any of the Challenged Transactions—including the closure of Spreadfair, the transfer of CIL's trading activity to CFE, and the increase in related-party fees charged to CIL—if they exposed CIHLLC or Lutnick to a substantial threat of liability. See Desimone, 924 A.2d at 928; Forsythe, 2007 WL 2982247, at *6. As explained in the balance of this opinion, Lutnick faces a substantial threat of liability for his involvement in the 2006 License Agreement and 2011 License Agreement, and both he and CIHLLC face a substantial threat of liability for their involvement in the Asset Purchase Agreement. None of the other Challenged Transactions, however, supports a claim against either Defendant. Thus, demand is excused only for the 2006 License Agreement, the Asset Purchase Agreement, and the 2011 License Agreement, narrowing the scope of RGL's claims to these three transactions.

## V.    RGL's Claims

### A. Count I:  Breach of Fiduciary Duty

Defendants move to dismiss RGL's claim for breach of fiduciary duty, which is brought against CIHLLC, Lutnick, Merkel, and Amaitis. RGL plausibly states a claim against all four Defendants.

#### 1.  Applicable Law

"It is established Delaware law that a general partner owes a partnership fiduciary duties similar to the duties directors owe to a corporation." Brinckerhoff, 2011 WL 4599654, at *7. These are the "duties of care and loyalty," which, "where violated, may directly result in liability." Stone ex rel. AmSouth Bancorp. v. Ritter, 911 A.2d 362, 370 (Del. 2006).

"The focus of a duty of care analysis is not the substance of the decision the [fiduciaries]

made but rather the process they undertook in making it. 'Due care in the decision making context is *process* due care only.'" Stewart v. BF Bolthouse Holdco, LLC, C.A. No. 8119-VCP, 2013 WL 5210220, at \*10 (Del. Ch. Aug. 30, 2013) (quoting Brehm, 746 A.2d at 264). "Gross negligence is the standard for evaluating a breach of the duty of care." Feeley v. NHAOCG, LLC, 62 A.3d 649, 664 (Del. Ch. 2012). "In the duty of care context, gross negligence is 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'" Sutherland v. Sutherland, C.A. No. 2399-VCN, 2013 WL 2362263, at \*11 (Del. Ch. May 30, 2013) (quoting McPadden v. Sidhu, 964 A.2d 1262, 1274 (Del. Ch. 2008)). "A failure to act on an informed basis" breaches the duty of care. Id.

A breach of the fiduciary duty of loyalty may be established by showing "that the defendants either (1) 'stood on both sides of the transaction and dictated its terms in a self-dealing way,' or (2) 'received in the transaction a personal benefit that was not enjoyed by the shareholders generally.'" In re Coca-Cola Enterprises, Inc., C.A. No. 1927-CC, 2007 WL 3122370, at \*4 (Del. Ch. Oct. 17, 2007) (quoting Chaffin v. GNI Grp., Inc., No. Civ.A. 16211-NC, 1999 WL 721569, at \*5 (Del. Ch. Sept. 3, 1999)), aff'd sub nom. Int'l Bhd. Teamsters v. Coca-Cola Co., 954 A.2d 910 (Del. 2008). In addition, "[d]irectors of a parent board can breach their duty of loyalty if they purposely cause—or knowingly fail to make efforts to stop—action by a wholly-owned subsidiary that is adverse to the interests of the parent." Grace Bros., Ltd. v. Uniholding Corp., No. Civ.A. 17612, 2000 WL 982401, at \*1, \*12 (Del. Ch. July 12, 2000); see also Stone, 911 A.2d at 369. Analogously, as CIH's general partner, CIHLLC would breach its duty of loyalty if it purposely caused one of CIH's wholly owned subsidiaries to act in a manner inimical to the interests of CIH or knowingly failed to stop the subsidiary from pursuing such a course of action.

"'[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.'" Hamilton Partners, L.P. v. England, 11 A.3d 1180, 1208-09 (Del. Ch. 2010) (quoting Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1174 (Del. 1988)). In addition, the Delaware Court of Chancery has consistently held "that the individuals and entities who control the general partner owe to the limited partners at a minimum the duty of loyalty." Feeley, 62 A.3d at 670-71. Thus, for example, the "[o]fficers, affiliates and parents of a general partner, *may* owe fiduciary duties to limited partners if those entities control the partnership's property." Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1178 (Del. Ch. 1999); see also Paige Capital Mgmt., LLC v. Lerner Master Fund, LLC, CIV.A. 5502-CS, 2011 WL 3505355, at *30 (Del. Ch. Aug. 8, 2011) ("[A] director, member, or officer of a corporate entity serving as the general partner of a limited partnership . . . who exercises control over the partnership's property owes fiduciary duties directly to the partnership and its limited partners."). The rationale behind this extension of fiduciary duties is that "one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner." In re USACafes, L.P. Litig., 600 A.2d 43, 48 (Del. Ch. 1991).[20] This theory "has not been extended beyond duty of loyalty claims," however, and thus the controllers of a general partner are not held liable for breaches of the duty of care, *i.e.*, gross negligence. Feeley, 62 A.3d at 671-72.

The DRULPA provides that "[a] partnership agreement may provide for the limitation or

---

[20] Thus, "mere ownership—either direct or indirect—of the general partner does not result in the establishment of a fiduciary relationship." Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners, No. Civ.A. 16630-NC, 2001 WL 1641239, at *8 (Del. Ch. Dec. 4, 2001).

37

elimination of any and all liabilities for . . . breach of duties (including fiduciary duties) of a

partner or other person to a limited partnership" with the exception of "a bad faith violation of

the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 17-1101(f). Here,

the LPA contains an exculpatory provision that limits CIHLLC's liability as general partner "to

the fullest extent permitted by the Act," with the exception of liability for, among other things,

"act[s] or omission[s]" attributable to CIHLLC's "willful misconduct" or "gross negligence."[21]

(AC Ex. A § 3.04(a).) [22]

As noted above, "gross negligence" is the standard for a breach of the duty of care.

Feeley, 62 A.3d at 664. "Willful misconduct is one standard for evaluating whether a fiduciary

breached the duty of loyalty by acting in bad faith." Id.

> A failure to act in good faith may be shown, for instance, where the fiduciary
> intentionally acts with a purpose other than that of advancing the best interests of
> the corporation, where the fiduciary acts with the intent to violate applicable
> positive law, or where the fiduciary intentionally fails to act in the face of a
> known duty to act, demonstrating a conscious disregard for his duties.

Stone, 911 A.2d at 369 (quoting In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 67 (Del.

2006); see also Dawson v. Pittco Capital Partners, L.P., C.A. No. 3148-VCN, 2012 WL

1564805, at *28 n.303 (Del. Ch. Apr. 30, 2012) ("The duty to refrain from intentional

---

[21] The DRULPA also provides that a partner or other person's fiduciary duties "may be
expanded or restricted or eliminated by provisions in the partnership agreement; provided that
the partnership agreement may not eliminate the implied contractual covenant of good faith and
fair dealing." 6 Del. C. § 17-1101(d). Here, though, the LPA explicitly limits "[t]he liability of
the General Partner," rather than its fiduciary duties. (AC Ex. A § 3.04(a).)

[22] The exculpatory provision also contains an exception for "breach of duty." (AC Ex. A §
3.04(a).) Defendants argue, however, that this cannot include the full range of fiduciary duties,
and RGL concedes this point, arguing only that Defendants' conduct amounted to gross
negligence and willful misconduct. (Pl. Opp'n 24-26.)

The Court notes that the hold-harmless provision cited by Defendants, (Def. Mem. 29), appears
merely to provide for indemnification and in any event also contains exceptions for gross
negligence and willful misconduct. (AC Ex. A § 3.04(e).)

misconduct is a subset of the general duty of loyalty, much akin to, and essentially a subset of or another name for, the duty to act in good faith . . . .").

"[W]hen intentional misconduct or bad faith is the standard at issue, and not the general, broader loyalty standard, some showing of the requisite mental state is necessary for the defendant to be liable; mere participation in a self-dealing, unfair transaction is not enough, without a showing of the requisite mental state." Dawson, 2012 WL 1564805, at *32.  Of course, "general loyal[t]y and due care concerns are not irrelevant to an intentional misconduct analysis," as "[a] self-interested or otherwise conflicted [general partner] has an incentive to engage in certain sorts of intentional misconduct that an independent [general partner] would not." Id.  "Some actions may objectively be so egregiously unreasonable . . . that they 'seem [ ] essentially inexplicable on any ground other than [subjective] bad faith.'" Allen v. Encore Energy Partners, L.P., 72 A.3d 93, 107 (Del. 2013) (alterations in original) (quoting Parnes v. Bally Entm't Corp., 722 A.2d 1243, 1246 (Del.1999)).  "It may also be reasonable to infer subjective bad faith in less egregious transactions when a plaintiff alleges objective facts indicating that a transaction was not in the best interests of the partnership and that the [general partner] knew of those facts." Id.  However, mere "approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith." Wood v. Baum, 953 A.2d 136, 142 (Del. 2008).

Aside from conclusory assertions of liability, there is no allegation that the decision-making process of any of the Defendants was tainted by gross negligence.  Indeed, the complaint does not describe their decision-making process at all or allege that they failed to act on an informed basis.  Thus, only the duty of loyalty is at issue, and Defendants may be liable only for willful misconduct in violation of that duty.

## 2.  CIHLLC's Liability

RGL states a claim for willful misconduct against CIHLLC.  Defendants argue that RGL

has not alleged that CIHLLC was involved in or directed any of the Challenged Transactions.

As explained above, however, CIHLLC can be liable for willful misconduct if, in "conscious

disregard" of its duty of loyalty, Stone, 911 A.2d at 369, it "knowingly fail[ed] to make efforts to

stop" actions by wholly owned CIH subsidiaries that were adverse to the interests of CIH, Grace

Bros., Ltd., 2000 WL 982401, at *1.

The complaint contains a number of allegations that are probative of CIHLLC's

knowledge of the Challenged Transactions.  Lutnick occupied key positions at the CIH

subsidiaries whose valuable assets were allegedly siphoned away.  He "served as a director

and/or officer of one or more of the CIH Entities, including [CIL]" and "executed the 2006

License Agreement . . . as Chairman and Chief Executive Officer of [CILLC]."  (AC ¶ 15.)

As a result, it is reasonable to infer that Lutnick knew about each of the Challenged Transactions,

particularly in light of his positions at Cantor Nevada and CGWL (UK), which participated in the

majority of the transactions.  (Id. ¶¶ 45, 47.)

In addition, the complaint alleges that Lutnick served as "Chairman of CFS, which is the

sole member of CIH's general partner CIHLLC."  (Id. ¶ 45.)  As a general rule, Lutnick's

knowledge can be imputed to the entities in which he was a director or officer.  See Triton Const.

Co., Inc. v. E. Shore Elec. Servs., Inc., Civil Action No. 3290-VCP, 2009 WL 1387115, at *16

(Del. Ch. May 18, 2009) ("[I]t is the general rule that knowledge of an officer or director of a

corporation will be imputed to the corporation."), aff'd, 988 A.2d 938 (Del. 2010); Khanna, 2006

WL 1388744, at *27 & n.215 (imputing the general partner's knowledge to a limited partnership

in the context of a motion to dismiss).  To the extent this rule applies, Lutnick's knowledge of

the transactions can be imputed to CFS, and it is reasonable to infer that CIHLLC would possess the same knowledge as CFS, its sole member.

Similarly, Amaitis "served as a director and/or officer" of CIHLLC, CIL, and CILLC. (AC ¶ 13; see also id. ¶ 96.) Specifically, Amaitis has served as Executive Managing Director of CILLC since 2004. (Id. ¶ 46.) It is therefore reasonable to infer that he knew about the Challenged Transactions, all of which involved CIL or CILLC. Moreover, he executed the Asset Purchase Agreement on behalf of CGWL (UK) and executed the 2011 License Agreement on behalf of both CILLC and Cantor Nevada. (Id. ¶¶ 116, 130.) His status as a director and/or officer of CIHLLC also suggests that his knowledge may fairly be imputed to CIHLLC.

The application of the imputation doctrine is not, however, so straightforward. RGL alleges that Lutnick and Amaitis personally benefited from certain of the Challenged Transactions. CFS and CIHLLC, by contrast, were purportedly harmed, as they held a 1% limited partnership interest in CIH and had no corresponding interest in Cantor Nevada or CGWL (UK). "Under agency law, the knowledge of an agent is generally imputed to his principal *except* when the agent's own interests become adverse [to those of the principal]." MetCap Sec. LLC v. Pearl Senior Care, Inc., No. Civ.A. 2129-VCN, 2007 WL 1498989, at *10 (Del. Ch. May 16, 2007). The rationale for this adverse-interest exception is that, in such circumstances, "it is to the agent's own interest not to impart the knowledge to the principal." 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 819; see also 18B Am. Jur. 2d Corporations § 1451 ("[T]he presumption that an agent will report information of his or her activities to the corporation is invalid when the agent is involved in matters damaging to the corporation."). This rationale is weaker here, however, as Lutnick and Amaitis's incentive to

keep information from CIHLLC may be mitigated by the fact that Lutnick exercises control over CIHLLC.

The complaint does not directly link CIHLLC to any Challenged Transaction, and the extent to which CIHLLC can be charged with its agents' knowledge of these transactions is unclear. RGL therefore has not plausibly alleged that CIHLLC is liable for the vast majority of the Challenged Transactions. One allegation, however, tips the scales in favor of the conclusion that RGL has adequately pled CIHLLC's knowledge of the Asset Purchase Agreement by which CGWL (UK) acquired CIL's FFO business. The complaint quotes CET's Form S-1/A, which states that Cantor Nevada "acquired, through entities under common control, [CGWL (UK)] . . . when it was *contributed by [CFLP] to [Cantor Nevada] from [CIL]*." (AC ¶ 123; see also Jarvis Decl. Ex. 4 at 59, 67, 73.)[23] CFLP's ability to manage CIH's subsidiaries—and thereby contribute CIL's FFO business to CGWL (UK)—derives from its control over CIH's general partner, CIHLLC. (Pl. Opp'n, App'x. A, Chart II.) It is therefore reasonable to infer that CIHLLC was involved in the transaction or, at the very least, was aware of it.

RGL has also sufficiently alleged bad faith on the part of CIHLLC with respect to this transaction. Pursuant to the Asset Purchase Agreement, CIL sold its FFO business to CGWL (UK) for only £1.00. (AC ¶ 104.) Defendants are correct to note that the FFO business's projected gross revenues alone, (id. ¶ 112), do not establish that it generated a net profit. However, the fact that Amaitis described FFO as "a very successful product," (id. ¶ 72), renders it plausible that £1.00 was patently insufficient compensation for the business, assets, goodwill,

---

[23] CGWL (UK)'s application for a gambling license with the United Kingdom's Gambling Commission indicates that CGWL (UK) was "newly incorporated" in order to "take over the [FFO] operations of [CIL]." (AC ¶ 106.) The application further states that the FFO transfer was "part of a corporate restructuring" in which the Cantor group of companies "re-organi[z]e[d] and consolidate[d] its gambling-related business" and "concentrate[d] more resources in the USA (Nevada)." (Id. ¶¶ 106-07.)

and employees of CIL associated with the FFO service. Moreover, the various documents quoted in the complaint suggest that the Asset Purchase Agreement was intended to be part of a broader reorganization within the Cantor group, rather than an arms-length transaction in which CIL sought a reasonable purchase price. (Id. ¶¶ 106-09, 122-23.)

The Asset Purchase Agreement conferred a substantial benefit on Lutnick, who controls CIHLLC and holds an 89.97% equity interest in the recipient of the FFO business. (Id. ¶ 103.) At this stage of the litigation, the objectively suspect nature of the transaction, coupled with Lutnick's incentives, permits the inference that CIHLLC acted (or failed to act) not only knowingly but also willfully. See Allen, 72 A.3d at 107; Dawson, 2012 WL 1564805, at *32.

It is adequately pled that CIHLCC knew the terms of the Asset Purchase Agreement and either was directly involved in the transaction or chose not to stop it, purposefully undermining CIH's interests for Lutnick's benefit. RGL therefore plausibly alleges that CIHLLC engaged in willful misconduct, breaching its duty of loyalty to the limited partnership in a manner not exculpated by the LPA.

### 3. Lutnick's Liability

The complaint also states a claim for breach of fiduciary duty against Lutnick. As a result of his control over the general partner, Lutnick can be liable for willful misconduct in breach of his duty of loyalty to the limited partners. See Feeley, 62 A.3d at 671-72. Moreover, Lutnick owes fiduciary duties to the partnership by virtue of his status as a director or officer of its subsidiaries. See Hamilton Partners, L.P., 11 A.3d at 1208-09.

As explained above, the allegations in the complaint are sufficient to establish that Lutnick knew about the Asset Purchase Agreement, had the power to stop it, and nevertheless chose to let it proceed, primarily because of the personal benefit he would receive. This is

sufficient to entitle RGL to proceed with discovery on a claim of willful misconduct. See Stone, 911 A.2d at 369; Grace Bros., Ltd., 2000 WL 982401, at *1, *12.

Furthermore, it is plausibly alleged that Lutnick played a direct role in the 2006 License Agreement. Lutnick executed the agreement on behalf of all parties in his capacity as Chairman and CEO of both CILLC and Cantor Nevada. (AC ¶ 86.) Cantor Nevada was thereby granted a perpetual, royalty-free license to use CILLC patents in exchange for consideration that was to "be determined within a reasonable time pursuant to arms-length negotiations in good faith." (Id. ¶¶ 83, 85.) Consideration was never paid, however, or even negotiated. (Id. ¶¶ 87-88.) The License Agreement and CILLC's subsequent failure to enforce its right to compensation allegedly benefited Lutnick, given his large stake in Cantor Nevada, but appear detrimental to CILLC and, by extension, CIH.

Although Lutnick executed the License Agreement for CILLC, it is not alleged that he directed CILLC to refrain from seeking compensation. Lutnick's knowing failure to cause CILLC to act in CIH's interests would, however, constitute willful misconduct. It is reasonable to infer that, as Chairman and CEO of CILLC, and as a signatory to the 2006 License Agreement, Lutnick knew that CILLC was failing to seek compensation to which it was entitled. Lutnick also had the power to rectify the situation, given his control over CILLC via CIHLLC. As a result of his ownership interest in Cantor Nevada, however, he had an incentive to do nothing.

Defendants contend that that there is no reason to believe "that a reasonable time has elapsed or that the compensation could have been determined." (Def. Mem. 37.) It appears that Cantor Nevada has already made use of CILLC's intellectual property. (AC ¶¶ 84, 89-91, 147-159.) Nevertheless, eight years have passed without any negotiation or appraisal to determine

44

compensation. (Id. ¶ 87.) While the delay may turn out to be justified, at this stage in the litigation, RGL has credibly alleged willful misconduct on the part of Lutnick.

The same is true of the 2011 License Agreement. Lutnick's position as Chairman and CEO of CILLC and Chairman of Cantor Nevada permits the inference that he knew the terms of the transaction, which conferred the right to receive royalties from CILLC's patents on Cantor Nevada rather than CILLC. His stake in Cantor Nevada suggests the truth of the allegation that he failed to require the negotiation of a royalty arrangement more favorable to CILLC because it was not in his interest to do so. Accordingly, RGL states a claim for willful misconduct against Lutnick based on this transaction as well. Defendants' argument that CILLC has not "suffered any damage through the loss of any revenue or royalties," as the complaint does not allege that any payments have been made to Cantor Nevada, is without merit. (Def. Mem. 38.) The right to receive payments in the future is valuable irrespective of whether any payments have already been made. While Defendants' argument may affect the amount of damages, if any, that may be recovered from Lutnick, it does not change the fact that RGL plausibly alleges that Lutnick acted in conscious disregard of his duty of loyalty to CIH.

For purposes of analyzing demand futility, the Court notes that none of the remaining Challenged Transactions—the closure of Spreadfair, the transfer of CIL's trading activity to CFE, or the increase in related-party fees charged to CIL—supports a willful misconduct claim against Lutnick and, therefore, exposes him to a substantial threat of personal liability. RGL rightly notes that because Lutnick was a director or officer of CIL and an officer of CILLC, it can be inferred that he knew about these transactions. As explained in Part IV(C) above, however, RGL does not plausibly allege that Lutnick materially benefited from these business

decisions and therefore had a sufficiently strong incentive to disregard his fiduciary duties.[24]  As a result, RGL has not adequately pled that Lutnick "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties" with respect to these transactions.  Stone, 911 A.2d at 369.

### 4.  Merkel's Liability

As "a director and/or officer of one or more of the CIH Entities, including [CIL]," (AC ¶¶ 14, 33), and as "Executive Managing Director, General Counsel, and Secretary" of CFLP, (id. ¶ 46), which exercises control over CIH's property, Merkel owes fiduciary duties to CIH and its limited partners.  See Feeley, 62 A.3d at 670-71; Hamilton Partners, L.P., 11 A.3d at 1208-09.

Merkel's positions at CIL and CFLP, which directed CIL to transfer its FFO business to CGWL (UK), permit the inference that he knew about the Asset Purchase Agreement.  This inference is bolstered by Merkel's status as "Executive Vice President, Chief Legal Officer, General Counsel and Secretary of Cantor Nevada," (AC ¶ 46), which wholly owns CGWL (UK). Merkel also purportedly benefited from the transaction by consequence of his ownership interest in CGWL (UK).[25]  (Id. ¶ 103.)  Taken together, these allegations plausibly suggest that Merkel acted in conscious disregard of his duty of loyalty to CIH in allowing CIL to sell its FFO business for £1.00.  RGL therefore states a claim against Merkel under Count I.

### 5.  Amaitis's Liability

The breach-of-fiduciary-duty claim survives against Amaitis as well.  It is alleged that Amaitis "served as a director and/or officer" of CIHLLC, CIL, and CILLC and, in particular, that

---

[24] Indeed, with respect to the transfer of CIL's trading activity to CFE and increase in related-party fees charged to CIL, the Court has no reason to infer that the increase in the value of Lutnick's unspecified interest in CFE outweighed the decrease in the value of Lutnick's unspecified interest in CIL.

[25] While Merkel's 2.6% ownership interest in CGWL (UK) is modest, it is not offset by any interest in CIL.

he has served as Executive Managing Director of CILLC since 2004. (AC ¶¶ 13, 46, 96, 130.) Thus, at the very least, Amaitis owes a duty of loyalty to CIH. See Feeley, 62 A.3d at 670-71; Hamilton Partners, L.P., 11 A.3d at 1208-09.

Amaitis also has significant ties to Cantor Nevada, having "served as [its] President . . . from 2004 to January 2009, and as its CEO from January 2009 to the present." (Id. ¶ 46.) He also holds a 7.43% ownership interest in the company. (Id. ¶ 92.) For this reason, he stood to gain from the 2006 License Agreement and 2011 License Agreement, the latter of which he executed on behalf of both CILLC and Cantor Nevada. It is reasonable to infer that, as Executive Managing Director of CILLC, Amaitis had the power to ensure that CILLC negotiated compensation for the use of its patents under both agreements. His failure to do so, in conjunction with the resultant benefit to an entity in which he had a substantial stake, permits an inference of willful misconduct.

The Asset Purchase Agreement may also support a willful misconduct claim against Amaitis, who executed the agreement in his capacity as a director of CGWL (UK) and benefited as a result of his 7.43% ownership interest in that entity. (Id. ¶¶ 103, 116). The fact that he was not acting in his capacity as a director or officer of CIHLLC or CIL at the time does not relieve him of his responsibility to avoid injuring CIH in all of his dealings with CIH or its subsidiaries. See Grace Bros., Ltd., 2000 WL 982401, at *13.

## B. Count II: Aiding and Abetting Breach of Fiduciary Duty

Defendants also move to dismiss RGL's claim for aiding and abetting the aforementioned breaches of fiduciary duty, which is brought against all Defendants other than CIHLLC (i.e., CFLP, CFS, Cantor Nevada, Lutnick, Merkel, and Amaitis). This claim is dismissed only with respect to Merkel.

### 1. Applicable Law

Under Delaware law, "one who knowingly participates in the breach of a fiduciary duty stands liable with the primary wrongdoer for injuries resulting from the breach or the recovery of profit wrongfully captured." In re USACafes, L.P. Litig., 600 A.2d at 55. Thus, "'[t]he elements of a claim for aiding and abetting a breach of a fiduciary duty are: (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.'" Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 172 (Del. 2002) (quoting Fitzgerald v. Cantor, No. CIV. A. 16297-NC, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)).[26]

Defendants' primary contention is that the complaint does not plausibly allege their knowing participation in any breach of duty. "Knowing participation in a . . . fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." Malpiede v. Townson, 780 A.2d 1075, 1097 (Del. 2001). "To plead knowing participation adequately, [a plaintiff] must allege facts that the [defendant] directly 'sought to induce the breach of a fiduciary duty' or 'make factual allegations from which

---

[26] "[W]ithout an underlying breach, the aiding and abetting claim fails." In re Wayport, Inc. Litig., 76 A.3d 296, 323 (Del. Ch. 2013). At the same time, it is "possible for a non-fiduciary to be liable for aiding and abetting even if the [fiduciary] . . . is exculpated for th[e] breach." Id. at 322 n.3 (internal quotation marks omitted). Here, the LPA limits "[t]he liability of the General Partner," as is permitted by 6 Del. C. § 17-1101(f). (AC Ex. A § 3.04(a).) Although the LPA could have "restricted or eliminated" the general partner's underlying fiduciary duties, see 6 Del. C. § 17-1101(d), it does not do so. Cf. Feeley, 62 A.3d at 664 (noting, in the analogous context of the Delaware LLC Act, that "[a] provision exculpating a member from liability for breach of fiduciary duty . . . accomplishes a different result than a provision that modifies, restricts, or eliminates the underlying fiduciary duty itself"). In addition, the LPA does not limit the liability of any person or entity other than the general partner, as it could have done. See 6 Del. C. § 17-1101(f). Thus, Defendants could be liable for aiding and abetting breaches of fiduciary duty for which CIHLLC is exculpated under the LPA.

knowing participation may be inferred.'" In re BJ's Wholesale Club, Inc. S'holders Litig., C.A.
No. 6623-VCN, 2013 WL 396202, at *14 (Del. Ch. Jan. 31, 2013) (quoting In re Telecommc'ns,
Inc. S'holders Litig., No. Civ.A 16470-NC, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003)).
"Knowing participation may be inferred where 'it appears that the defendant may have used
knowledge of the breach to gain a bargaining advantage in the negotiations' or 'where the terms
of the transaction are so egregious or the magnitude of the side deals is so excessive as to be
inherently wrongful.'" Id. (quoting In re Telecommc'ns, Inc. S'holders Litig., 2003 WL
21543427, at *2).

### 2. CFLP's Liability

RGL states a claim against CFLP for aiding and abetting CIHLLC's breach of fiduciary
duty. As explained above, it has been plausibly alleged that the sale of CIL's FFO business for
£1.00 pursuant to the Asset Purchase Agreement involved willful misconduct on the part of
CIHLLC and damaged CIH's interests. CFLP's participation in this breach of duty is evident
from the fact that, according to CET's Form S-1/A, CFLP caused its subsidiaries to enter into the
transaction. (AC ¶ 123.) Furthermore, given the facially egregious terms of the transaction, it is
plausible that CFLP knew that the transaction constituted a breach of fiduciary duty, as alleged.
No more is necessary.

### 3. CFS's Liability

Count II survives against CFS as well. RGL adequately pleads a claim for breach of
fiduciary duty against CIHLLC. It is reasonable to believe that, as the sole member of CIHLLC,
CFS knowingly participated in that breach. Cf. Feeley, 62 A.3d at 659 ("As the managing
member and sole decision-maker of AK–Feel, Feeley made the challenged decisions and carried
them out on behalf of AK–Feel. He therefore participated knowingly in [its] contractual

breaches of duty.").[27]

Defendants argue that CFS cannot be liable for the actions of CIHLLC because the Delaware LLC Act provides that "no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company." 6 Del. C. § 18-303(a). Here, however, CFS would not be held liable "solely by reason of being a member" of CIHLLC, but rather because CFS knowingly caused CIHLLC to breach its fiduciary duties.

Defendants cite no case in which this provision of the LLC Act shielded a member or manager from aiding and abetting liability. Indeed, Delaware cases addressing similar factual scenarios suggest otherwise. In Feeley, the Court of Chancery held that Feeley, an individual who acted as the sole and managing member of AK-Feel (a Delaware LLC), was liable for aiding and abetting AK-Feel's breaches of the operating agreement of Oculus (a Delaware LLC of which AK-Feel was a member). See 62 A.3d at 659. Moreover, Feeley claimed that to hold him liable for breach of fiduciary duty as the controller of AK-Feel would require "disregard[ing] the separate existence" of the LLC and "piercing [its] corporate veil." Id. at 667. The court rejected this argument, noting that "Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers." Id. at 668. The Court finds no reason to reach a different conclusion here.

---

[27] It is possible that CIHLLC has a single passive member, CFS, and a non-member manager. See R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations §20.3 ("The management of an LLC may be vested in its members or in a manager or managers, or in other persons, or in a combination of members, managers, and other persons (§ 18-402). A manager of an LLC need not be a member.") Defendants do not make this argument, however, and it is reasonable to infer from RGL's allegations that CFS manages CIHLLC's activities.

Moreover, in <u>Gotham Partners, L.P.</u>, the Delaware Supreme Court held that the directors and controlling stockholders of a corporate general partner were liable for aiding and abetting the corporation's breach of its contractually delimited fiduciary duties to the limited partnership that it managed. 817 A.2d at 173. Significantly, the court did not consider whether the corporate shield protected the directors and controlling stockholders from aiding-and-abetting liability, which suggests that the LLC Act would not shield LLC members either. <u>See</u> <u>Poore v. Fox Hollow Enterprises</u>, No. C.A. 93A-09-005, 1994 WL 150872, at *2 (Del. Super. Mar. 29, 1994) (noting that the LLC Act "afford[s] limited liability for members and managers similar to the limited liability afforded to shareholders and directors of a Delaware corporation"). CFS therefore cannot avoid liability on this basis.

### 4. Cantor Nevada's Liability

The aiding-and-abetting claim is adequately pled as to Cantor Nevada as well. It is plausibly alleged that Lutnick and Amaitis breached their duty of loyalty to CIH with respect to the 2006 License Agreement and 2011 License Agreement. Moreover, both individuals occupied high-level positions at CILLC and Cantor Nevada when the agreements were executed, and they continued to occupy such positions during the time CILLC's compensation was to be negotiated pursuant to the 2006 License Agreement. (AC ¶¶ 45-46, 86, 130.) Their knowledge can therefore be imputed to Cantor Nevada, which was an active participant in and beneficiary of both transactions. As a result, Defendants' contention that Cantor Nevada did not knowingly participate in any breach of fiduciary duty fails.

### 5. Lutnick, Merkel, and Amaitis's Liability

RGL has plausibly alleged that, given their positions at Cantor Nevada and CILLC, both Lutnick and Amaitis were knowing participants in the 2006 License Agreement and 2011

License Agreement. Indeed, Lutnick executed the 2006 License Agreement for both sides, and Amaitis did the same for the 2011 License Agreement.

The aiding-and-abetting claim assumes that Lutnick and Amaitis are non-fiduciaries—an assumption that is inconsistent with the allegations in the complaint and with the breach-of-fiduciary-duty claim. If, however, it is later determined that one of the two individuals is actually a non-fiduciary, he may be liable for aiding and abetting the other's breach. RGL may therefore "continue to pursue the inconsistent, conflicting, aiding and abetting claim if [it] so choose[s]." Wallace, 752 A.2d at 1184.

Merkel's status as a director and/or officer of CIL, Cantor Nevada, and CFLP, (AC ¶¶ 14, 46), plausibly suggests that he knew about at least some of the transactions. There is no further allegation, however, that would permit the inference that he participated in any of them. At most, as discussed with respect to Count I, it is plausibly alleged that Merkel knew about the Asset Purchase Agreement and consciously chose to do nothing to stop it. This does not rise to the level of inducing, encouraging, advocating, or assisting the underlying breach, as is required for aiding-and-abetting liability. See Malpiede, 780 A.2d at 1097; In re NYMEX S'holder Litig., C.A. No. 3621-VCN, 2009 WL 3206051, at *12-13 (Del. Ch. Sept. 30, 2009). Count II is therefore dismissed with respect to Merkel.[28]

### C. Count III: Unjust Enrichment

The third count in the complaint alleges that all Defendants are liable for unjust enrichment. "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the

---

[28] Although CFE is dismissed from this action for lack of personal jurisdiction, the Court further notes that the complaint does not state a claim against CFE for aiding and abetting. CFE is alleged to have participated in only two transactions: the transfer of CIL's trading activity and the increase in related-party fees charged to CIL. Because demand is excused as to neither transaction, Count II could not be maintained against CFE.

retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010) (quoting Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988)). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." Id. This claim is dismissed as to all Defendants except Cantor Nevada, Lutnick, Merkel, and Amaitis.

### 1. Enrichment

At the outset, the Court notes that Defendants do not contest the element of impoverishment with regard to CIH.[29] As to the element of enrichment, however, neither CIHLLC nor CFS could have been enriched by any of the Challenged Transactions. CIHLLC and CFS hold the same 1% ownership interest in CIH, which is alleged to have lost value as a result of the transactions. Neither CIHLLC nor CFS has a stake in Cantor Nevada or CGWL (UK), which are alleged to have gained value. Count III is therefore dismissed as to CIHLLC and CFS.

Nor has the complaint adequately alleged that CFLP was enriched. CFLP holds an 89% ownership interest in CIH via CIHLP II and controls an additional 1% via CIHLLC. (Pl. Opp'n, App'x A, Chart II). However, the complaint does not allege that CFLP holds any ownership interest in Cantor Nevada or CGWL (UK). RGL's brief cites a portion of the complaint that alleges that CFLP licensed technology to Cantor Nevada and "provided Cantor Nevada with a large line of credit to begin operations." (AC ¶ 140.) RGL also points to CET's Form S-1/A,

---

[29] "'Impoverishment' does not require that the plaintiff seeking a restitutionary remedy suffer an actual financial loss, as distinguished from being deprived of the benefit unjustifiably conferred upon the defendant." Nemec, 991 A.2d at 1130 n.37.

which suggests that CET may enter into a contribution agreement with CFLP in connection with its proposed IPO, pursuant to which CFLP would hold an undisclosed number of shares of CET stock. (Jarvis Decl. Ex. 4 at 7.) As RGL fails to explain the significance of these attenuated links between CFLP and Cantor Nevada, the Court finds that it has not plausibly pled a claim of unjust enrichment against CFLP. See Vichi v. Koninklijke Philips Elec. N.V., 62 A.3d 26, 59-61 (Del. Ch. 2012) (emphasizing the need for a "direct relationship" between the plaintiff's impoverishment and the defendant's enrichment and, therefore, a "direct benefit" to the defendant).

In addition, as is relevant to demand futility, the closure of Spreadfair, transfer of CIL's trading activity to CFE, and increase in related-party fees charged to CIL cannot support a claim for unjust enrichment. The complaint does not plausibly allege that any of the Defendants were actually enriched by the decision to close CIL's Spreadfair business. Furthermore, although the increase in related-party fees paid by CIL and the transfer of CIL's trading activity both enriched CFE, CFE is not a proper Defendant in this action, and there is insufficient information in the complaint from which to conclude that any other Defendant was enriched through CFE. CIHLLC is not alleged to have any stake in CFE, and as noted above, RGL has not pled with the requisite particularity and plausibility that Lutnick benefited from the transfers from CIL to CFE.

## 2. Relationships Governed by Contract

Defendants' primary argument is that RGL cannot maintain a claim for unjust enrichment as to the remaining transactions because they occurred pursuant to written agreements. "If unjust enrichment arises from a relationship governed by contract, then that contract alone must provide the measure of the plaintiff's rights." AM Gen. Holdings LLC ex rel. Ilshar Capital LLC v. Renco Grp., Inc., C.A. No. 7639-VCN, 2013 WL 5863010, at *15 (Del. Ch. Oct. 31, 2013)

(internal quotation marks omitted).  Furthermore, "unjust enrichment cannot be used 'to circumvent basic contract principles [recognizing] that a person not a party to [a] contract cannot be held liable to it.'"  Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 891 (Del. Ch. 2009) (alterations in original) (quoting MetCap Sec. LLC, 2007 WL 1498989, at *6).  The mere existence of a contract, however, is insufficient to preclude an unjust enrichment claim, since a defendant's misconduct may enrich that defendant in the form of an unjust contract.  See McPadden, 964 A.2d at 1276 ("Plaintiff alleges that it is the [contract], itself, that is the unjust enrichment; that is, [Defendant's] manipulative conduct . . . unjustly enriched him in the form of the contract for the sale of [the subsidiary of the company of which he was an officer] to [a company that he owned].").

Applying these principles, the Court finds that the 2006 License Agreement cannot support a claim for unjust enrichment.  Defendants are alleged to have been unjustly enriched not by virtue of the agreement itself, but by Cantor Nevada's failure to pay the consideration contemplated by the agreement.  Thus, "the contract is the measure of plaintiff['s] right," Wood v. Coastal States Gas Corp., 401 A.2d 932, 942 (Del. 1979), and it need not resort to a theory of unjust enrichment in order to recover for a breach of that agreement.  By contrast, RGL alleges that the Asset Purchase Agreement and 2011 License Agreement were themselves improper transactions designed to unjustly enrich Defendants.  Accordingly, the fact that these transactions involved contracts does not foreclose the possibility of a viable unjust enrichment claim.[30]

---

[30] Defendants also make the related argument that RGL was required to plead that "CIH, or its subsidiaries (the transferors), transferred some business or asset with the purpose of benefitting the recipient, and the recipient had an obligation, but did not pay for it in return." (Def. Mem. 48.)  They contend that RGL has not done so, "as the parties to the [Challenged Transactions] clearly contracted for and agreed upon the appropriate consideration." (Id.)  As discussed above, however, the payment of consideration is not dispositive.  As in McPadden, the complaint here alleges that any consideration paid was the product of unfair self-dealing transactions and

### 3. The Nature of the Benefit Received

Defendants do not appear to contest that Cantor Nevada was enriched by the Asset Purchase Agreement and the 2011 License Agreement. (Def. Mem. 49 (discussing only CFLP, CFS, and CIHLLC).) Lutnick, Merkel, and Amaitis, however, purportedly benefited indirectly as a result of their ownership interests in Cantor Nevada. Defendants argue that "an individual director may not be enriched if the challenged transaction does not benefit him personally but only an entity with which he or she is associated." (Id.)

In the case they cite, Dubroff v. Wren Holdings, LLC, the Court of Chancery dismissed unjust enrichment claims against individual defendants who were not alleged to have directly received anything in the challenged transaction. C.A. No. 3940-VCN, 2011 WL 5137175, at *12 (Del. Ch. Oct. 28, 2011). Two of the individual defendants did, however, have substantial ownership interests in one of the entities against which the court had upheld the plaintiff's unjust

---

therefore inadequate.

Furthermore, Defendants' argument appears to conflate unjust enrichment with the quasi-contractual claim of *quantum meruit*, which "allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." Petrosky v. Peterson, 859 A.2d 77, 79 (Del. 2004). As previously noted, the elements of unjust enrichment are different. See Caldera Properties-Lewes/Rehoboth VII, LLC v. Ridings Dev., LLC, C.A. No. 07C-12-002 THG, 2009 WL 2231716, at *30-31 (Del. Super. May 29, 2009) (comparing unjust enrichment and *quantum meruit*), aff'd, 998 A.2d 851 (Del. 2010); but see MetCap Sec. LLC, 2007 WL 1498989, at *6 (imposing quasi-contractual limitations on an unjust enrichment claim). Indeed, fiduciary liability and aider-and-abettor liability frequently give rise to liability for unjust enrichment, even in the absence of a quasi-contractual arrangement of the sort Defendants describe. See, e.g., Frank v. Elgamal, C.A. No. 6120-VCN, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014) (observing that the Delaware Court of Chancery "frequently treats duplicative fiduciary duty and unjust enrichment claims in the same manner when resolving a motion to dismiss"); Jackson Nat. Life Ins. Co. v. Kennedy, 741 A.2d 377, 394 (Del. Ch. 1999) (holding that "it is axiomatic" that the plaintiffs had sufficiently pled certain elements of unjust enrichment, having sufficiently pled that the defendants breached their fiduciary duties or aided and abetted the breach). Of course, the elements of these claims do not perfectly overlap; a defendant may breach its fiduciary duties without being enriched, as in the duty-of-care context.

enrichment claims. See id. at *1-2, *11. Nevertheless, the court did not explicitly hold that an unjust enrichment claim cannot be premised on the benefit an owner receives when his or her company is unjustly enriched.

Other Delaware cases suggest that individuals may be liable for unjust enrichment if they participate in transactions that benefit the entities in which they have ownership interests. See Stevanov v. O'Connor, Civil Action No. 3820-VCP, 2009 WL 1059640, at *14 (Del. Ch. Apr. 21, 2009); Nash v. Schock, No. 14721-NC, 1998 WL 474161, at *1-2 (Del. Ch. July 23, 1998). For example, Nash "ar[o]se[] from a dispute as to the ownership of [a testator's] property that, prior to her death, was transferred by her attorney-in-fact . . . to herself and her family. If not so transferred, the property would have passed to [a university] under [the testator's] will." Schock v. Nash, 732 A.2d 217, 220 (Del. 1999). The Court of Chancery found, *inter alia*, that the attorney-in-fact and her husband were unjustly enriched by the transfers. See Nash, 1998 WL 474161, at *1. The husband argued the funds had been transferred to two Delaware corporations, rather than directly to him, "and that there ha[d] been no evidence presented which would allow plaintiff to pierce the corporate veil and extend the judgment to him or to the two corporations," which were not parties to the action. Id. at *1. The court rejected this argument, holding that, as the attorney-in-fact and her husband would benefit from the improper transfers, "[t]he theory that these funds can be shielded from restitution because the corporations were the depositories rather than [the individuals] shocks any sense of equitable conscience." Id. at *2.

Fundamentally, "a plaintiff must show that there is 'some *direct* relationship . . . between a defendant's enrichment and a plaintiff's impoverishment.'" Vichi, 62 A.3d at 59-60 (alteration in original) (quoting Anguilla RE, LLC v. Lubert-Adler Real Estate Fund IV, L.P., C.A. No. N11C-10-061 MMJ CCLD, 2012 WL 5351229, at *6 (Del. Super. Oct. 16, 2012)). "The implicit

purpose of [this] requirement is to ensure that a court accurately can reverse the unjust retention of a benefit to the loss of another. Where the relationship between the impoverishment and enrichment is attenuated or speculative, the court has no such assurance." Id. at 61.

According to the complaint, the relationship between CIH's impoverishment and the enrichment of Lutnick, Merkel, and Amaitis is anything but attenuated. Collectively, these individuals own Cantor Nevada, which is alleged to have increased in value in part because of the Asset Purchase Agreement and the 2011 License Agreement. While their benefit is, in a sense, indirect, it is not so speculative that the Court would have difficulty reversing its unjust retention should the individual Defendants be found liable.

Count III therefore survives against Cantor Nevada, Lutnick, Merkel, and Amaitis and is dismissed as to all other Defendants. As the threat of liability that Lutnick faces is premised on the Asset Purchase Agreement and the 2011 License Agreement, for which demand is already excused, Count III does not expand the scope of demand futility in this action.

### D. Count IV: Waste of Assets

RGL claims that CIHLLC, Lutnick, Merkel, and Amaitis engaged in waste by "siphoning away" the CIH subsidiaries' businesses and assets "for no or nominal consideration." (AC ¶ 241.) Defendants' response is that none of the transactions meets Delaware's standard for waste—"an extreme test, very rarely satisfied by a [derivative] plaintiff." Steiner v. Meyerson, Civ. A. No. 13139, 1995 WL 441999, at *1 (Del. Ch. July 19, 1995). Count IV nevertheless survives.

### 1. Applicable Law

"[A] waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."

Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997). "A claim of waste will arise only in the rare, 'unconscionable case where directors irrationally squander or give away corporate assets.'" In re Walt Disney Co. Derivative Litig., 906 A.2d at 74 (quoting Brehm, 746 A.2d at 263). The Court is "*not* to examine the allegations to see whether consideration, once received, was excessive or lopsided, was proportional or not, or even whether it was a 'bad deal' from a business standpoint." In re 3COM Corp., No. C.A. 16721, 1999 WL 1009210, at *4 (Del. Ch. Oct. 25, 1999). Instead, "the company would have to receive virtually nothing for what it gave," Criden v. Steinberg, No. 17082, 2000 WL 354390, at *3 (Del. Ch. Mar. 23, 2000), such that the transfer "is in effect a gift," Vogelstein, 699 A.2d at 336.

"In the end, most transactions that actually involve waste are almost found [*sic*] to have been inspired by some form of conflicting self-interest." Sample v. Morgan, 914 A.2d 647, 670 (Del. Ch. 2007). "The doctrine of waste, however, allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms." Id. Thus, "[c]onceived more realistically, the doctrine of waste is a residual protection for stockholders." Id. at 669.

### 2. The Challenged Transactions

The allegations concerning the 2006 License Agreement meet the standard for waste. Although the agreement provides that consideration for the licenses of CILLC's patents would be negotiated "within a reasonable time," it has been eight years, and no negotiations have occurred. (AC ¶¶ 85, 87.) Defendants contend that RGL "cannot[] rule out that consideration will be negotiated after Cantor [Nevada] begins utilizing and realizing revenue from [these] patents." (Def. Mem. 39.) It is alleged in the complaint, however, that Cantor Nevada has

already made use of CILLC's intellectual property.  (Id. ¶¶ 84, 89-91, 147-159.)  Consequently, a rational businessperson likely would have insisted that consideration be negotiated, and the Court cannot conclude that RGL's claim is implausible.

RGL also plausibly alleges that the closure of Spreadfair in 2008 constituted waste.  To be sure, there are a myriad of valid reasons for shutting down a line of business, and a derivative plaintiff should not be allowed to proceed to discovery merely by alleging that the company in which it had invested had discontinued one of its services.  However, Spreadfair had been described in the media as "stunningly successful," (id. ¶ 68), accounted for a large share of CIL's revenue, (id. ¶¶ 73-74), and may have been shut down for reasons unrelated to its value, (id. ¶¶ 96, 99).  It is therefore plausibly alleged that no rational businessperson with CIL's best interests in mind would have shut down Spreadfair.

The 2010 Asset Purchase Agreement supports RGL's waste claim as well.  The sale of an entire line of business for £1.00 "is in effect a gift."  Vogelstein, 699 A.2d at 336.  Indeed, it appears that the sale of CIL's FFO business was intended to be a pure transfer to CGWL (UK) rather than an arm's length transaction involving substantial consideration.  (AC ¶¶ 106-09, 122-23.)  It is of course possible to imagine scenarios in which, given the debt and other costs associated with a business, a person of sound business judgment would want to give it away.  But RGL need not append CIL's financial statements to the complaint in order for it to be plausible that the value of the FFO business far exceeded £1.00.  FFO was projected to generate substantial revenues and was described by Amaitis as "a very successful product."  (Id. ¶¶ 72, 112.)  This is sufficient to survive a motion to dismiss.

The decision by CIL management to transfer CIL's trading activity to CFE in 2011 and retain only a 1% economic interest, (id. ¶¶125-27), was also essentially a gift.  It, too, therefore

meets the standard for waste.

The same is true of the 2011 License Agreement, which provided that all royalties from CILLC patents licensed to Shuffle Master would be paid to Cantor Nevada rather than CILLC. (Id. ¶¶ 133-34.) Defendants argue that this agreement cannot support a claim of waste because "RGL fails to allege that any royalty payments or revenues that might be due under this agreement have in fact been earned and paid only to Cantor [Nevada]." (Def. Mem. 40.) This simply means that Cantor Nevada has not yet received any monetary benefit; it does not follow that "CILLC has [not] suffered any loss." (Id.) The right to make use of CILLC's patented systems and methods is valuable, as evidenced by Shuffle Master's desire to enter into the agreement. While there may be legitimate reasons for Cantor Nevada to receive payment, (Jan. 30, 2014 Tr. 20:4-8, ECF No. 37), there does not appear to be any reason for CILLC to receive no consideration whatsoever for its intellectual property.

The final Challenged Transaction, the increase in fees paid by CIL to CFE and other Cantor affiliates, does not, however, state a claim for waste. RGL alleges that related-party fees increased even as CIL's revenues declined and that in 2007 the amount paid was "more than 91% of [CIL's] 2007 revenue." (AC ¶¶ 193-94.) The complaint entirely fails, however, to explain the purpose of these fees. Without more information, the Court cannot conclude that RGL has plausibly alleged that it was irrational to fail to ensure that the fees were correlated to CIL's revenues.

### 3. Implications for Demand Futility

Defendants do not engage in a defendant-by-defendant analysis of liability under Count IV. The Court nevertheless does so for CIHLLC and Lutnick, as demand is excused with respect to any transaction that exposes them to a substantial threat of liability for waste.

As explained in Part V(A)(2) above, the complaint does not adequately allege CIHLLC's involvement in any transaction aside from the Asset Purchase Agreement. To the extent that CIHLLC wasted partnership assets, it is only plausibly alleged to have done so in connection with the Asset Purchase Agreement, and the other transactions thus do not expose it to liability under Count IV.

Lutnick's control over CIHLLC imposed on him a fiduciary duty of loyalty to RGL. Feeley, 62 A.3d at 670-71 (observing that "the individuals and entities who control the general partner owe to the limited partners at a minimum the duty of loyalty"). It does not appear, however, that his control over CIHLLC exposes him to liability for wasting partnership assets. See id. at 671-72 (noting that controller liability "has not been extended beyond duty of loyalty claims"); Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, C.A. No. 3658-VCS, 2009 WL 1124451, at *10 (Del. Ch. Apr. 20, 2009) (same); In re USACafes, L.P. Litig., 600 A.2d at 49 n.3 (noting that the extension of the duty of loyalty to the directors of a corporate general partner "impl[ies] nothing on such questions as whether a director of a corporate general partner might be held liable directly to the partnership . . . for waste of partnership assets"). As a director or officer of CIH's subsidiaries, however, Lutnick can be held liable in a double-derivative suit for wasting the subsidiaries' assets, to the extent he was involved in the Challenged Transactions. See Schreiber v. Carney, 447 A.2d 17, 18, 22, 26-27 (Del. Ch. 1982).

The Court has already concluded that demand is excused with respect to the 2006 License Agreement, the Asset Purchase Agreement, and the 2011 License Agreement. Moreover, as previously noted, the increase in related-party fees paid by CIL does not support a claim for waste. Consequently, the Court focuses on the remaining two Challenged Transactions: the closure of Spreadfair and the transfer of CIL's trading activity to CFE.

Aside from alleging in a conclusory fashion that the closure of Spreadfair was intended to benefit Cantor Nevada, RGL does not allege that Lutnick was responsible for the closure of Spreadfair. With respect to the transfer of CIL's trading activity to CFE, according to the complaint, CIL's annual report and financial statements disclosed that CIL "management" made the decision. (Id. ¶ 125.) It is not clear, though, whether Lutnick was a "director" or an "officer" of CIL and, therefore, whether he was involved. (Id. ¶ 15.) In sum, RGL has not pled with the requisite particularity and plausibility that Lutnick faces a substantial threat of liability for waste as a result of his participation in either transaction.

At most, then, the liability CIHLLC and Lutnick face under Count IV could excuse demand with respect to the 2006 License Agreement, the Asset Purchase Agreement, and the 2011 License Agreement. Count IV does not excuse demand for the closure of Spreadfair, the transfer of CIL's trading activity to CFE, or the increase in related-party fees paid by CIL. Defendants provide no reason to doubt that RGL states a claim for waste based on at least one of the three surviving transactions against each named Defendant. The Court therefore declines to dismiss Count IV.

### E. Count V: Breach of the Limited Partnership Agreement

RGL's fifth claim alleges that CIHLLC breached the LPA. This claim is dismissed in its entirety. The Delaware Supreme Court has recently summarized the principles of interpretation that apply to limited partnership agreements:

> We construe limited partnership agreements in accordance with their terms in order to give effect to the parties' intent. When interpreting limited partnership agreements, we give words their plain meaning unless it appears that the parties intended a special meaning. We construe limited partnership agreements as a whole and give effect to every provision if it is reasonably possible to do so.

Allen v. Encore Energy Partners, L.P., 72 A.3d 93, 104 (Del. 2013) (footnotes omitted).

The complaint alleges that CIHLLC breached the LPA in two respects. First, by

siphoning assets away from CIH's subsidiaries, CIHLLC is alleged to have breached Section 1.01 of the LPA, which provides that "[t]he Partnership has been formed to . . . [r]ealize the income and gains to be derived from the Products, for the mutual benefit of the Partners." (AC ¶¶ 246-47; id. Ex. A § 1.01(b).) RGL does not defend this theory of liability in its brief, and the Court fails to see how Section 1.01 imposes any obligation on CIHLLC, rather than simply expressing the reason for CIH's existence.

Second, RGL alleges that CIHLLC breached Section 3.03 of the LPA, which requires CIHLLC to seek the unanimous consent of the partners before selling substantially all of CIH's assets or "winding up" or liquidating CIH. (Id. ¶ 248; id. Ex. A § 3.03.) CIHLLC did not obtain RGL's approval for the Challenged Transactions, which are alleged both to have sold substantially all of CIH's assets and to have "wound up" or liquidated CIH. (Id. ¶¶ 249-50.) As discussed above, this aspect of Count V is a direct claim and is therefore dismissed for lack of Article III standing.

This claim would fail on the merits in any event. With respect to subsection (c), Defendants argue that the "business or assets of the Partnership" include only "CIH's own assets[] [and] its shares in its subsidiaries" and do not include the assets of the subsidiaries themselves. (Def. Mem. 43-44.) As Defendants acknowledge, the assets of the partnership generally include the assets held by its subsidiaries. Cf. Gimbel v. Signal Cos., Inc., 316 A.2d 599, 601, 604-08 (Del. Ch. 1974) (considering whether the sale of a wholly owned subsidiary triggered 8 Del. C. § 271(a), "which requires majority stockholder approval for the sale of 'all or substantially all' of the assets of a Delaware corporation"), aff'd, 316 A.2d 619 (Del. 1974); Geer v. Cox, 242 F. Supp. 2d 1009, 1014-15, 1021 (D. Kan. 2003) (analyzing the sale of a wholly owned subsidiary's assets under 8 Del. C. § 271(a)). Defendants argue, however, that

appending the phrase "or Hollywood Stock Exchange, LLC" to the phrase "business or assets of the Partnership" gives the latter a special meaning. They reason that because HSX is a subsidiary of CIH, it would be redundant to specify that unanimous consent is required before selling substantially all of HSX's assets if such consent were already required before selling substantially all of the assets of CIH's subsidiaries.

This reasoning is flawed; the phrase "business or assets of [HSX]" has independent meaning and purpose even though the phrase "business or assets of the Partnership" includes the assets of CIH's subsidiaries. While subsection (c) requires unanimous consent before CIHLLC sells substantially all of CIH's assets, including those held by its subsidiaries, it imposes on CIHLLC the additional obligation of seeking unanimous consent before selling substantially all of HSX's assets, even if CIH would retain a substantial proportion of its assets after the sale. The structure of subsection (c) makes clear, however, that selling substantially all of the assets of a subsidiary *other* than HSX does not require unanimous consent, so long as CIH has substantial assets after the sale.

The closure of Spreadfair, Asset Purchase Agreement, transfer of trading activity to CFE, and increase in related-party fees paid to CFE have allegedly left CIL with very little.[31]  But even if CIL had virtually no assets after these transactions, RGL has not plausibly alleged that the same was true of CIH as a whole.  CIH continued to hold an interest in three other subsidiaries: CILLC, HSX, and CFGH (together with its wholly owned subsidiary CGL, "Cantor Gaming UK").  (AC ¶¶ 28, 34.)  CILLC continued to hold patents that were valuable enough to license on two occasions.  HSX presumably held substantial assets; otherwise, RGL could have asserted an additional breach of subsection (c).  Cantor Gaming UK is alleged to have "created and r[u]n on-

---

[31] It is debatable whether these transactions can be characterized as a sale by CIHLLC, but Defendants do not make this argument.

line and wireless gambling sites," including a "white-label casino service it was running in partnership with Australia-based Gaming & Entertainment Group" and "FHM Casino, an online casino, in partnership with media group Emap plc." (Id. ¶¶ 77, 79-80.) In addition, Cantor Gaming UK "licensed slot game content" from Aristocrat Technologies, Inc. in November 2006 and, in November 2007, "signed an agreement with 24hPoker Holding AB (Sweden) to launch a Cantor Gaming UK-powered site on 24hNetwork and to add poker to www.pub-casino.co.uk, operated by Cantor Gaming UK and Punch Taverns, which operated in 9,000 pubs in the U.K." (Id. ¶ 81.) Although Cantor Gaming UK's site CantorPoker.com was closed around the time that Spreadfair was discontinued, (id. ¶ 101), in light of Cantor Gaming UK's remaining assets, RGL has not plausibly alleged that CIHLLC sold "substantially all" of the assets held by CIH and its subsidiaries.[32]

Nor has RGL adequately pled that CIHLLC wound up or liquidated CIH for purposes of subsection (a) of Section 3.03. "Winding up" is part of the process of formally terminating a partnership. See 6 Del. C. § 17-803 (describing who may wind up a limited partnership's affairs after its dissolution); Instituform Tech., Inc. v. Insitu, Inc., No. CIV. A. 17013, 1999 WL 240347, at *12 n.9 (Del. Ch. Apr. 19, 1999) ("[U]nder partnership law . . . . the termination of a partnership is a three-step process: dissolution, winding up, and then termination."). The same is

---

[32] Although the parties did not brief the issue, it is possible that Section 3.03(c) was intended to be interpreted in the same manner as 8 Del. C. § 271(a), which requires shareholder approval for the sale of substantially all of the assets of a corporation. Shareholder approval is not required "simply because an independent, important branch of a corporate business is being sold" or "upon every 'major' restructuring of the corporation." Gimbel, 316 A.2d at 605. "The standard for determining whether shareholder approval is required" is "whether a transaction is out of the ordinary and substantially affects the existence and purpose of the corporation." Thorpe by Castleman v. CERBCO, Inc., 676 A.2d 436, 444 (Del. 1996) (internal quotation marks omitted). Even if this standard were intended to apply, the result would be the same. CIH's alleged retention of substantial gambling-related assets renders it implausible that either its existence or purpose is threatened.

true of "liquidation." See Quadrangle Offshore (Cayman) LLC v. Kenetech Corp., No. 16362NC, 1999 WL 893575, at *9 (Del. Ch. Oct. 13, 1999) (enumerating the "elements of liquidation: (1) sale of assets; (2) paying off of creditors; (3) distribution of remaining proceeds to shareholders; and (4) abandonment of corporate form"), aff'd, 751 A.2d 878 (Del. 2000); Rosan v. Chicago Milwaukee Corp., 16 Del. J. Corp. L. 378, 387 (Del. Ch. Feb. 6, 1990) ("[T]wo of the central characteristics of a liquidation are the winding up of the corporation's affairs and the abandonment of its corporate identity."). Indeed, the LPA uses these terms to describe the termination of CIH. (AC Ex. A §§ 8.03-04, 8.06.) There is no allegation that CIHLLC has begun this termination process. To the extent RGL argues that "a sale or transfer of substantially all of the assets of an entity can constitute 'liquidation,'" (Pl. Opp'n 33-34), the Court has already determined that RGL has not plausibly alleged such a sale or transfer. Count V is therefore dismissed.

## F. Count VI: Conversion

Defendants next move to dismiss RGL's claim for conversion, which is brought against all Defendants. "'Generally speaking, any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it, is a conversion.'" Israel Disc. Bank of N.Y. v. First State Depository Co., LLC, Civil Action No. 7237-VCP, 2013 WL 2326875, at *20 (Del. Ch. May 29, 2013) (quoting Drug, Inc. v. Hunt, 168 A. 87, 93 (Del. 1933)); see also Lorenzetti v. Hodges, 62 A.3d 1224 (Del. 2013) ("On a claim of conversion, the plaintiff must prove a) a right to the property in question and b) that the defendant holds the property in contravention of that right.").[33] "An action for conversion has traditionally applied to the wrongful exercise of dominion over tangible goods. Following a modern trend, Delaware

---

[33] Although RGL suggests that New York law may apply to its tort claims, (Pl. Opp'n 41 n.33), both parties cite Delaware cases regarding conversion.

courts have tentatively expanded the doctrine to encompass some intangible goods where the intangible property relations are merged into a document," such as a stock certificate. <u>Carlton Inv. v. TLC Beatrice Int'l Holdings, Inc.</u>, Civ. A. No. 13950, 1995 WL 694397, at *16 (Del. Ch. Nov. 21, 1995) (citation omitted). Delaware law focuses on "whether the conversion claim relates to 'specific property'" that is "identifiable." <u>Israel Disc. Bank of N.Y.</u>, 2013 WL 2326875, at *21.

Defendants first argue that "RGL's conversion claim premised on the closing of Spreadfair fails as a matter of law because RGL has not and cannot allege that CIL transferred the entirety of the Spreadfair business to one of the . . . Defendants." (Def. Mem. 40.) But an action of conversion will lie even "though the property alleged to have been converted was not applied to the use of the defendant." <u>Drug, Inc.</u>, 168 A. at 93. Indeed, the intentional destruction of another's property can support a claim for conversion. <u>See</u> <u>Restatement (Second) of Torts</u> § 226.

Defendants are correct, however, that RGL fails to plausibly allege that any Defendant "wrongfully exerted dominion over the Spreadfair business." (Def. Mem. 40.) The complaint points out that Amaitis resigned from his position at CIL shortly before CIL closed Spreadfair, (AC ¶¶ 96-97), suggesting that the two events were connected, but this alone cannot subject him to liability for conversion. The allegation that *The Racing Post* linked the closure of Spreadfair to "Cantor's recent success in getting the regulatory nod in Nevada for its handheld wireless casino gaming device EDeck," (<u>id.</u> ¶ 99), suggests that one or more of the Defendants could have been involved with the decision, but the complaint does no more to connect any Defendant to this transaction.

Next, Defendants contend that CIL's FFO business and the trading activity transferred to

CFE are not "tangible goods capable of being converted." (Def. Mem. 41.)  In response, RGL

cites Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc., which found that "property interests in . . .

proprietary information," including "plans, technology, designs, and specifications," could

support a claim for conversion under Delaware law.  42 F. Supp. 2d 423, 439 (D. Del. 1999).

The court's reasoning appears to be that the proprietary information at issue was "merged into a

document."  Id. (quoting Carlton Inv., 1995 WL 694397, at *16).  Here, RGL does not explain

how the FFO business or trading activity could be deemed to have been "merged into a

document."  It does appear, however, that the Asset Purchase Agreement transferred tangible

assets such as computer hardware and records from CIL to CGWL (UK).  (AC ¶¶ 117-18; id. Ex.

D §§ 1, 2.1.)  These tangible assets could form the basis of a conversion claim, and Defendants

do not argue any other basis for dismissing such a claim based on the Asset Purchase Agreement.

Defendants further argue that the 2006 License Agreement and 2011 License Agreement

cannot support a conversion claim because "the agreement[s] only provide[] for a license to use

the patents, not the assignment o[r] the transfer of the patents themselves."  (Def. Mem. 41.)

Thus, they contend, the licenses did not grant "ownership of or dominion over the patents," as is

required to state a claim for conversion.  (Id.)  RGL argues in response that "mere

'dispossess[ion]' or destruction of a party's property constitutes conversion."  (Pl. Opp'n 37

(alteration in original) (quoting Restatement (Second) of Torts § 223).)  This is the extent of the

parties' argumentation on the subject, and the Court has found no Delaware case that resolves the

issue in the context of patent licenses.  As a general matter, however, "[o]ne who uses a chattel

in a manner which is a serious violation of the right of another to control its use is subject to

liability to the other for conversion."  Restatement (Second) of Torts § 227.  Thus, the unadorned

argument that the license agreements merely impaired CILLC's ability to control the "use" of its

patents, rather than transferring "ownership" over the patents, is not a sufficient basis for dismissing a conversion claim premised on those license agreements.

In addition, Defendants argue that the conversion claim must be dismissed to the extent it is based on the royalties and other compensation due under the license agreements. With respect to the 2006 License Agreement, RGL's claim may be that Cantor Nevada has not paid the consideration explicitly provided for in the agreement and has therefore wrongfully exerted dominion over money due to CILLC. "Where, however, the plaintiff's claim arises solely from a breach of contract, the plaintiff 'generally must sue in contract, and not in tort.'" Kuroda, 971 A.2d at 889 (quoting Data Mgmt. Internationale, Inc. v. Saraga, C.A. No. 05C-05-108, 2007 WL 2142848, at *3 (Del. Super. July 25, 2007)). Moreover, "an action for conversion of money will lie only where there is an 'obligation to return the identical money' delivered by the plaintiff to the defendant" and "not where an indebtedness may be discharged by the payment of money generally." Goodrich v. E.F. Hutton Grp., Inc., 542 A.2d 1200, 1203 (Del. Ch. 1988) (quoting Lyxell v. Vautrin, 604 F.2d 18, 21 (5th Cir. 1979)). Here, the consideration that RGL claims has been wrongfully withheld from CILLC under the 2006 License Agreement is fungible and therefore cannot support a claim of conversion.

RGL's grievance with respect to the 2011 License Agreement is that the agreement was made—not that it was breached. The royalties paid from Shuffle Master to Cantor Nevada could not, however, support a claim for conversion. Even if these royalties could be considered CILLC's property, there is no reason to believe that Cantor Nevada would be obligated to return the specific money that was paid. Thus, with respect to both license agreements, RGL's conversion claim must be premised on CILLC's right to control the use of its intellectual property, rather than Defendants' conversion of royalties or other consideration. For now,

Defendants have not articulated any valid reason to dismiss this aspect of Count VI.

The final Challenged Transaction, the increase in related-party fees charged to CIL, does not constitute conversion. There is no allegation that CIL is entitled to the specific money that was paid, rather than simply the amount it was overcharged. See Goodrich, 542 A.2d at 1203.

Accordingly, Count VI survives only to the extent that Defendants converted CIL's tangible assets through the Asset Purchase Agreement or converted CILLC's patents through the 2006 License Agreement or 2011 License Agreement. As the Court has already determined that demand is excused as to these transactions, the Court need not determine whether CIHLLC or Lutnick in particular face a substantial threat of liability for conversion.

### G. Counts VII and VIII: Fraudulent Conveyance Under New York and Delaware Law

The last claims that RGL has standing to assert are for fraudulent conveyance under N.Y. Debt. & Cred. Law ("DCL") § 276 and 6 Del. C. § 1304(a)(1). Both claims are dismissed.[34]

#### 1. Choice of Law

Relying on the LPA's choice-of-law provision, Defendants argue that Delaware law applies to RGL's fraudulent conveyance claim. RGL, on the other hand, contends that the Court must apply New York's fraudulent conveyance law.

"'[W]here no significant federal policy, calling for the imposition of a federal conflicts rule, exists,' a bankruptcy court must apply the choice of law rules of the forum state." In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013) (alteration in original) (citations omitted); see also In re Coudert Bros. LLP, 673 F.3d 180, 186 (2d Cir. 2012) ("It is well established that a federal court sitting in diversity must generally apply the choice of law rules of the state in which it sits. And it is now well established that a bankruptcy court must also apply state choice of law

---

[34] The Court notes that RGL does not argue that its fraudulent conveyance claims expose Lutnick to a substantial threat of liability for purposes of demand futility. (Pl. Opp'n 22.)

rules."). The Court discerns no significant federal policy interests here and therefore applies New York choice-of-law rules.

Under these rules, "[a] choice-of-law analysis need not be performed unless there is an actual conflict between the applicable rules of two relevant jurisdictions." Licci, 672 F.3d at 157 (internal quotation marks omitted). "An actual conflict exists where the applicable law from each jurisdiction provides differing rules that have the potential to affect the outcome of the case significantly." SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc., No. 12 Civ. 7280 (ALC) (DCF), 2013 WL 5366373, at *4 (S.D.N.Y. Sept. 25, 2013) (citing Fin. One Public Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005)). There are sufficient differences between the New York and Delaware fraudulent conveyance statutes to create the potential for different outcomes and thus require a choice-of law analysis. See Drenis v. Haligiannis, 452 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2006).

The LPA's choice-of-law provision states that "[t]his Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Delaware, without giving effect to the principles of conflicts of laws thereof." (AC Ex. A § 9.12.) "New York recognizes the right of contracting parties to agree to the choice of law." Drenis, 452 F. Supp. 2d at 425. However, "'[u]nder New York law, a contractual choice-of-law provision governs only a cause of action sounding in contract, not one sounding in tort,' unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties." H.S.W. Enters., Inc. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 141 n.5 (S.D.N.Y. 2001) (quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1540 (2d Cir. 1997). Unlike choice-of-law provisions that apply to disputes "arising out of" or "relating to" a contract, those that provide that the contract will be

"governed by" or "construed in accordance with" the law of a particular state are not sufficiently broad to reach tort claims such as fraudulent conveyance. Drenis, 452 F. Supp. 2d at 426 (internal quotation marks omitted).

The LPA's choice-of-law provision is of the latter type, as it merely dictates the law under which "[t]his Agreement shall be construed and enforced." (AC Ex. A § 9.12.) Although it also makes reference to the law "govern[ing]" "the rights of the parties," this phrase plainly refers to the parties' rights under the LPA and not to their rights in all contexts. Accordingly, the choice-of-law provision does not cover RGL's fraudulent conveyance claim.[35]

The Court therefore proceeds to the next level of analysis in New York conflicts law, which "directs that the law of the jurisdiction having the greatest interest in the litigation will be applied." Licci, 672 F.3d at 157 (internal quotation marks omitted); see also In re Thelen LLP, 736 F.3d at 219 (applying New York's "interest-analysis test" to a fraudulent conveyance claim in the context of a bankruptcy adversary proceeding). "Under the interest-analysis test, torts are divided into two types, conduct-regulating rules, such as 'rules of the road,' and loss-allocation

---

[35] Immediately after the choice-of-law provision, the LPA contains a forum-selection clause that provides:

> Each party hereto . . . unconditionally submits to the exclusive jurisdiction of any court of the State of New York or any federal court sitting in the city of New York, NY for purposes of any suit, action or other proceeding arising out of this Agreement or the subject matter hereof brought by any party hereto . . . .

(AC Ex. A § 9.12.) Applying Texas law, the Second Circuit found that a similarly broad forum-selection clause expanded the scope of the narrow choice-of-law clause that preceded it to cover tort claims. See Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309 (2d Cir. 1994). "Under New York law, [however,] tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 335 (2d Cir. 2005). When "[t]he forum-selection and choice-of-law clauses use different language[,] there is no reason to think that they have the same scope." Id.

rules, 'such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit.'" In re Thelen LLP, 736 F.3d at 220 (quoting GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc., 449 F.3d 377, 384 (2d Cir. 2006)).

Fraudulent conveyance statutes are conduct-regulating rules. See id.; Lyman Commerce Solutions, Inc. v. Lung, No. 12 Civ. 4398, 2014 WL 476307 (TPG), at *3 (S.D.N.Y. Feb. 6, 2014); Drenis, 452 F. Supp. 2d at 427. Consequently, "'the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.'" In re Thelen LLP, 736 F.3d at 220 (quoting Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 280 (N.Y. 1993)). "[F]or claims based on fraud, the locus of the tort is generally deemed to be the place where the injury was inflicted, rather than where the fraudulent act originated." Id. "Although the parties' domicile is less important for conduct-regulating rules than for loss-allocation rules, the location of the firm's principal place of business is certainly relevant in deciding the law applicable to actions taken in the course of that business." Id. (citation omitted).

It is apparent that Delaware does not have the greatest interest in the litigation, as none of the injured parties is alleged to be located in Delaware. The principal places of business for CIH and CIL are New York and the United Kingdom, respectively; the complaint does not provide CILLC's principal place of business. (AC ¶¶ 20, 22; see also supra note 9.) Nor are any of the alleged perpetrators located in Delaware. Lutnick and Merkel are citizens and residents of New York, and Amaitis is a citizen of Nevada and resides in both Nevada and New York. (AC ¶¶ 13-15.) The remaining entity Defendants have their principal places of business in New York, Nevada, or the United Kingdom. (Id. ¶¶ 12, 16-19.)

In addition, none of the Challenged Transactions is alleged to have occurred in Delaware.

It is unclear where the 2006 and 2011 License Agreements were executed. The closure of Spreadfair, sale of CIL's FFO business, transfer of CIL's trading activity to CFE, and increase in fees paid by CIL to CFE all seem to have occurred within the United Kingdom. (AC ¶¶ 18-19, 96-98, 116, 125, 194; see also supra note 9.)

It is true that CFLP, CIHLLC, CIH, and CILLC are entities organized under Delaware law. (AC ¶¶ 11, 16, 20, 22.) An entity's place of organization, however, "is not by itself sufficient to overcome the significance of th[e] contacts" discussed above. In re Thelen LLP, 736 F.3d at 220; see also Lyman Commerce Solutions, Inc., 2014 WL 476307, at *4.

Count VIII is dismissed, as it asserts a cause of action under Delaware law. The fraudulent conveyance laws of New York, England and Wales, or Nevada are the only possible candidates. To the extent the latter two apply, Count VII must be dismissed as well. But even assuming New York law applies, RGL has not stated a claim for fraudulent conveyance.

### 2. New York Law

Under § 276 of the New York Debtor and Creditor Law, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." DCL § 276. The DCL allows the creditor to "obtain a nullification of the conveyance," Fed. Deposit Ins. Corp. v. Porco, 552 N.E.2d 158, 159 (N.Y. 1990) and "provide[s] a creditor's remedy for money damages against parties who participate in the fraudulent transfer of a debtor's property and are transferees of the assets and beneficiaries of the conveyance." Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158, 1172 (2d Cir. 1993). Claims of "actual fraud, brought under NYDCL § 276, are subject to the heightened pleading requirements of [Federal] Rule [of Civil Procedure] 9(b), and allegations must be plead with

particularity as to each and every defendant." Sullivan v. Kodsi, 373 F. Supp. 2d 302, 309
(S.D.N.Y. 2005).

Defendants first argue that neither RGL nor CIH is a "creditor" within the meaning of the
statute and therefore lacks standing. As all of RGL's direct claims have been assigned away in
bankruptcy, whether it qualifies as a creditor is irrelevant. CIH, however, is a creditor of certain
Defendants. A "'[c]reditor' is a person having any claim, whether matured or unmatured,
liquidated or unliquidated, absolute, fixed or contingent." DCL § 270. "Under New York's
broad definition of 'creditor,' one who has a right to maintain a tort action but has not recovered
judgment at the time of the transfer is a creditor, and ' . . . the relationship of debtor and creditor
[in tort cases] arises the moment the cause of action accrues.'" Drenis, 452 F. Supp. 2d at 428
(second alteration in original) (quoting Shelly v. Doe, 671 N.Y.S.2d 803, 805 (3d Dep't 1998))
(citing Marcus v. Kane, 18 F.2d 722, 723 (2d Cir. 1927). CIH has viable tort claims against
certain Defendants and is therefore their creditor for purposes of DCL § 276.

The fraudulent conveyance claim must nevertheless be dismissed because RGL has failed
to plausibly allege Defendants' actual intent with particularity.[36] "'Due to the difficulty of
proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on
"badges of fraud" to support his case, i.e., circumstances so commonly associated with
fraudulent transfers that their presence gives rise to an inference of intent.'" In re Sharp Int'l
Corp., 403 F.3d 43, 56 (2d Cir. 2005) (quoting Wall St. Assocs. v. Brodsky, 684 N.Y.S.2d 244,
247 (1st Dep't 1999). These include "a close relationship between the parties to the alleged

---

[36] "It is well settled . . . that a court need not consider arguments relegated to footnotes," F.T.C.
v. Tax Club, Inc., No. 13 Civ. 210 (JMF), 2014 WL 199514, at *1 (S.D.N.Y. Jan. 17, 2014), as is
the case here with respect to the issue of whether RGL has adequately pled Defendants'
fraudulent intent, (Def. Mem. 45 n.9; Pl. Opp'n 42 n.34). The Court nevertheless exercises its
discretion to do so, as RGL had notice of the deficiency in its complaint and an opportunity to be
heard. See Wachtler v. Cnty. of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994).

fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance." Brodsky, 684 N.Y.S.2d at 248.

DCL § 276, unlike the constructive fraud provisions of the statute, "does not require proof of unfair consideration or insolvency." Brodsky, 684 N.Y.S.2d at 247.  Nevertheless, the effect of the transfer on the debtor's assets is undoubtedly probative of whether it was intended to hinder, delay, or defraud creditors. Cf. Harris v. Coleman, 863 F. Supp. 2d 336, 343-44 (S.D.N.Y. 2012) (dismissing a DCL § 276 claim because the transferor was alleged to have conveyed a patent that he never owned and therefore could not have defrauded his creditors); Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) (holding that even under DCL § 276 a "'conveyance cannot be fraudulent as to creditors if the debtor's solvency is not affected thereby, that is, if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors'" (quoting 30 N.Y. Jur. 2d Creditors' Rights & Remedies § 305 (2003))), aff'd, 99 F. App'x 274 (2d Cir. 2004); Martes v. USLIFE Corp., 927 F. Supp. 146, 148 (S.D.N.Y. 1996) (holding that there was no fraudulent conveyance under DCL § 276 because the debtor remained in "exactly the same position vis-a-vis its ability to respond to the claims of creditors as it occupied before the transfer").

Here, although the Challenged Transactions allegedly exhibited certain badges of fraud, (AC ¶ 261), RGL has not plausibly alleged that any of the Defendants acted with actual intent to hinder, delay, or defraud CIH in the pursuit of its tort claims against them.  Fundamentally,

RGL's position is that Defendants stripped the *creditor*, CIH, of its assets for their own benefit.[37] The Challenged Transactions are alleged to have enriched Cantor Nevada and CGWL (UK) and increased the value of the individual Defendants' ownership interests in those entities. If anything, their collectible assets have increased, rather than diminished. The cases RGL cites in support of its claim are distinguishable on this basis. In Fromer v. Yogel, "Plaintiffs allege[d] that [one of the defendants], aided and abetted by [his wife], transferred substantial amounts of [his] personal assets to [his wife] with an intent to defraud Plaintiffs." 50 F. Supp. 2d 227, 246 (S.D.N.Y. 1999). Similarly, in Shelly v. Doe, one of the petitioners was alleged to have transferred valuable firearms to his brother shortly before the person he had sexually abused commenced a civil action against him. 671 N.Y.S.2d 803, 805 (1998). In neither case did the tort debtor transfer property that was already in the tort creditor's possession.

It is true that CFLP, CFS, and CIHLLC are alleged to have lost value as a result of the Challenged Transactions, as they had ownership interests in CIH but not in Cantor Nevada or CGWL (UK). As explained above, however, the only transaction in which these Defendants are plausibly alleged to have participated is the Asset Purchase Agreement. This transaction exposed them to liability, making CIH their tort creditor. But as they participated in no further transactions, they could not have fraudulently conveyed anything with the intent to frustrate CIH's ability to recover a judgment against them. See Harris, 863 F. Supp. 2d at 343 (dismissing a fraudulent conveyance claim because the plaintiffs "ha[d] not alleged any [independent,] pre-

---

[37] "[A] fraudulent conveyance requires that the transferor convey *its* property." In re Tesmetges, 85 B.R. 683, 694 (Bankr. E.D.N.Y. 1988) (emphasis added); see also Harris, 863 F. Supp. 2d at 343-44. Here, of course, the Defendants had ownership interests in CIH, complicating the application of this principle.

existing tort claim" and "their status as 'tort creditors' [wa]s based on the alleged fraudulent conveyance itself").[38]

Moreover, the Court can only speculate as to the contours of RGL's claim, as RGL has not identified which of the Challenged Transactions were fraudulent conveyances intended to frustrate CIH's efforts to collect for tort claims based on the other transactions. RGL certainly has not pled actual fraud "with particularity as to each and every defendant." Sullivan, 373 F. Supp. 2d at 309. Accordingly, Count VII is dismissed.

### H. Count IX: Accounting

In Count IX, RGL asserts that it is entitled to a full accounting of the finances and activities of CIH and its subsidiaries from CIHLLC. As discussed above, this direct claim is dismissed for lack of standing.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part. CIL, CGWL (UK), CFE, and CGL are dismissed from this action. Count II is dismissed as to Merkel. Count III is dismissed as to all Defendants except Cantor Nevada, Lutnick, Merkel, and Amaitis. Counts V, VII, VIII, and IX are dismissed as to all Defendants. RGL's remaining claims survive with respect to certain of the Challenged Transactions.

The parties shall appear for a conference on June 24, 2014 at 5:00 p.m. in Courtroom 1506 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The parties shall jointly submit to the Court a proposed case management plan and scheduling order by June 20, 2014. A template for the order is available at http://nysd.uscourts.gov/judge/Abrams.

---

[38] This argument is squarely raised in the body of Defendants' brief. (Def. Mem. 46-47.)

The Clerk of Court is respectfully instructed to terminate the motion pending at Docket

Number 20.

SO ORDERED.

Dated:     June 10, 2014
           New York, New York

Ronnie Abrams
United States District Judge