Jay W. Eisenhofer
Geoffrey C. Jarvis
Nathan A. Cook
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York  10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Special Litigation Counsel to Refco Group Ltd., LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| REFCO GROUP LTD., LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>CANTOR FITZGERALD, L.P., et al.,<br><br>               Defendants. | C.A. No. 1:13-cv-01654-RA<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

INTRODUCTION ............................................................................................................... 1

JURISDICTION, VENUE AND DEMAND FOR TRIAL BY JURY ......................................... 3

PARTIES ............................................................................................................................ 3

RELEVANT NON-PARTIES ............................................................................................... 8

FACTUAL ALLEGATIONS RELATING TO ALL CLAIMS ................................................... 9

    A.     THE CORPORATE STRUCTURE OF THE KEY ENTITIES ............................................ 9

        1.     The CIH Entities ................................................................................. 9

        2.     The Cantor Nevada Entities ............................................................... 11

        3.     The CIH Entities And The Cantor Nevada Entities Share Management ........................................................................................ 12

    B.     CANTOR PURSUES BETTING VENTURES THROUGH SUBSIDIARIES AND, IN EXCHANGE FOR A 10% LIMITED PARTNERSHIP INTEREST, OBTAINS AN $8 MILLION INVESTMENT IN CIH FROM RGL ............................................................ 13

    C.     CIH DRAMATICALLY GROWS ITS BUSINESSES ..................................................... 16

        1.     CIL's Business Grows, Including Through Its Creation Of Mobile Betting Technology ............................................................................. 16

    D.     THE CANTOR NEVADA ENTITIES ........................................................................ 18

        1.     Cantor Forms Cantor Nevada And Obtains A Change In Nevada Law To Allow For Mobile Gambling ................................................... 18

        2.     Cantor Nevada Operates Mobile Gambling In Nevada Casinos ............. 20

        3.     The Defendants Seek To Capitalize On Their Nevada Business Through An Initial Public Offering ..................................................... 22

    E.     THE DEFENDANTS TRANSFER—WITHOUT ANY COMPENSATION—CIH'S INTELLECTUAL PROPERTY TO THE CANTOR NEVADA ENTITIES ............................ 24

        1.     Mobile Gambling Technology .............................................................. 25

        2.     Midas Software ................................................................................... 27

    F.     THE DEFENDANTS CAUSE THE CIH ENTITIES TO RELINQUISH THEIR BUSINESSES AND ASSETS FOR NO OR NOMINAL CONSIDERATION ......................... 31

        1.     The 2006 License Agreement ............................................................... 31

        2.     CIL's Profitable UK Businesses Are Sold For £1 ................................... 34

            (a)     A Cantor Nevada Entity Files A UK License Application As Part Of The Process Of Taking CIL's Profitable FFO Business ..................................................................................... 34

(b) The Defendants Cause CIL To Sell Its FFO Business And Assets And Transfer Its Key Employees To [CGWL (UK)] For Only £1.00 .................................................................. 38

3. The Defendants Transfer Out The Remainder Of CIL's Trading Activity ................................................................. 40

4. The Defendants Again Cause CILLC To License Its Intellectual Property For No Consideration .................................. 41

5. The Defendants Unfairly Increased Fees Paid To Cantor Affiliates ........ 43

PLAINTIFF'S CLAIMS ARE TIMELY ................................................... 44

DERIVATIVE ALLEGATIONS ............................................................. 46

DEMAND IS EXCUSED AS FUTILE ...................................................... 46

A. LUTNICK DOMINATES CIHLLC ................................................. 47

B. LUTNICK WAS INTERESTED IN THE AFFILIATED TRANSACTIONS ........... 48

1. Defendants' Undocumented Taking of CIH's Technology ..................... 48

2. The 2006 License Agreement ............................................. 49

3. The 2010 Asset Purchase Agreement ...................................... 50

4. The 2011 License Agreement ............................................. 51

5. Transfer Of CIL's Trading Activity to CFE ............................. 51

6. The Increased Related-Party Fees Paid by CIL .......................... 51

C. LUTNICK AND CIHLLC FACE A SUBSTANTIAL THREAT OF LIABILITY FOR THEIR INVOLVEMENT IN THE AFFILIATED TRANSACTIONS ................... 52

CIHLLC'S CONDUCT IS NOT EXCULPATED ............................................ 52

COUNT I (BREACH OF FIDUCIARY DUTY AGAINST CIHLLC, LUTNICK, MERKEL AND AMAITIS) ................................................................ 53

COUNT II (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE DEFENDANTS OTHER THAN CIHLLC) ........................................... 55

COUNT III (UNJUST ENRICHMENT AGAINST DEFENDANTS) ........................... 56

COUNT IV (WASTE OF ASSETS AGAINST CIHLLC, LUTNICK, MERKEL AND AMAITIS) ............................................................................ 57

COUNT V (BREACH OF PARTNERSHIP AGREEMENT AGAINST CIHLLC) ................ 58

COUNT VI (CONVERSION AGAINST DEFENDANTS) ................................... 59

COUNT VII (FRAUDULENT CONVEYANCE UNDER N.Y. DEBTOR & CREDITOR LAW § 276 AGAINST DEFENDANTS) ............................................... 60

PRAYER FOR RELIEF ..................................................................... 61

Plaintiff Refco Group Ltd, LLC ("RGL or "Plaintiff"), for its direct complaint and derivative adversary complaint on behalf of nominal defendants Cantor Index Holdings, L.P. ("**CIH**"), Cantor Index LLC, and Cantor Fitzgerald Game Holdings, LLC, against defendants Cantor Fitzgerald, L.P., Cantor Fitzgerald Securities, Lee Amaitis, Stephen M. Merkel, Howard W. Lutnick, Cantor Index Holdings Limited Partnership LLC, and Cantor G&W (Nevada) L.P., hereby allege, upon knowledge as to themselves and upon information and belief (including the investigation of counsel and review of discovery and publicly available information) as to all other matters, as follows:[1]

## INTRODUCTION

1.      More than a decade ago, Cantor (defined below), with Howard W. Lutnick at the helm, determined to enter the gambling business and apply its securities trading experience to the gambling world.  Cantor began pursuing this new line of business in the U.K. and Europe, given the U.K.'s regulatory openness to gambling ventures and Cantor's presence in London, through CIH and CIH's subsidiaries.

2.      As described in greater detail below, in 2002, RGL, invested $8 million in CIH in return for a 10 percent partnership interest.  Over the course of the next several years, CIH and its subsidiaries were very successful.  Indeed, these entities developed revolutionary gaming technology and formats.  For example, they developed technology to permit customers to place bets on single occurrences during sporting events as they happened, devices for remote gambling, and opportunities to gamble on movements in financial indices.

3.      After CIH and its subsidiaries successfully developed and deployed these technologies and enterprises, Cantor secretly decided to appropriate all of their cutting-edge

---

[1] Plaintiff is not repleading allegations regarding defendants and claims dismissed pursuant to the Court's June 10, 2014 Opinion and Order (I.D. #39) but Plaintiff expressly incorporates those allegations herein to preserve them for appellate review.

technology and transfer it to newly created, wholly owned entities operating in Nevada as part of Cantor's new focus on Nevada's gambling markets. In doing so, unbeknownst to RGL, in addition to taking the technology for no compensation, Cantor also destroyed or took profitable CIH assets for zero compensation or, in one instance, for the nominal consideration of £1.00. Having taken those assets and technology from CIH through certain transactions referred to herein as "Affiliated Transactions,"[2] Cantor used them to create incredibly valuable businesses in Nevada and elsewhere. Indeed, Cantor has repeatedly admitted to regulators, analysts, and the press that the technology developed by CIH and its subsidiaries in the U.K. was critical to the build-out of Cantor's Nevada operations. For example, Lee Amaitis, one of Howard W. Lutnick's close associates at Cantor and a critical officer at both of CIH's subsidiaries and at Cantor's Nevada businesses, has explained that not only had a "tremendous amount of money" been spent developing the technology for remote gambling devices, but that the "mobile technology developed" by and for the CIH businesses "was well ahead of its time for the wholesale market industry and that started the underpinning of the application … in Nevada."

4.    Cantor was pursuing an initial public offering of its Nevada businesses (the "**IPO**") in 2012. The contemplated IPO would have resulted in a cash infusion to Defendants of at least $100 million. While Cantor has withdrawn its filings relating to the 2012 IPO,[3] it announced just this year that will again be pursuing a public offering. This will result in a

---

[2] "**Affiliated Transactions**" refers to the (i) the transfer of CIH's assets to help Cantor Nevada create mobile gambling and the Midas program, (ii) the 2006 License Agreement, (iii) the taking of CIL's FFO business and assets, including through the 2009 Application and the FFO APA, (iv) the 2011 License Agreement, (v) the transfer of CIL's remaining trading activity to CFE and (vi) Defendants unfair increase in fees from CIH and its affiliates to non-CIH Cantor related entities. *See infra* ¶¶ 105-90).

[3] On May 25, 2012, CET (defined below) filed a request to withdraw its Form S-1/A (defined below) with respect to the IPO, with the statement that it would "submit a new draft registration statement pursuant to the confidential submission process available to 'emerging growth companies'" under Section 6(e) of the Securities Act of 1933, thereby indicating that Cantor will continue to pursue the IPO. Indeed, while CET appears to no longer be an operating entity, Cantor Nevada itself has declared that it will be pursing an IPO.

substantial gain to Cantor, as well as to Howard W. Lutnick and Lee Amaitis. Of course, critical to that IPO will be the technology and businesses developed by, and taken from, CIH. Yet, while Cantor is pursuing the IPO, CIH is left as a mere husk, stripped of its businesses and assets as the result of the contractual and fiduciary duty breaches, conversion, waste and fraudulent conveyance of assets that Plaintiff seeks to remedy through this action.

## JURISDICTION, VENUE AND DEMAND FOR TRIAL BY JURY

5.     This adversary proceeding has been commenced to determine an actual controversy between RGL and the Defendants.

6.     The United States District Court for the Southern District of New York (the "**District Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), as this adversary proceeding is related to the Refco Inc. chapter 11 cases.

7.     In addition, the Partnership Agreement (as defined below), § 9.12, provides for consent to jurisdiction and venue in "any court of the State of New York or any federal court sitting in the city of New York, NY." The chapter 11 cases were filed in the United States Bankruptcy Court for the Southern District of New York, Manhattan division.

8.     Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure (the "**Civil Rules**"), RGL hereby demands a trial by jury as to all matters triable thereby.

## PARTIES

10.     Plaintiff Refco Group Ltd., LLC, ("**Plaintiff**" or "**RGL**") a limited liability company organized under the laws of the State of Delaware, is one of the reorganized Debtors, and has a principal place of business c/o Capstone Advisory Group LLC, Park 80 West, 250 Pehle Avenue, Suite 105, Saddle Brook, New Jersey 07663. It is a subsidiary of Refco, Inc., a

corporation organized under the laws of the State of Delaware, and one of the reorganized debtors in the chapter 11 bankruptcy case captioned *In re: Refco Inc., et al.*, No. 05-60006 (RDD). It was a limited partner of nominal defendant CIH at the time of the wrongs complained of herein, and continues to own a limited partnership interest in CIH.

11.    Defendant Cantor Fitzgerald LP ("**CFLP**") is a limited partnership organized under the laws of the State of Delaware. At all relevant times, CFLP was the sole member of CIHLP II (defined below), which in turn owned an 89% limited partnership interest in nominal defendant CIH following RGL's limited partnership investment in CIH. CF Group Management has an ownership interest in CFLP of greater than 3%.

12.    Defendant Cantor Index LLC ("**CIHLLC**") is a limited liability company organized under the laws of the State of Delaware, and maintains its principal place of business at 499 Park Avenue, New York, New York 10022. At all relevant times, CIHLLC was the general partner of nominal defendant CIH. Following RGL's limited partnership investment in CIH, CIHLLC owned a 1% limited partnership interest in nominal defendant CIH.

13.    Defendant Cantor Fitzgerald Securities ("**CFS**" and together with CFLP, and all of CFS's and CFLP's officers, directors, partners, members and/or employees (in their capacities as such) and all of their subsidiaries and affiliates, "**Cantor**") is a partnership organized under the laws of the State of Tennessee, and maintains its principal place of business at 499 Park Avenue, New York, New York 10022. At all relevant times, CFS was the sole member of defendant CIHLLC, which in turn was the managing general partner of nominal defendant CIH. CFLP is the sole member of CFLP CFS Holdings, LLC, which is the managing general partner of CFLP CFS I Holdings, L.P., which is the managing general partner of CFS.

14.     Defendant Lee Amaitis ("**Amaitis**") is a citizen of the state of Nevada, and has residences at 2700 Las Vegas Blvd. S., Unit 4302, Las Vegas, Nevada 89109 and 139 Prospect Hill Road Clinton Corners, New York, New York 12514.  Amaitis joined Cantor Fitzgerald, L.P., in 1995 as Senior Managing Director and moved to London in 1996, becoming President and CEO of Cantor Fitzgerald International.  Defendant Amaitis served as a director and/or officer of one or more of the CIH Entities (defined below), including Cantor Index (defined below), of CIHLLC and CIHLP II (defined below), and of one or more of the Cantor Nevada Entities (defined below), as well as CFLP, at the time of wrongs complained of herein.  For example, Amaitis served as CEO and President and Cantor Index, and he executed the 2011 License Agreement as CEO of Cantor Nevada and executive managing director of CILLC.  In addition, discovery revealed that, since 2002, Amaitis served and/or is serving as a director and/or employee of at least the following entities:

Cantor G&W Holdings, LLC
Cantor G&W International Holdings, LLC
Cantor G&W Special Assets Holdings, LLC
Cantor G&W Special Assets, L.P.
Cantor G&W, L.P.
Cantor Gaming Limited
Cantor Index Holdings, L.P.
Cantor Index Limited
Cantor Index LLC
CIHLP II LLC
CIHLP LLC
Hollywood Stock Exchange, LLC

2575 S Highland Drive Holdings, LLC
2575 S Highland Drive, L.P.
Cantor G&W (Nevada) Holdings, L.P.
Cantor G&W (Nevada), L.P.
Cantor G&W (Nevada), LLC
Cantor Gaming and Wagering Limited
Las Vegas Sports Consultants, Inc.
Las Vegas Sports Mobile, LLC
PlayWizard Holdings, L.P.
PlayWizard Holdings, LLC

15.     Defendant Stephen M. Merkel ("**Merkel**") is a citizen of the state of New York, and resides at 75 Remsen Street, Apt. 1, Brooklyn, New York 11201.  Defendant Merkel served as a director and/or officer of one or more of the CIH Entities, including Cantor Index, CFLP, and upon information and belief of one or more of the Cantor Nevada Entities, at the time of wrongs complained of herein.

16.     Defendant Howard W. Lutnick ("**Lutnick**", and together with Amaitis and Merkel, the "**Individual Defendants**") is a citizen of the state of New York, and resides at 11 E. 71st Street, New York, New York 10021.  He is the Chairman of CFLP and has a limited partnership interest in CFLP greater than 10%.  The amended Form S-1 (the "**Form S-1/A**") filed by Cantor Entertainment Technology, Inc. ("**CET**") with the Securities and Exchange Commission (the "**SEC**") in 2012 provides that "Mr. Lutnick . . . controls [CFLP and its subsidiaries]."  The Form S-1/A also provides that Lutnick "is the President and sole stockholder of CF Group Management, Inc., [which is] the managing general partner of [CFLP]."  Defendant Lutnick also served as a director and/or officer of one or more of the CIH Entities, as well as of one or more of the Cantor Nevada Entities, at the time of wrongs complained of herein.  For example, Lutnick was Chairman of Cantor Index Limited at the time that its trading activity was transferred to Cantor Fitzgerald Europe, a wholly owned subsidiary of CFLP.  Lutnick also

executed the 2006 License Agreement (defined below) as Chairman and Chief Executive Officer of both Cantor Nevada and of CILLC.

17.     Defendant Cantor G&W (Nevada) L.P. ("**Cantor Nevada**," and together with Cantor, the Individual Defendants, and CIHLLC, the "**Defendants**") is a limited partnership organized under the laws of the State of Nevada, and maintains its principal place of business at 2575 South Highland Drive, Las Vegas, Nevada 89109.  On January 9, 2014—three days after the Nevada Gaming Control Board filed a complaint against Cantor Nevada in an action that would ultimately result in a record $5.5 million fine levied against the company—Cantor Nevada changed its name to CG Technology L.P. ("CG Technology").[4]  According to a press release issued in connection with the name change, CG Technology "intends to seek a public offering in the future."  Plaintiff will continue to refer to CG Technology as "Cantor Nevada."

18.     Nominal defendant CIH ("CIH") is a limited partnership organized under the laws of the State of Delaware, and maintains its principal place of business at 135 East 59th Street, New York, New York 10022.

19.     Nominal defendant Cantor Index LLC ("**CILLC**") is a limited liability company organized under the laws of the State of Delaware.  At all relevant times, nominal defendant CILLC was a subsidiary of nominal defendant CIH.

20.     Nominal defendant Cantor Fitzgerald Game Holdings, LLC ("**CFGH**") is a limited liability company organized under the laws of the State of Delaware.  At all relevant times, nominal defendant CFGH was a subsidiary of nominal defendant CIH.

---

[4] Plaintiff will refer herein to this entity principally as "Cantor Nevada."

21.     At all relevant times, Cantor (including the CIH Entities, as defined below, the Cantor Nevada Entities, as defined below, CFLP, and CFE, as defined below) was controlled by Lutnick, including through and with the assistance of Amaitis and Merkel.

## RELEVANT NON-PARTIES

22.     CET was a Delaware Corporation formed in 2011 in connection with its proposed public offering. According to the amended Form S-1 (the "**Form S-1/A**") filed with the Securities and Exchange Commission (the "**SEC**") on February 14, 2012, CET's principal place of business was to be in Las Vegas, Nevada. Once the IPO was complete, CFLP was to contribute Cantor Nevada to CET, at which time Cantor Nevada would have become CET's only operating subsidiary. CET's public filings indicate that, through Cantor Nevada, CET would have had "over 30% of the Nevada sports wagering market and processes over 50% of Nevada technology-based wagers."

23.     On May 25, 2012, CET filed a request to withdraw its Form S-1/A with respect to the IPO, representing that it would "submit a new draft registration statement pursuant to the confidential submission process available to 'emerging growth companies'" under Section 6(e) of the Securities Act of 1933, thereby indicating that Cantor will continue to pursue the IPO. As of the date of the filing of this proposed Second Amended Complaint, CET was no longer an entity registered with Delaware's Office of the Secretary of State. However, according to a January 1, 2014 press release issued by Cantor Nevada under its new name, CG Technology, Cantor Nevada will be pursuing a public offering as CG Technology.

24.     Cantor Index Limited ("**CIL**") is a limited liability company organized under the laws of England and Wales, and maintains a registered office at One Churchill Place, Canary Wharf, London, E14 5RD. At all relevant times, nominal defendant CIL was a subsidiary of nominal defendant CIH.

25.     Cantor Gaming Limited ("**CGL**") is a company organized under the laws of England and Wales, and maintains a registered office at One Churchill Place, Canary Wharf, London, E14 5RD.

26.     Cantor Gaming & Wagering Limited ("**CWGL (UK)**") is a company organized under the laws of England and Wales.  Its registered office is located at One Churchill Place, London E14 5RD.

27.     Cantor Fitzgerald Europe ("**CFE**"), a wholly owned subsidiary of CFLP, is an investment bank organized under the laws of England and Wales, and maintains its principal place of business at Cantor Capitol, One Churchill Place, Canary Wharf, London E14 5RD.  Lutnick is the Chairman of CFE, as well as the Chairman, President, and CEO of each of the intermediary holding companies that control CFE.  CFE is described by CFLP as

> an integrated mid-market investment bank offering clients corporate finance and corporate broking services, together with institutional cash equities, fixed income, equity derivatives and foreign exchange products.  CFE advises some 70 corporate clients and makes markets in over 700 companies and investment trusts.  CFE is 100% owned by US-based Cantor Fitzgerald.

### FACTUAL ALLEGATIONS RELATING TO ALL CLAIMS

**A.     THE CORPORATE STRUCTURE OF THE KEY ENTITIES**

28.     The allegations in this Complaint relate primarily to two sets of entities, which are referred to herein as the CIH Entities and the Cantor Nevada Entities.

#### 1.     The CIH Entities

29.     The "**CIH Entities**" are the direct and indirect wholly owned subsidiaries of nominal defendant CIH.

30.     The CIH Entities are comprised of the following entities: (a) nominal defendant CIH; and (b) CIH's wholly owned subsidiaries:  CIL; CILLC; Hollywood Stock Exchange, LLC ("**HSX**"), and Cantor Fitzgerald Game Holdings, LLC; and (c) Cantor Fitzgerald Game

Holdings, LLC's wholly owned subsidiary, CGL, which, together with its direct parent Cantor Fitzgerald Game Holdings, LLC, is referred to herein as "Cantor Gaming UK".

31.     CIH's general partner is CIHLLC.  CIH's limited partners are CIHLLC (with a 1% limited partner interest), CIHLP II LLC ("CIHLP II") (with an 89% limited partner interest), and RGL (with a 10% limited partner interest).



32.     CIHLLC's sole member is CFS, which is controlled by CFLP.  CIHLP II's sole member is CFLP.

33.     Thus, CFLP – through CIHLLC, CFS and CIHLP II – control CIH.  Lutnick, according to the Form S-1, filed by CET with the SEC, controls CFLP and its subsidiaries and as a result controls CIH.  Further, Lutnick, Amaitis and Merkel served as directors and officers of CIH at the time of the wrongs complained of herein.

34.     Lutnick's control over CIH is demonstrated in the chart below:



35. Notably, CFLP (Cantor LP in chart below), which is controlled by Lutnick, indirectly controls CIH and its subsidiaries as well as CFE:

2. **The Cantor Nevada Entities**

36. The "**Cantor Nevada Entities**" refers to Cantor Nevada, its direct and indirect parent and subsidiary entities, and the successors in interest of each of them.

37. At all relevant times, the general partner of Cantor Nevada was Cantor G&W (Nevada), LLC ("Cantor G&W LLC").

38. The sole managing member of Cantor G&W LLC, and the sole limited partner of Cantor Nevada, was Cantor G&W (Nevada) Holdings LP ("Cantor G&W Holdings"). Cantor G&W Holdings' limited partners were Merkel, Amaitis and Lutnick. The general partner of Cantor G&W Holdings was Cantor G&W (Nevada) Holdings, LLC, whose managing member was the Howard W. Lutnick Family Trust ("The Trust"). Lutnick is the sole member of the

Trust and the Trust is controlled by Lutnick. The Trust owns 95% of Cantor G&W (Nevada) Holdings, LLC, while Lutnick owns the other 5% individually.

39. The Cantor Nevada Entities are reflected in the following organizational chart:



40. At all relevant times, Lutnick, along with Amaitis and Merkel, owned Cantor Nevada.

41. At all relevant times, Lutnick, including through and with the assistance of Amaitis and Merkel, controlled Cantor Nevada.

42. Following CET's IPO, Cantor Nevada would have been a wholly owned indirect subsidiary of CET.

**3. The CIH Entities And The Cantor Nevada Entities Share Management**

43. The CIH Entities and the Cantor Nevada Entities share numerous directors, officers, and managers.

44.     For example, Lutnick has been chairman of the board of directors of Cantor Nevada since 2004, and served as its CEO from 2004 to January 2009.  During this same time, Lutnick also served as, *inter alia*, (1) CILLC's Chairman and CEO, (2) Chairman of CFS, which is the sole member of CIH's general partner CIHLLC; and (3) Chairman and CEO of CFLP, which is the sole member of CIH's limited partner CIHLP II.

45.     Similarly, Amaitis served as President of Cantor Nevada from 2004 to January 2009, and as its CEO from January 2009 to the present.   Simultaneously, Amaitis served as, *inter alia*, the Executive Managing Director of CILLC.  Likewise, Merkel has served as the Executive Vice President, Chief Legal Officer, General Counsel and Secretary of Cantor Nevada since 2004, and as its Chief Legal Officer since November 2010, while also serving as the Executive Managing Director, General Counsel, and Secretary of CFLP.

46.     Moreover, materials submitted by Cantor to the UK's Financial Services Authority recite that "a number of the directors of Cantor [CGWL (UK)] are also main directors of Cantor Group companies, including the Cantor Group's president, Howard Lutnick."

**B.      CANTOR PURSUES BETTING VENTURES THROUGH SUBSIDIARIES AND, IN EXCHANGE FOR A 10% LIMITED PARTNERSHIP INTEREST, OBTAINS AN $8 MILLION INVESTMENT IN CIH FROM RGL**

47.     Throughout its history, Cantor has been a financial services firm.  Over the last decade, however, the CIH Entities developed technology, subsequently built-upon in connection with Cantor's Nevada businesses, for betting on, among other things, financial markets and sporting events.  Through that investment, Cantor's subsidiaries made forays into remote and internet gambling, including "Spread Betting" and financial fixed-odds ("**FFO**") betting.

48.     With Spread Betting on financial instruments, for example, a bettor predicts whether the price of the financial instrument will rise or fall, without having to physically buy or sell the instrument.  The bettor "stakes" an amount of money that he will win or lose each time

the price of the instrument on which he is betting moves by one "point." A point is the unit of price of the instrument. Depending on the instrument, this could be movements of 1, 0.1 or 10, for example. Spread Betting allows the bettor to bet in both directions, since the bettor does not physically have to buy or sell the instrument. The bettor simply speculates on whether he thinks the price of the instrument will rise or fall. If he is right, he moves into profit; and if he is wrong, the bettor incurs losses. In Spread Betting, the "spread" is the cost to the bettor to open and close the spread bet. The spread is the difference between the price at which the bettor can buy (i.e., the offer price) and the price at which the bettor can sell (i.e., the bid price). The closer these two prices are (i.e., the "tighter" the spread), the less the cost to the bettor. The bettor's winnings and losses are then determined by the number of points difference between the price at which the bettor entered his bet and the price at which the better closed the bet, multiplied by the bettor's stake for the bet. In other words, the bettor wins more the more the price for the instrument moves in the direction predicted, and loses more the more the price for the instrument moves away from the direction predicted. Spread bets are a leveraged product, which means that the bettor can open a proportionally larger position than the capital the bettor has to invest. This also means that the bettor's liabilities can be bigger than his initial stake.

49.     With FFO betting, the bettor similarly predicts whether a financial market will finish above or below a specified level at the time the market expires. If the bettor is correct, he wins. If not, he loses. However, with FFO betting, the bettor's risk is limited to the stake the bettor is prepared to bet.

50.     These ventures allow customers to wager on future events, such as the movement of stock prices and indexes, the outcome of sporting events, and even individual plays during sporting events.

51.     In or around 2000, Cantor began pursuing ventures for betting in the United Kingdom including by forming CIL in May 2000 as a wholly owned subsidiary of nominal defendant CIH.

52.     Thereafter, CIL obtained a bookmaker's permit from the British government and opened a bookmaker's business.  In December 2000, CIL launched an online gaming platform and website for bookmakers.

53.     CIH's efforts to expand CIL were successful.  In the year prior to November 23, 2001, CIL's Spread Betting customers doubled.

54.     In or around the winter of 2001, Cantor had discussions with Refco concerning an investment by Refco in CIH.

55.     These discussions culminated in a transaction on or about January 1, 2002, whereby RGL invested $8 million in CIH in exchange for a 10% limited partnership interest in CIH.

56.     In connection with RGL's $8 million investment, CIHLLC, CIHLP II and RGL executed an Amended and Restated Limited Partnership Agreement, dated January 1, 2002 (the "**Partnership Agreement**", attached as Exhibit A hereto), which sets forth the relevant rights, powers and responsibilities of the general and limited partners of CIH.

57.     Lutnick executed the Partnership Agreement on behalf of both CIHLLC and CIHLP II.

58.     The Partnership Agreement provides that RGL may enforce its rights under the Partnership Agreement through litigation in any court of the State of New York or any federal court sitting in the city of New York, New York, that RGL is entitled to recover reasonable

attorneys' fees as the successful party in any such litigation in addition to any other available remedy, and that the Partnership Agreement is governed by Delaware law.

## C. CIH DRAMATICALLY GROWS ITS BUSINESSES

59.     Throughout the next several years, CIH expanded its businesses, including an expansion of CIL and its Spread Betting business.

### 1. CIL's Business Grows, Including Through Its Creation Of Mobile Betting Technology

60.     CIL continued its positive growth and development of its business.  On or about January 30, 2002, CIL became the first Spread Betting firm to offer round-the-clock trading, which it did through its website.

61.     CIH and CIL understood the need for better and innovative technology in their business.  Indeed, in March 2003, Amaitis, then the president and CEO of Cantor Fitzgerald International, among other positions within Cantor, stated: "Technology is a must.  Unless you have effective technology, you are a prime target for take over."

62.     In September 2003, years before the introduction of the first iPhone by Apple, CIL introduced a key new technology, "Cantor Mobile," the first real-time mobile trading device in the world.  Cantor Mobile, using a handheld PC called an "XDA," gave mobile access to real-time finance and sports news, charting, continuous streaming of live prices and instant trading, and allowed users of the handheld devices to wager on financial indices and sporting events with Spread Betting.

63.     The mobile wagering was hugely successful within a few years.  Within the first few months, CIL expected to distribute over 10,000 XDAs.  By April 2005, Cantor Mobile represented a significant percentage of all of CIL'S business.

64.     In connection with the growth of Spread Betting using mobile, handheld devices, in June 2004, CIL launched "Spreadfair," an online Spread Betting exchange designed to allow for customer to customer betting ("**Spreadfair**").  Spreadfair was the world's first sports Spread Betting exchange.  CIL made profits on the bets made by customers through Spreadfair.

65.     Importantly, while many companies provided opportunities for customers to bet on the outcome of a sports game, CIL also allowed people to bet on events taking place during a game.

66.     As reported in a November 1, 2008 article from Casino Journal, Cantor employee John Buyacheck explained that in-game wagering in the U.K. had "taken off like a rocket."  For example, according to Buyacheck, the amount wagered after the first serve at the Wimbledon men's tennis finals was £30 million in 2007 and was £42 million in 2008.

67.     Also, on July 27, 2004, CILLC, a subsidiary of CIH, and Scientific Games Corporation, announced the formation of a "global joint venture to implement and market new, proprietary pari-mutuel bets.  Cantor Index [LLC] has developed new forms of pari-mutuel wagering [on horse races] and Scientific Games Racing will create the bet software and write the code enabling it to run on tote systems worldwide."  In the press release, Amaitis stated: "We believe that content, in this case the type of betting option, is fundamentally important to the future of horse racing."

68.     In August 2005, CIL teamed up with another company, Ladbrokes, to launch an FFO betting service, which allowed clients to bet on a range of financial markets, including how the market would fluctuate during certain intervals (e.g., five minutes).  In a podcast interview with Global Gaming Business on or about November 11, 2011, Amaitis described that "as a very successful product."

69.     CIL derived substantial revenues from its business activities.  For the fiscal year ended December 31, 2006, CIL reported revenue of approximately $76.4 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)."  For the fiscal year ended December 31, 2007, CIL reported revenue of approximately $51.0 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)."

70.     During early 2010, Cantor caused CIL to transfer its FFO business and assets to the control of the Cantor Nevada Entities (as also described in greater detail below).  Thus, for the fiscal year ended December 31, 2010, CIL reported revenue of approximately $8.1 million, "net of any related dealing / broking expenses (e.g. commissions, cost of carry)," as compared to the $34.6 million, and $9.2 million recorded for fiscal years ending in 2008 and 2009, respectively.

71.     CIL's reduced revenues in these later years resulted in large part from the Defendants' raiding the CIH Entities' business and assets and transferring them to the Cantor Nevada Entities, as explained in greater detail below.

**D.     THE CANTOR NEVADA ENTITIES**

**1.     Cantor Forms Cantor Nevada And Obtains A Change In Nevada Law To Allow For Mobile Gambling**

72.     On or about November 12, 2004, CFLP formed Cantor Nevada to operate a business that would, among other things, provide mobile betting, including sports betting, to casinos using hand-held gaming devices.  As part of its business model, Cantor Nevada would supply the central server system and devices.

73.     CFLP was intimately involved in Cantor Nevada from the very beginning. Shortly after Cantor Nevada's formation, CFLP purported to license, by an agreement dated December 8, 2004, certain mobile gaming technology to Cantor Nevada, and provided Cantor

Nevada with a large line of credit to begin operations, according to CET's S-1/A. On the same day, Cantor Nevada executed a demand promissory note line of credit in favor of CFLP (the "**Cantor Note**"), which, as of September 30, 2011, was up to $144.4 million. The Cantor Note is payable upon demand of CFLP as lender.

74.    At the time of Cantor Nevada's formation, Nevada law did not allow for mobile betting using hand-held devices in casinos. As a result, Cantor conducted a lobbying effort in Nevada to permit mobile betting through handheld devices.

75.    Unbeknownst to Plaintiff, but as has been reported by Bloomberg Markets Magazine, "[b]y 2005, …, Amaitis began laying the groundwork for Cantor's move to [Las Vegas]. He hired one of the state's top gambling lobbyists, Bob Faiss, to write and push a bill through the Nevada legislature to allow mobile wagering."

76.    Indeed, on May 11, 2005, Bob Faiss, representing Cantor Nevada before the Nevada Assembly Judiciary Committee, stated that Cantor Nevada is "an affiliate of Cantor Fitzgerald LP," which "heralded the legislative action that puts Nevada on the way to apparently becoming the first state to allow wireless gambling."

77.    On or about May 3, 2006, Joe Asher ("**Asher**"), who was at all relevant times managing director of Cantor Nevada, recalled the lobbying effort by Cantor and stated that "we went through the process of sitting with the gaming board, drafting a bill with our attorneys, then moving the bill through the Legislature."

78.    Following these lobbying efforts, in June 2005, the Nevada Gaming Control Act was amended to allow for mobile gaming in Casinos using handheld devices. However, the Nevada Gaming Control Board (the **"Gaming Control Board"**) still needed to issue appropriate regulations.

79.     In March 2006, the Gaming Control Board approved regulations governing mobile gaming in Nevada.  Cantor Nevada wasted no time getting licensed, filing its application shortly thereafter.

80.     On May 3, 2006, the Gaming Control Board recommended the approval of Cantor Nevada's mobile gaming license application.

81.     On May 18, 2006, Cantor Nevada and several "key" executives were granted the first ever licenses as a manufacturer, distributor and operator of mobile gaming systems by the Nevada Gaming Commission.

### 2.     Cantor Nevada Operates Mobile Gambling In Nevada Casinos

82.     On May 25, 2006, just a week after Cantor Nevada received its mobile gaming license, the Las Vegas Sands Corp. announced that it had entered a long-term agreement with Cantor Nevada for the provision of handheld gaming machines at the Venetian Resort Hotel Casino (the **"Venetian"**) and the Palazzo Resort Hotel Casino (the **"Palazzo"**), then under construction.

83.     By February 2007, a Cantor Nevada mobile gaming system, including the eDeck portable gaming device ("**eDeck**"), was being tested at the Venetian.   In April 2008, Cantor Nevada began mobile gaming field trials at the Venetian and the Palazzo.

84.     On July 7, 2008, owners of the M Resort Spa Casino ("**M Resort**"), announced a deal by which Cantor Nevada would provide mobile gaming and operate a sports book when the resort opened in early 2009.

85.     On November 24, 2008, following extensive testing at the Venetian, Cantor Nevada announced that it had received approval from the Nevada Gaming Commission, on recommendation from the Gaming Control Board, to begin operating mobile gaming systems, and specifically eDeck, in Nevada.

86.     On March 1, 2009, Cantor Nevada commenced race and sports operations at M Resort.

87.     On March 21, 2009, In-Running wagers, based on the Midas software discussed below (*see infra* § E.2), became available to guests at M Resort.  Cantor has explained that In-Running "is wagering on an event where the odds change dynamically based upon changes that occur within the sporting event and where the player can wager multiple times on events during the course of the event."  For example, In-Running, like CIL's Spread Betting and Spreadfair, allows customers to bet on particular plays after a sporting event has begun, as opposed to betting only on the outcome of the event.  According to Cantor Nevada's Chief Technology Officer, Sunny Tara, in explaining wagering related to U.S. football games, "[o]ur patrons will have the opportunity to place wagers on the money line, point spread, totals for both the entire game and the first half, as well as other proposition bets such as whether the next play yields 20 yards or a drive has another first down."

88.     In addition to M Resort, In-Running was then made available at the Venetian and Palazzo for the 2009 NFL season.

89.     By January 2010, mobile gaming generated approximately 75 percent of Cantor Nevada's revenue.

90.     Indeed, a 2010 article in Wired Magazine reported that Amaitis "anticipate[d] that Cantor Gaming will control 15 percent of Nevada's sports betting this year.  Judging by 2009's numbers, that would make for about $375 million in bets taken."  The article also reported that, "[b]y 2012, Amaitis predicts, his company's revenue will be $20 million."

91.     In February 2011, Cantor Nevada opened sports books at the Hard Rock Hotel & Casino and the Tropicana Las Vegas.  In March 2011, Cantor Nevada opened the Cosmopolitan

Race and Sports Book at the Cosmopolitan of Las Vegas. In November 2011, Cantor Nevada opened a sports book at the Venetian.

### 3. The Defendants Seek To Capitalize On Their Nevada Business Through An Initial Public Offering

92. Having rapidly grown Cantor Nevada's business based on the CIH Entities' businesses and assets (including the CIH Entities' technology), the Defendants now appear to be seeking to capitalize on this growth by pursuing an IPO.

93. CET was incorporated in Delaware on November 10, 2011. On December 22, 2011, CET filed a Form S-1 with the SEC in contemplation of its IPO, and on February 14, 2012, it filed a Form S-1/A. The Form S-1/A provides that, in connection with the completion of the IPO, Cantor Nevada would be contributed to CET as its operating subsidiary.

94. Upon information and belief, if the IPO had been pursued, it would have resulted in a cash infusion to Defendants of approximately $100 million. This would have resulted in a substantial gain to Cantor, as well as Lutnick and Amaitis, since they own and control CET. Indeed, according to the Form S-1/A, Lutnick would control CET and serve as its Chairman. Further, Amaitis would serve as President, CEO, and Director of CET, while Merkel would serve as Executive Vice President, Chief Legal Officer, General Counsel, Secretary and Director of the company.

95. The Form S-1/A explains that, as a result of the technology underpinning the businesses, CET and Cantor Nevada believe they would have a substantial first-mover advantage over potential competitors and that there are substantial barriers to entry by any potential competitors.

96. For example, the Form S-1/A provides that, "[d]ue to the significant historical capital investment in our technology platform and our leadership position within the industry, we believe substantial barriers to entry and brand equity have been created."

97. The Form S-1/A also confirms that "[o]ur patents, trademarks, copyrights and other intellectual property rights are a significant asset. We rely on the strength of our intellectual property portfolio in the development and commercialization of our products."

98. With respect to FFO betting, the Form S-1/A provides that, "[t]hrough [Cantor Nevada's] subsidiary, Cantor [G&W], [Cantor Nevada] operates a financial fixed odds betting product…."

99. With respect to mobile gaming, the Form S-1/A states:

We offer a complete mobile gaming solution, including a proprietary wireless gaming system, full back-office infrastructure and a portfolio of casino games. Players have the ability, with our mobile gaming technology, to play in all authorized areas of a property, including our race and sports books, and private areas such as pools, restaurants and lounges.

100. Regarding the rapid growth of the mobile gaming market, the Form S-1/A provides:

According to Juniper Research, the mobile entertainment industry, of which mobile gaming is a subset, was worth $33 billion in 2010 and is expected to be worth $54 billion in 2015. The mobile gaming industry is expected to make $8 billion in 2011 according to an article on Fool.com and will be earning $11.4 billion in 2014 according to Gartner, Inc. The biggest reason for the growth in these markets is the "rapid proliferation and quick adoption" of mobile devices such as smartphones and tablets. Casino Enterprise Management, in an article published February 1, 2011, indicated "….mobile gaming will change the gaming industry by adding convenience and a whole new spectrum to the industry. Mobile gaming is here today and is going to proliferate inside of casinos."

* * *

Adoption of mobile gaming is expected to be driven by the following trend:

*Rising use of mobile devices.* Tablet computers and smartphones provide a convenient, simple platform for users to play games. Goldman Sachs Equity

Research estimates that tablet sales increased from $17.8 billion in 2010 to $51.2 billion in 2011 and are expected to increase further to $71.4 billion in 2012. Mobile gaming continues to grow driven by the rapid proliferation of smartphones and smartphones and tablets. According to BMO Equity Research, Apple has sold more than 250 million iOS devices and its online multiplayer social GameCenter platform has 67 million registered players while Google has activated more than 190 million Android devices globally. Games are the largest category of apps on tablets and smartphones and mobile gaming allows publishers to reach a wide global audience. Additionally, casino-style games rank in the top 5 top grossing iPhone games and top 20 for iPad games in the U.S., Canada, United Kingdom, and Germany.

101.    The Form S-1/A also states that, "[i]n addition to our current business in the United Kingdom, we plan to further expand our operations throughout Europe, Asia and elsewhere in the future."

102.    As set forth in the Form S-1/A, it was contemplated that Lutnick and his Trust would hold the only voting securities of CET following the IPO, with the Class A common stock being offered through the IPO having no voting rights unless required by law.

103.    Although CET withdrew its S-1/A, and is no longer an entity registered with the State of Delaware, Cantor Nevada itself is now pursing an IPO. On January 6, 2014, using the name CG Technology, Cantor Nevada stated that "as [CG Technology] continues to significantly grow and expand, it intends to seek a public offering in the future." As CET—with Cantor Nevada as its only operating subsidiary—was expected to have obtained a cash infusion of $100 million in its now-withdrawn IPO, it is expected that Cantor Nevada's future IPO will result in at least the same, if not greater, valuation.

E.    THE DEFENDANTS TRANSFER—WITHOUT ANY COMPENSATION—CIH'S INTELLECTUAL PROPERTY TO THE CANTOR NEVADA ENTITIES

104.    Despite the success of CIH and its subsidiaries, beginning in 2005 and thereafter, Defendants recognized that they could use the technology developed at CIH to further their ambitions in Nevada. Thus, they decided to take the CIH technology and give it to the Cantor

Nevada entities. While this transfer of technology may have, in some part, been carried out through the documented transactions discussed below (*see infra* § E), on information and belief, significant technology transfers occurred without any documentation. On information and belief, such transfers occurred by having CIH employees—such as CIH Managing Director Andrew Garood—develop such technology for the Cantor Nevada entities using the intellectual property he had developed for CIH while he was employed there. Upon information and belief, other similar undocumented transactions resulted in the misappropriation of intellectual property belonging to the CIH Entities to allow Cantor Nevada to create mobile gambling and in-game betting.

### 1. Mobile Gambling Technology

105. Beginning in 2005 or earlier, Cantor Nevada appropriated Candor Index LLC's mobile gaming technology prior to the execution of the 2006 License Agreement, which it used to successfully lobby the State of Nevada to legalize mobile gaming in 2005. On May 11, 2005, in connection with Cantor's lobbying efforts in Nevada, Cantor Nevada's managing director Joe Asher testified before the Nevada Senate Judiciary Committee that, "[i]n September 2003, CIL rolled out the first real-time mobile trading device anywhere in the world. We call it Cantor Mobile and it now represents a significant percentage of all of CIL's trading. … Having successfully deployed mobile technology, we are aggressively seeking to expand the areas in which we offer it. And, that is what brings me before you today."

106. On or about July 2, 2005, Asher admitted to the New York Times that, "[i]n 2003, Cantor's company in London introduced the first hand-held device that allows for wireless gambling in casinos in Britain.... 'Since we spent a tremendous amount of money developing the technology, we were looking for other new applications, and so we approached Nevada.'"

107.     Similarly, on or about November 28, 2005, Asher stated that Cantor first introduced wireless gaming on hand-held devices in Great Britain in 2003.

108.     On or about May 4, 2006, the Las Vegas Review-Journal, after interviewing Lutnick, and again on May 25, 2006, after interviewing Amaitis, reported that Cantor "has supplied similar hand-held gaming devices for use in the United Kingdom."

109.     On or about December 28, 2009, Amaitis admitted to the New York Times that eDeck's "algorithms are variations of those created by a sister company, [CIL]…."

110.     A November 1, 2010 article in Wired Magazine, entitled *Wall Street Firm Uses Algorithms to Make Sports Betting Like Stock Trading*, explains that Amaitis "presented his UK setup to the Nevada Gaming Control Board as evidence that the wireless component of his master plan was sound and secure. 'When we applied for our gaming license, Nevada tried cracking into our UK system a couple hundred times,' Amaitis says. 'They bounced in from IP addresses in the States and off of other IP addresses around the world. We always blocked them.'"

111.     On or about November 11, 2011, Amaitis told Global Gaming Business during a recorded podcast that the mobile technology of Cantor Nevada originated in CIL:

> So we had the bank as a client and then we have the traders as a client or – or other people within the bank as a client that want to take a - a bet, let's say, on the movement of an indice – the Dow Jones, the FTSE or whatever, you know ... And – and that is – that was done in [CIL]. Now, in order to make [CIL] more, um, interesting we decided that we thought it was a good idea to start investing in mobile technology ... and we thought that the world would actually move to be out of the office sort of access ... So we spent years of development on mobile technology, which was – which was well ahead of its time for the wholesale market industry and that started the underpinning of the application here in Nevada.

112. Amaitis also specifically referenced prior race and sports betting as something "we've been doing ... in the U.K." In fact, he admitted that when Cantor came to Nevada, the technology already existed:

> five years ago when we came to Nevada to actually, uh, introduce the idea of mobile gaming ... It was with a much broader stroke than where we are today ... I mean we were – we were a little bit more ambitious in what we could actually do in terms of – although the technology existed ... the regulations didn't exist.

113. Amaitis went on to say that the on-line gaming component in the United Kingtom., referring to Cantor Gaming UK's business, was "sort of a test bed for our games and the popularity of games that we have created."

114. Finally, a May 9, 2012 article published on Bloomberg.com, "Lutnick Seizes Las Vegas With Cantor Fitzgerald's Bet on Sports," reported from its interview with Amaitis that "Cantor saw so much promise in the technology that in 2005 it contracted with manufacturers to produce about 500 eDeck, or electronic card deck, hand-held devices." To do so clearly required Cantor Nevada to use the mobile technology that had originated with CIL.

115. It is Plaintiff's contention that Cantor Nevada appropriated the technology underlying the hand-held gaming devices, which involve technology different than the technology that was transferred pursuant to the 2006 License Agreement or any other transactions as to which documentation has been provided to Plaintiff, without any compensation to—or even legal transfer from—CIH Entities.

### 2. Midas Software

116. Upon information and belief, Cantor Nevada's In-Running betting, which allows betting during sporting events, was misappropriated from the CIH Entities.

117. On or about October 1, 2008, Amaitis told the Casino Journal that betting during sporting events—Cantor Nevada's In-Running betting—was a service that Cantor had been

offering as a licensed bookmaker in the United Kingdom for seven years. Upon information and belief, the only licensed bookmaker affiliate of Cantor in the United Kingdom during that time period was CIH's subsidiary, CIL.

118.    On or about June 1, 2009, Anthony Marnell, III, the chief executive officer of M Resort, told American Executive that Cantor has been using the software for In-Running betting for years in Europe.

119.    The November 1, 2010 Wired Magazine article explains in detail the origins of critical components of the technology on which the Cantor Nevada Entities relied to create the software underlying In-Running betting. Among other things, the article provides that Cantor's Nevada operations rely in significant part on a program called "Midas." The article explains:

> Cantor has generated a lot of buzz with the original technology behind its sports book operation, especially the eDeck tablets—touchscreen wireless devices that can be used to bet from anywhere in the casino. **But the cornerstone of the operation is a piece of number-crunching software called Midas.** It functions like the predictive computer programs that Amaitis dealt with on Wall Street: Midas acquires information, processes it, finds mathematical patterns and correlations, and uses all of that to divine the ever-shifting odds of sporting events. (emphasis added)

120.    The 2010 Wired Magazine article further explains that Midas was developed in part by Andrew Garrood. Garrood was CIL's Managing Director until at least 2009.[5] Notably, Garrood is listed in the Business Plan accompanying the 2009 Application as "the Managing Director of [CIL]…."

121.    The 2010 Wired Magazine Article states:

> By March 2000, [Garrood] was on the Cantor payroll. Garrood was tasked with gathering the data and creating software that could calculate the in-running odds for an online sports-wagering operation. He developed the algorithms, and an IT

---

[5] According to the Nevada Gaming Control Board, Garrood is also now the Executive Director of a Cantor Nevada subsidiary, CG Analytics, Inc. ("CG Analytics"), which provides pre- and in-gaming wagering data, and prices and odds for various sportsbooks. Lutnick is the Chairman of CG Analytics, and Amaitis is its President and CEO, and also serves as a director. Merkel is CG Analytics' secretary, and its Executive Managing Director.

team turned them into code. In 2004, the UK site Cantor Spreadfair was launched. It was a peer-to-peer sports gambling site, allowing users to set their own bets, which would be taken by other players (or by Cantor). The site allowed for spread betting, a volatile form of gambling in which the payoffs are based on how closely you predict the final point difference between two teams. They also set up a site called [CIL] for "financial fixed odds"—allowing people to bet on the moment-to-moment changes in the stock market—as well as financial spread betting.

122. In other words, Garrood, as an employee of one or more CIH Entities, and his IT team developed key technology underpinning Spreadfair and CIL's FFO business.

123. The Wired Magazine article provides that Amaitis viewed the CIH Entities' success as "a proof of concept" and "used it to pitch Vegas casinos on the prospect of allowing him to lease their sports books and introduce in-running to American gamblers."

124. The article further reports that Garrood "[w]ork[ed] out of a skyscraper in the Canary Wharf business district of London and found that he was able to port some elements of Cantor's British betting site into the nascent Midas," while using historical data on American sporting events as the inputs. Given that "Americans wouldn't want to bet on rugby or cricket," the article quotes Garrood as stating: "**I had the perfect sauce recipe**, … but I need different ingredients." (emphasis added.) The article reports that the historical sports data was provided through Cantor's purchase of Las Vegas Sports Consultants, whose "archive forms the bulk of the content that Midas analyzes."

125. The 2010 Wired Magazine article additionally reports that "the final step of Midas' development was overseen by Cantor's CTO, Sunny Tara…." The article quotes Tara as explaining: "The computer gets the info, the algorithm churns millions of combinations of calculations, it feeds out a price, and that gets displayed on the customer's terminal in just a few milliseconds…." The article reports that this "was a logistical nightmare." However, "'[t]he challenge was to do multiple games, simultaneously, with different rules and criteria and various

inputs,' Tara says.  'Yet it's the same Midas doing all of them at the same time.  The code had to accommodate apples and oranges.  **But we were able to leverage what Andrew [Garrood] already had in England and what Cantor already had for its financial markets**.'"  (emphasis added.)

126.    The article also reports: "[U]ltimately, the company is thinking beyond casinos, beyond Vegas, and beyond sports betting.  Someday soon, Amaitis hopes, Cantor will take bets on just about anything that a price can be attached to, and it will take them from just about anywhere in Nevada."  Indeed, the article reports that "Cantor Gaming is also laying the groundwork to allow gamblers at its sports books to wager on movements within the stock market, **just like [CIL] in the UK**."  (emphasis added.)

127.    Indeed, in the 2012 Bloomberg.com article, Garrood concedes that he began developing the Midas software in 2007—even though at the time he was a Managing Director of CIL—after a trip to Las Vegas:  "[Garrood] returned to Cantor's London office to help create software to enable wagering with odds during games."

128.    The foregoing transfers of CIL's intellectual property to create mobile gaming and the Midas program, which were apparently accomplished without any recorded transaction, are unfair, as a matter of price and process, to CIH and its wholly owned subsidiary, CIL, and constituted a breach of fiduciary duties, conversion and waste.

129.    These undocumented transactions, which have only recently come to light, resulted in the effective transfer of valuable technologies to an entity, Cantor Nevada, in which neither the CIH Entities nor RGL hold any ownership interest.  By contrast, according to CGWL (UK)'s 2009 Application (defined above) with the U.K.'s Gambling Commission, Defendant Lutnick holds a 68.08% equity interest in Cantor Nevada, while Defendants Amaitis and Merkel

hold 7.43% and 2.6% ownership interests, respectively, and the Trust owns the remaining 21.89% ownership interests. Further, as noted above in Paragraph 40, all of the Individual Defendants have operated Cantor Nevada since at least 2004.

### F. THE DEFENDANTS CAUSE THE CIH ENTITIES TO RELINQUISH THEIR BUSINESSES AND ASSETS FOR NO OR NOMINAL CONSIDERATION

130. In addition to the uncompensated and improper transfer of mobile and "Midas-related" technologies from CIH to the Cantor Nevada entities discussed above, the Defendants, with Lutnick at the helm, also decided, through certain documented transactions, to transfer the CIH Entities' businesses and assets for no or only nominal compensation to the control of the Cantor Nevada Entities, in which neither the CIH Entities nor RGL held any ownership interest.

131. What was not poached by the Cantor Nevada Entities was transferred to CFE—also controlled by CFLP and Lutnick—by way of transfer of trading activity and transfer of assets in the form of exorbitant fees.

### 1. The 2006 License Agreement

132. For example, the Defendants caused the execution of a License Agreement, dated February 7, 2006 (the "**2006 License Agreement**") and attached as Exhibit B hereto, among CILLC, a wholly owned subsidiary of CIH, CFPH LLC and Cantor Nevada. The 2006 License Agreement granted Cantor Nevada a "non-exclusive, non-transferable, perpetual, worldwide, royalty-free right and license to certain patent and patent applications indicated as held by each … Party in the attached Schedule A…." Schedule A to the 2006 License Agreement identified the following intellectual property of Cantor Index LLC covered by the 2006 License Agreement:

| | | |
|---|---|---|
| ■ | ■■■■■■■■ | |
| ■■■■■■ | ■■■■ | ■■■■ |
| ■■■■■■ | ■■■■ | ■■■■ |
| ■■■■■ | ■■■■■ | ■■■■ |
| ■■■■■ | | |

133. The Defendants caused CILLC to enter into the 2006 License Agreement only days before Cantor Nevada filed its licensing application with the Nevada Gaming Commission (as described in greater detail above).

134. Importantly, the 2006 License Agreement provides that consideration for the perpetual licenses would "be determined within a reasonable time hereafter pursuant to arms-length negotiations in good faith…."

135. Yet, the License Agreement was executed on behalf of all the parties thereto by the same individual – Lutnick – in his capacity as Chairman and Chief Executive Officer of Cantor Nevada and in his capacity as Chairman and Chief Executive Officer of CILLC. Given the Defendants' control over both CILLC and Cantor Nevada, arms-length negotiations were and are impossible.

136. Indeed, upon information and belief, no good faith attempt to conduct arms-length negotiations has ever occurred, nor have CIL or Cantor Nevada ever sought an independent appraisal to determine appropriate compensation.

137. Upon information and belief, CILLC has received no compensation for the perpetual licenses set forth in the 2006 License Agreement.

138. Nevertheless, the licenses are valuable intellectual property of CILLC.

139. For example, an abstract for the patent titled ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ provides:



140. This patent may underlie some portion of the highly valuable real-time betting technology.

141. As indicated above, the 2006 License Agreement, which Plaintiff first learned of as a result of the Defendants' May 7, 2012 production of documents, resulted in the effective transfer of valuable technologies to an entity, Cantor Nevada, in which neither the CIH Entities nor RGL hold any ownership interest. By contrast, according to CGWL (UK)'s 2009 Application (defined below) with the UK's Gambling Commission, Defendant Lutnick holds a 68.08% equity interest in Cantor Nevada, while Defendants Amaitis and Merkel hold 7.43% and 2.6% ownership interests, respectively, and the Trust owns the remaining 21.89% ownership interests. Further, as noted above in Section A.3, all of the Individual Defendants have operated Cantor Nevada since at least 2004.

142. The 2006 License Agreement is unfair, as a matter of price and process, to CIH and its wholly owned subsidiary, CILLC, and constituted a breach of fiduciary duty, conversion and waste.

## 2. CIL's Profitable UK Businesses Are Sold For £1

143. Next, the Defendants determined to take CIL's profitable FFO betting business, by transferring it to CGWL (UK), a Cantor Nevada Entity, for only nominal consideration. While neither the CIH Entities nor RGL hold any ownership interest in CGWL (UK), according to CGWL (UK)'s 2009 Application (defined below) with the UK's Gambling Commission, Lutnick holds a combined 89.97% equity interest in CGWL (UK)'s, while Amaitis and Lutnick hold 7.43% and 2.6% ownership interests in the company, respectively.

144. As described below, in connection with this scheme the Defendants caused CGWL (UK) to file an application for a gambling license with UK authorities in late 2009, which clearly explained that CGWL (UK) would be the successor to CIL's FFO business as part of a purported corporate reorganization and that CGWL (UK) needed a quick decision on its license application so that it could seamlessly take over operations by the time CIL's license expired on January 29, 2010. A few months later, to paper over this raid on CIL's FFO business, the Defendants caused CIL to enter into an asset purchase agreement with CGWL (UK) for only £1.00 for the sale of CIL's FFO business, including all of CIL's intellectual property and employees, such as Andrew Garrood, who developed much of CIL's (and CILLC's) technology, to CGWL (UK), with a retroactive effective date of midnight on February 1, 2010. Again, Plaintiff first learned of the asset purchase agreement in connection with the Defendants' April 13, 2012 production of documents.

### (a) A Cantor Nevada Entity Files A UK License Application As Part Of The Process Of Taking CIL's Profitable FFO Business

145. On November 19, 2009, Hammonds LLP, counsel to CGWL (UK), a direct subsidiary of Cantor Nevada, filed an "application for a non-remote gambling software license and a remote general betting license together with supporting documentation" (the "**2009**

**Application**") with the UK's Gambling Commission (the "**Gambling Commission**").  A copy

of the 2009 Application is attached as Exhibit C hereto.

146.    The cover letter to the 2009 Application explains:

> [CGWL (UK)] is a newly incorporated company.  It is part of the Cantor
> Fitzgerald Group of companies, which is one of the largest financial institutions in
> the world.  By way of background, a number of Cantor companies hold or have
> held gambling licenses both in the UK and other jurisdictions such as Nevada.
> Currently, for example, Cantor Index Ltd conducts betting business in the UK
> under license no. 02997.
>
> The purpose of this application is as part of a **corporate restructuring**.
> Essentially, [CIL] currently operates both fixed odds betting on financial indices
> and also spread betting (which is regulated by the FSA).  It is proposed that the
> new company, **[CGWL (UK)], will take over the Financial Fixed Odds
> operations of Cantor Index Ltd**.  Some staff and assets as well as the benefit of
> a contract with Ladbrokes will be transferred to [CGWL (UK)] once it has its
> license – and it will essentially carry on the Financial Fixed Odds business
> conducted currently by [CIL].  Equally, [CIL] will surrender its license to offer
> fixed odds betting once [CGWL (UK)] is operational.  It is for this reason that we
> are able to give quite accurate predictions of the likely business streams of the
> new business.
>
> The license currently held by Cantor Index Ltd is due to expire on 29 January
> 2010, ideally we would like the [CGWL (UK)] license to be in place on or before
> this date…. (emphasis added)

147.    Consistent with the cover letter to the 2009 Application, CGWL (UK)'s Business

Plan enclosed in the 2009 Application further explains:

> Recently, Cantor has decided to re-organi[z]e and consolidate its gambling-related
> businesses.  The objective is to concentrate more resources in the USA (Nevada)
> and to focus more heavily on the development of software products for use in the
> gambling industry.  As part of this re-organi[z]ation (relevant to the UK), it is
> proposed that [CIL] should cease to offer the FFO Product and that a new
> company, [CGWL (UK)] should take over that responsibility.

The Business Plan states that, "[u]nder this new arrangement, [CGWL (UK)] would offer its

services to the end-user exclusively through partnerships with third parties holding a relevant

gambling license."

148.    The Business Plan also emphasizes:

It should be recogni[z]ed that [CGWL (UK)] is effectively taking over the business of [CIL]…. [CIL] operated not only through a partnership with Ladbrokes but also on its own account through the website www.cantorindex.com. Although the direct servicing of customers was discontinued at the end of 2008 [*i.e.*, with the closing of Spreadfair, as described above], all of the processes relating to customer identification and social responsibility remain in place, and the knowledge and experience of operating directly with customers remains within [CIL] and can be deployed to ensure that business conducted through [CGWL (UK)]'s partners complies with the standards that the Commission would expect.

149.    The Business Plan further states:

[CIL] intends to surrender its license as a general betting operator and for the business which it currently conducts in relation to Fixed Odds products to be transferred to [CGWL (UK)]. [CGWL (UK)] will remain within the Cantor Group of companies but will be solely responsible for its UK gambling activities. [CIL] will continue to offer spread betting under the regulatory regime run by the Financial Services Authority.

* * *

**It should be stressed that although this will be a new license application, it arises essentially from a corporate re-organi[z]ation rather than from any fundamental shift in the business being conducted. Consequently, many of the details (in terms of the software used, the management and staff of the company and so on) will be the same as applied in the period during which the service was offered by [CIL].** [emphasis in original.]

150.    Another form included with the 2009 Application expressly provides: "The software which will be used to provide the services is **<u>identical</u>** to the software currently used by CIL under license number 002997, the plans for technical compliance are as set out in the application for license 002997." (emphasis added.)

151.    In other words, as the 2009 Application materials make clear, Cantor had determined to transfer **<u>in its entirety</u>** CIL's profitable FFO business and related assets and employees to [CGWL (UK)], a Cantor Nevada Entity in which neither the CIH Entities nor RGL hold any ownership interest.

152.     In addition, the Business Plan states that "[t]he historic trading risk for the provider of financial fixed odds wagers is very low" and sets forth the following "conservative" revenue forecasts for the FFO business:

| 2009 | FINANCIAL FIXED ODDS | TOTAL |
| --- | --- | --- |
| September 2009 | £93,016 | £1,555,444 |
| October 2009 | £105,493 | £1,764,101 |
| November 2009 | £98,687 | £1,650,288 |
| December 2009 | £82,807 | £1,384,724 |
| Total: | £380,003 | £6,354,556 |

| 2010 | FINANCIAL FIXED ODDS | TOTAL |
| --- | --- | --- |
| January 2010 | £71,084 | £1,188,703 |
| February 2010 | £87,017 | £1,455,137 |
| March 2010 | £117,857 | £1,987,509 |
| April 2010 | £94,371 | £1,578,108 |
| May 2010 | £107,852 | £1,803,550 |
| June 2010 | £109,078 | £1,824,045 |
| July 2010 | £102,950 | £1,721,670 |
| August 2010 | £125,011 | £2,090,478 |
| September 2010 | £100,499 | £1,680,581 |
| October 2010 | £113,980 | £1,906,024 |
| November 2010 | £106,677 | £1,783,055 |
| December 2010 | £89,465 | £1,496,127 |
| Total: | £1,225,594 | £20,404,886 |

153.     Given the foregoing, CIL's FFO business, assets and employees were very valuable, and the Defendants expected substantial revenues as a result over the subsequent years.

154.     The UK Gambling Commission ultimately granted CGWL (UK) its requested license.

155.     The Form S-1/A confirms that CGWL (UK) now "holds both a Remote Gambling Operator's License and a Gambling Software License from the Gambling Commission."  The Form S-1/A explains that, as a result of the licenses, CGWL (UK) "can offer FFO online in the

United Kingdom as bookmaker and that we can also white label FFO to other bookmakers in the United Kingdom to offer to their customers." Notably, the Form S-1/A also provides that "[o]ur white label arrangements in Gibraltar with 32 Red, PartyGaming and Victor Chandler do not require us to be licensed in the United Kingdom."

**(b)** **The Defendants Cause CIL To Sell Its FFO Business And Assets And Transfer Its Key Employees To [CGWL (UK)] For Only £1.00**

156. On or about April 30, 2010, CIL and [CGWL (UK)] entered into an Asset Purchase Agreement (the "**FFO APA**"), with an "Effective Time" of "midnight on 1 February 2010." A copy of the FFO APA is attached as Exhibit D hereto. Amaitis, in his capacity as Director of CGWL (UK), executed the FFO APA.

157. Pursuant to the FFO APA, CIL sold its FFO business as a going concern, including all of the relevant customer lists, intellectual property, goodwill, and other assets, and then transferred its key employees, to CGWL (UK).

158. Among other things, the FFO APA provides:

Unless expressly provided in this agreement, [CIL] shall sell with full title guarantee, and [CGWL (UK)], with a view to carrying on the Business as a going concern, shall purchase free from all Encumbrances and with effect from the Effective Time:

(a)      the Business and Assets;[6]
(b)      the Goodwill;
(c)      the Records;[7]
(d)      all (if any) of the other assets, property or rights of [CIL] relating to or connected with, or belonging to  or required or intended for use in, the Business.

---

[6] The FFO APA defines "Business" as "the financial fixed odds betting business carried on by [Cantor Index] at the Effective Time."  The FFO APA defines "Assets" as "the property, rights and assets of [Cantor Index] that comprise the Business including the Goodwill, Business Intellectual Property Rights, Book Debts, the IT System and the Contracts."

[7] The FFO APA defines "Records" as "the books, accounts, lists of Customers and suppliers and all the other documents, papers and records relating to the Business or any of the Assets."

159.     The FFO APA also provides that the CIL's "Employees" "shall be transferred to [CGWL (UK)] … with effect from the Effective Time."

160.     The "Employees" transferred to CGWL (UK) pursuant to the FFO APA were critical employees of CIL.  For example, the list of "Employees" includes David Puckeridge, who CGWL (UK)'s Business Plan describes as having been "responsible for the IT and software development of the FFO Product with [CIL]…."   The Business Plan also explains that Puckeridge was "a part of the [CIL] FSA-regulated spread-betting system development team, and since 2004 he has managed the development of the Cantor Financial Fixed Odds (FFO) betting system."   The Business Plan provides that Puckeridge "will move his responsibilities to [CGWL (UK)]" and the FFO APA made good on that promise.

161.     As consideration to [CIL] for entering into the FFO APA and thereby selling its valuable FFO business and transferring its key employees, CGWL (UK) paid the nominal consideration of only £1.00.

162.     Also, confirming that the FFO APA was intended to effectuate the purported "re-organi[z]ation" described in the 2009 Application, the midnight on February 1, 2010 "Effective Time" for the FFO APA corresponds precisely with the January 29, 2010 expiration date for [CIL]'s UK Gambling Commission license, as stated in the cover letter to the 2009 Application discussed above.[8]

163.     With respect to bringing the FFO business to Nevada, in November 2011, Amaitis told Global Gaming Business during a recorded podcast that Cantor Nevada would be able to

---

[8] Cantor Index's report to the UK's Financial Services Authority for the fiscal year ended December 31, 2010, also confirms that Cantor Index's "[FFO] business was transferred to Cantor [G&W] (a related company) on 1 February 2010."

build on business already done in the UK:  "Because what we've been able to do is build off of that investment in the UK...."

164.    Indeed, as described above, the software employed by CGWL (UK) (a Cantor Nevada Entity) for providing FFO betting services was "identical" to the software previously used by CIL (a CIH Entity) for its FFO betting business, until CGWL (UK) took over that business from CIL for only nominal consideration

165.    Moreover, the Form S-1/A confirms that the Defendants were behind the FFO APA's unfair transfer.  The Form S-1/A provides that Cantor Nevada "acquired, through entities under common control, [CGWL (UK)] … when it was **contributed by [CFLP] to us from Cantor Index, Limited**" on April 30, 2010, with an effective date of February 1, 2010. (emphasis added.)

166.    The FFO APA is unfair, as a matter of price and process, to CIH and its wholly owned subsidiary, CIL, and constituted a breach of fiduciary duties, conversion and waste.

### 3.      The Defendants Transfer Out The Remainder Of CIL's Trading Activity

167.    Finally, to complete the process of gutting CIL's profitable businesses, Defendants caused CIL to transfer out its valuable trading activities.

168.    CIL's business involved acting as "an introducing broker" for trading in contracts for difference ("CFDs").  For the year ended 2010, CIL reported revenue of $8,089,000 arising from its trading in CFDs and its spread betting business.

169.    CIL disclosed in its annual report and financial statements for the fiscal year ended December 31, 2010, that "[m]anagement of [CIL] has conducted a review of its activities and has commenced a project to transfer all the trading activity of [CIL] to [CFE]."

170.     CIL's annual report further stated that "[i]t is intended that the transfer will be completed by the end of the second quarter of 2011. [CIL] will retain an economic interest in the trading activity transferred." The stated reason for this transfer was "to ensure resources are most efficiently deployed within the CFLP group."

171.     Upon information and belief, the retained economic interest referenced above is relatively nominal, constituting a 1% interest in Cantor Fitzgerald Services, LLP.

172.     By contrast, CFE, in which RGL has no ownership interest, owns the other 99% interest in Cantor Fitzgerald Services, LLP.

173.     On November 16, 2014, CFE sold its CFD and financial spread betting businesses to Solo Capital Partners LLP for an undisclosed sum.

174.     The foregoing transfer of CIL's trading activity to CFE is unfair, as a matter of price and process, to CIH and its wholly owned subsidiary, CIL, and constituted a breach of fiduciary duties, conversion and waste.

**4.     The Defendants Again Cause CILLC To License Its Intellectual Property For No Consideration**

175.     Similar to the 2006 License Agreement, the Defendants again caused CIH's subsidiary CILLC to license its intellectual property for no consideration.

176.     In June 2009, Cantor Nevada and Shuffle Master, Inc. ("Shuffle Master"), negotiated the licensing of certain CILLC patents to Shuffle Master, which patents are discussed further below. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

177.   Two years later, Amaitis, as Executive Managing Director of CIH's subsidiary CILLC and as Chief Executive Officer of Cantor Nevada, executed a License Agreement, dated June 23, 2011, between CILLC, Cantor Nevada, and Shuffle Master (the "**2011 License Agreement**").  A copy of the 2011 License Agreement is attached as Exhibit F hereto.

178.   The 2011 License Agreement licenses to Shuffle Master certain ███████ ██████ relating to the game of Black Jack owned by CIL, which are listed on the following Schedule C to the 2011 License Agreement:



179.   The 2011 License Agreement also provides that ████████████████ ██████████████████████████

180.   Importantly, the 2011 License Agreement provides that royalties and fees derived from this license of CILLC's intellectual property are to be paid to Cantor Nevada, and not to CILLC.

181.   The 2011 License Agreement does not specify any payment to, or right to payment for, CILLC.

182.     Upon information and belief, no payment has been made to CILLC for the license of its intellectual property under the 2011 License Agreement.

183.     As noted above, neither the CIH Entities nor RGL hold any ownership interest in Cantor Nevada, while all of the Individual Defendants own and operate Cantor Nevada.

184.     Thus, Cantor Nevada and the Individual Defendants unfairly appropriated for their own benefit revenues and/or the right to receive revenues that should be and/or have been paid to CILLC.

185.     The 2011 License Agreement is unfair, as a matter of price and process, to CIH and its wholly owned subsidiary, CILLC, and constituted a breach of fiduciary duties, conversion, and waste.

### 5.     The Defendants Unfairly Increased Fees Paid To Cantor Affiliates

186.     Not only did the Defendants strip the CIH Entities of profitable businesses and assets as described above, they also caused CIL – the wholly owned subsidiary through which CIH operated successful gambling ventures – to pay exorbitant sums to CFLP subsidiary CFE and other CFLP affiliates through a series of related-party transactions and agreements.  As a result, what revenues CIH and CIL did accrue were drastically reduced by unfair fees.

187.     For example, from 2003 to 2006, CIL's revenues more than doubled, growing from $35 million in 2003 to $76.4 million in 2006.  However, over that same period, amounts paid by CIL to CFLP affiliates quadrupled, growing from $9.3 million in 2003 to $38.3 million in 2006 – more than 50% of CIL's total revenues that year.

188.     Even as Defendants began to transfer CIH's and CIL's operations out of CIH, Defendants allowed CFLP affiliates to continue looting the company through related-party fees. Indeed, from 2006 through 2007, CIL's revenues declined by more than $15 million from $76.4 million to $59.9 million. Yet, over this same period, amounts charged to CIL by CFE, alone,

*increased* by more than $10 million, doubling as a percentage of total CIL revenue. Similarly, and even more astoundingly, total amounts paid by CIL to CFLP affiliates increased to a staggering $54.4 million, or **more than 91% of CIL's 2007 revenue**.

189.    Accordingly, related-party fees did not increase merely because business in general increased or because the business became more profitable. Instead, the hyper-inflation of these fees was without correlation to any revenue-producing business of CIH or CIL.

190.    Upon information and belief, these increases in related-party fees were unfair, as a matter of price and process, to the CIH Entities and constituted a breach of fiduciary duties, conversion and waste. Defendants CFLP (which controlled CFE and the other CFLP affiliates) and Lutnick (who owns more than 10% of CFLP and admittedly controls it), both materially benefitted from the unfair related-party fees.

**PLAINTIFF'S CLAIMS ARE TIMELY**

191.    The Defendants hid from Plaintiff or otherwise improperly failed to disclose the facts relating to the theft of the CIH businesses. Plaintiff first learned of the theft of the CIH businesses when it obtained information regarding the "Affiliated Transactions" as a result of Rule 2004 discovery in connection with Refco Inc.'s and Plaintiff's bankruptcy proceedings before the U.S. Bankruptcy Court for the Southern District of New York.

192.    As used herein, the "**Affiliated Transactions**" refers to the (i) the transfer of CIH's assets to help Cantor Nevada create mobile gambling and the Midas program, (ii) the 2006 License Agreement, (iii) the taking of CIL's FFO business and assets, including through the 2009 Application and the FFO APA, (iv) the 2011 License Agreement, (v) the transfer of CIL's remaining trading activity to CFE and (vi) Defendants unfair increase in fees from CIH and its affiliates to non-CIH Cantor related entities.

193.    In particular, Plaintiff first learned of the Affiliated Transactions as a result of a Rule 2004 document production that occurred in 2012.  Prior to such production, Plaintiff was not provided the necessary documents that could have reasonably placed Plaintiff on notice of such conduct.

194.    Upon information and belief, Defendants hid these matters from Plaintiff or otherwise improperly failed to disclose these matters to Plaintiff.

195.    Indeed, Cantor improperly failed to provide information to which Plaintiff was entitled under the Partnership Agreement.  Under Section 9.02 of the Partnership Agreement, Cantor was required to provide Plaintiff, *inter alia*, "a monthly report of business activity (including revenues), a quarterly unaudited profit and loss statement . . . [and] audited annual financial statements[.]"  Cantor failed to provide this information to Plaintiff.   Additionally, under Section 3.07 of the Partnership Agreement, Cantor was required to form a management committee ("Management Committee"), which was to meet quarterly and include a member of RGL.   Cantor, however, failed to form the Management Committee or hold the required quarterly meetings.

196.    As a result, on July 7, 2010, Plaintiff served CFS and CIH with a notice of inspection (the "**Inspection Notice**") of CIH's books and records pursuant to Section 9.01 of the Partnership Agreement and a notice (the "**Demand Notice**") demand production of documents in accordance with Section 9.02 of the Partnership Agreement and Section 17-305(a) of the Delaware Revised Uniform Limited Partnership Act (the "**LP Act**").  Thereafter, as a result of CIH's longstanding refusals to produce requested documents, and the specific refusals to produce or permit inspection of any documents in response to the Inspection Notice and the Demand Notice, on August 30, 2010, Plaintiff commenced an adversary proceeding by filing a

complaint against CIH and its other partners in this Court, Adv. Proc. No. 10-03527, in which RGL expressly sought the production of audited financial statements and other documents including those requested in the Demand Notice. In May 2011, RGL obtained summary judgment in the adversary proceeding directing that Plaintiff be provided audited annual financial statements as soon as practicable for the years 2003 onward. However, RGL's efforts to obtain those materials are ongoing. Indeed, RGL previously sought the Court's assistance with negotiations over an appropriate auditor for CIH. Yet, only recently has Cantor agreed to direct work on the audits to commence.

## DERIVATIVE ALLEGATIONS

197.  RGL brings this action derivatively to redress injuries suffered by CIH as a result of improper conduct, including breaches of fiduciary duties, by the Defendants.

198.  RGL has owned limited partnership interests in CIH continuously during the time of the wrongful course of conduct by Defendants alleged herein and continues to own limited partnership interests in CIH.

199.  RGL will adequately and fairly represent the interests of CIH in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

200.  This action is not a collusive one designed to confer jurisdiction upon this Court that it would otherwise lack.

## DEMAND IS EXCUSED AS FUTILE

201.  RGL has not made demand on CIHLLC, the general partner of CIH, to bring suit asserting the claims set forth herein because pre-suit demand was excused as a matter of law because CIHLLC is controlled by Lutnick, Lutnick was interested in each of the Affiliated

Transactions, and Lutnick and CIHLLC face a substantial threat of liability for the Affiliated Transactions.

A.     **LUTNICK DOMINATES CIHLLC**

202.     CIHLLC suffers from conflicts of interest and divided loyalties that preclude it from exercising independent business judgment.

203.     Pursuant to the Partnership Agreement, "[e]xcept as provided by the [LP] Act or in this [Partnership] Agreement, the General Partner shall have the sole power to make management decisions on behalf of [CIH] and to exercise the powers set forth in Section 3.02 [of the Partnership Agreement]."  Such powers include the power to commence litigation by CIH.

204.     However, CIHLLC is controlled by Lutnick.

205.     As the Court found in its June 10, 2014 Opinion and Order (the "Order"), Lutnick dominates CIHLLC.   The chart at ¶ 34, *supra*, reflects the following chain of ownership: Lutnick is the sole shareholder and owner of 100% of CF Group Management, Inc., which is the managing general partner of CFLP.   CFLP is the sole and managing member of CFLP CFS Holdings, LLC, which is, in turn, the managing general partner of CFLP CFS I Holdings., L.P. That limited partnership is the managing general partner of CFS, which is the sole member of CIHLLC.   Accordingly, Lutnick owns 100% of the corporation that manages CFLP, which manages CFLP CFS Holdings, LLC, CFS and ultimately, 100% of CIHLLC.   Each entity within this flow of ownership from CIHLLC to Lutnick is either managed by the subsequent entity in the chain, or is beholden to it by virtue of being wholly owned.   The ownership stream terminates at CF Group Management, Inc., which is 100% owned by Lutnick and therefore, as the Court held in the Order, is beholden to Lutnick.   Accordingly, and as the Court found, Lutnick dominates CIHLLC as a result of his control over each intermediate entity.   *See supra* at ¶¶ 34-42.

**B. LUTNICK WAS INTERESTED IN THE AFFILIATED TRANSACTIONS**

206. Lutnick benefited materially from the Affiliated Transactions alleged herein, or stood and/or stood on both sides of them.

207. In its Order, the Court held it reasonable to infer that Lutnick expected that the Affiliated Transactions would increase the value of his ownership interest in Cantor Nevada more than they would diminish the value of his interest in CIH. The Court also held that the prior allegations sufficiently alleged that Lutnick saw the Affiliated Transactions as an opportunity to bolster a rapidly growing business in Nevada that he predicted would become far more valuable than CIH. Therefore, CIHLLC is prevented from evaluating the Affiliated Transactions disinterestedly.

### 1. Defendants' Undocumented Taking of CIH's Technology

208. Defendants' taking of CILLC's mobile gaming technology and their appropriation of CIL's predictive algorithm program known as Midas, and simply giving those assets to the Cantor Nevada entities without documentation and without consideration materially benefited Cantor Nevada. *See supra* at ¶ 129. As to Midas, the Second Amended Complaint alleges that, "Cantor Nevada's In-Running betting, which allows betting during sporting events, was misappropriated from the CIH Entities." Both of these transfers contributed significantly to Cantor Nevada's growth. *See supra* at ¶¶ 105-29.

209. These transfers of valuable hardware and software from CIL and CILLC to Cantor Nevada also materially benefited Lutnick. As the Court found, the prior allegations show that Lutnick has an equity interest of at least 69.17% of Cantor Nevada, which profited from free access to CILLC's technology and intellectual property, and if Lutnick's family trust were included in the calculation of his ownership interest in Cantor Nevada (*see supra* at ¶ 39), it would be 89.97%. Cantor Nevada grew in part as a result of its use of technology taken from

CIH, thus materially benefiting Lutnick. *See supra* at §§ D, E. In its Order, the Court found it reasonable to infer that Lutnick expected that the Affiliated Transactions would increase the value of his ownership interest in Cantor Nevada more than they would diminish the value of his interest in CIH.

210. In any event, Lutnick may be deemed interested in the misappropriation of CIH Entities' mobile gaming technology because during the relevant period, he served as CEO of CILLC and Chairman of Cantor Nevada. Likewise, during the time in which Midas was developed and transferred from CIL to Cantor Nevada, Lutnick was both Chairman of CIL and Chairman of Cantor Nevada. *See supra* at ¶ 16.

211. Furthermore, Lutnick faces a substantial threat of liability arising from the transfers of technology and other assets from CIH Entities to Cantor Nevada. Because of Lutnick's interests in Cantor Nevada, these transfers enriched him, while concomitantly depriving CIH of its valuable assets. These transfers amounted to waste and conversion of CIH's assets, because CIH was not compensated for the misappropriation of its technology, employees, and business lines. The transfers were accomplished knowingly and intentionally by Lutnick, who controlled the entities that accomplished these transfers. Furthermore, the transfers were unfair in both price and process. Thus, Lutnick acted willfully, tortiously, and in contravention of his fiduciary duties of good faith and loyalty to CIH and its subsidiaries.

### 2. The 2006 License Agreement

212. In its Order, the Court found it plausible that Lutnick personally materially benefited from the transaction involving the 2006 License Agreement. Given Lutnick's 69.17% equity interest in Cantor Nevada (and indeed, when his family trust is considered, an 89.97%

interest), he personally benefits from Cantor Nevada's free access to CILLC's intellectual property obtained pursuant to the agreement. *See supra* at ¶¶ 39, 208.

213. In its Order, the Court also found that this benefit to Lutnick appears to be material in light of Cantor Nevada's growth attributable in part to technology from CIH subsidiaries, including the patents licensed by CILLC in 2006. *See supra* at §§ D, E.

214. Lutnick executed the 2006 License Agreement on behalf of all parties in his capacity as Chairman and CEO of both Cantor Nevada and CIH's subsidiary CILCC. *See supra* at ¶ 135. In the Order, the Court also found that these allegations sufficiently alleged that Lutnick stood on both sides of the 2006 License Agreement and, therefore, Lutnick is deemed interested in that Affiliated Transactions.

### 3. The 2010 Asset Purchase Agreement

215. In its Order, the Court found that the prior allegations sufficiently alleged that Lutnick was interested in the sale of CIL's FFO business to CGWL (UK) because under the Agreement, CGWL (UK) paid a mere £1 for a valuable line of business and the transfer of key employees from CIL. *See supra* at ¶¶ 156-66. Lutnick holds an 89.7% equity interest in CGWL (UK). In so doing, the Court acknowledged the allegations that the FFO business which CGWL (UK) operates generates substantial revenues, and noted Amaitis's statement that it is a "very successful product." *See supra* at ¶¶ 68, 72, 112

216. In the Order, the Court also found the prior allegations sufficiently alleged that Lutnick stood on both sides of the Asset Purchase Agreement because CFLP, which Lutnick controls, arranged the sale of CIL's FFO business to CGWL (UK). *See supra* at ¶ 165.

### 4. The 2011 License Agreement

217.    In the Order, the Court found that the prior allegations sufficiently alleged that Lutnick personally benefited from the 2011 License Agreement because it licenses certain of CILLC's patents to Shuffle Master, Inc., and provides that any royalties are to be paid to Cantor Nevada, rather than to CILLC. *See supra* at ¶¶ 175-85.

218.    In the Order, the Court also found it plausible to infer that Lutnick participated in the 2011 License Agreement transaction as Chairman and CEO of CILLC and Chairman of Cantor Nevada, and therefore the prior allegations sufficiently alleged that Lutnick stood on both sides of the transaction. *See supra* at ¶ 16.

### 5. Transfer Of CIL's Trading Activity to CFE

219.    The Court previously reviewed the allegations regarding the transfer of CIL's trading activity to CFE and found them insufficient to establish Lutnick's interest in that Affiliated Transaction. The amended allegations now specify the nature of the trading activity, which involved CFDs and spread betting. The amendments also make clear that this trading activity earned CIL more than $8,000,000 in revenue in 2010. Furthermore, the amendments now allege that Lutnick owned at least 10% of CFLP at the time that CIL's trading activity was transferred to CFE, which is a wholly owned subsidiary of CFLP and is controlled by CFLP. *See supra* at ¶¶ 16, 27, 131. Therefore, any increase in revenues resulting from this trading activity would have benefitted CFLP and, by extension, Lutnick, to the detriment of CIL. In addition, Lutnick has the power to direct CFE's decisions. *See supra* at ¶ 21. Based on these allegations, it is clear that Lutnick benefited from the transfer of trading activity and is not disinterested.

### 6. The Increased Related-Party Fees Paid by CIL

220.    The Court previously reviewed the allegations regarding the increase in related-party fees paid by CIL to CFE and other Cantor affiliates and found them insufficient to establish

Lutnick's interest in that Affiliated Transaction. As described above, the amended allegations now make clear that Lutnick holds a more than 10% interest in CFLP, of which CFE is an indirect, wholly owned subsidiary. Lutnick controls CFE and CFLP. Therefore, he benefited materially from the increase in fees from CIL to CFE.

### C. LUTNICK AND CIHLLC FACE A SUBSTANTIAL THREAT OF LIABILITY FOR THEIR INVOLVEMENT IN THE AFFILIATED TRANSACTIONS

221. In its Order, the Court found that Lutnick faces a substantial threat of liability for his involvement in the 2006 License Agreement and the 2011 License Agreement, and both he and CIHLLC face a substantial threat of liability for their involvement in the 2010 Asset Purchase Agreement. Because the amended allegations make clear that Lutnick is liable for the transfer of valuable trading activity from CIL to CFE, and for causing CIL to pay exorbitant related-party fees to CFE, he faces a substantial threat of liability on the basis of these transfers as well.

222. In addition, Amaitis and Merkel, along with other employees of Cantor, acted in concert with Lutnick or at Lutnick's direction in effecting the conduct challenged herein. In its Order, the Court found that the prior allegations plausibly state claims against them as well.

223. For all of the foregoing reasons, CIHLLC cannot independently and disinterestedly consider demand.

224. Under these circumstances, CIHLLC cannot be expected to bring the claims asserted herein, and the actions challenged herein are not protected from judicial scrutiny. Demand is therefore excused.

### CIHLLC'S CONDUCT IS NOT EXCULPATED

225. The liability of CIHLLC is not exculpated since, *inter alia*, its conduct (i) is attributable to CIHLLC's willful misconduct, gross negligence and/or breach of duty, (ii) was the

result of active and deliberate dishonesty, and/or (iii) was clearly outside the scope of authority granted to CIHLLC under the Partnership Agreement or any other agreement to which CIHLLC was a party in its capacity as general partner of CIH. Furthermore, upon information and belief, CIHLLC's acts or omissions were not done in reliance upon the opinion of independent legal counsel or public accountant selected with the exercise of reasonable care by CIHLLC on behalf of CIH.

## COUNT I
### (BREACH OF FIDUCIARY DUTY AGAINST CIHLLC, LUTNICK, MERKEL, AND AMAITIS)

226. Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

227. Pursuant to the Court's July 6, 2015 Opinion and Order[9] and the December 17, 2015 ruling denying Defendants' Rule 72 Objections (the "**SAC Orders**"), this Count is brought against CIHLLC, Lutnick, Merkel and Amaitis, except that the Affiliated Transaction involving the transfer of CIH's assets to help Cantor Nevada create mobile gambling and the Midas program forms a basis of this Count only as against Lutnick, Merkel, and Amaitis.

228. As general partner of CIH, CIHLLC owed CIH fiduciary duties of good faith, care and loyalty.

229. As officers and/or directors of one or more CIH Entities, Lutnick, Merkel, and Amaitis owed the CIH Entities fiduciary duties of good faith, care and loyalty.

230. The Affiliated Transactions siphoned businesses and assets away from CIH and the other CIH Entities for no or nominal consideration.

---

[9] Dkt. # 101.

231. The Affiliated Transactions were not entirely fair, as a matter of both process and price, to CIH and the other CIH Entities and favored the Defendants at the expense of CIH and the other CIH Entities. Under the circumstances, CIHLLC, Lutnick, Merkel and Amaitis did not act in the interests of CIH and the other CIH Entities, even though they knew or were reckless in not knowing that their conduct would result in harm to CIH and the other CIH Entities. At a minimum, they were willfully blind to the foreseeable harm of the Affiliated Transactions, and acted grossly negligently and/or recklessly in approving and/or facilitating transactions that drained CIH and the other CIH Entities of their valuable property.

232. CIHLLC, Lutnick, Merkel and Amaitis failed to exercise necessary care and breached their respective duties of good faith, care and loyalty.

233. CIHLLC, Lutnick, Merkel and Amaitis are not entitled to the protection of the business judgment rule for the breach of their duties. CIHLLC, Lutnick, Merkel and Amaitis failed to act in good faith and instead acted in their own interest or in the interests of entities and/or individuals other than CIH and the other CIH Entities, or in a manner that cannot be attributed to a rational business purpose. Finally, in reaching the decisions complained of herein, CIHLLC, Lutnick and Amaitis were grossly negligent and/or willfully blind by, among other things, failing to consider all material facts reasonably available and completely and willfully or recklessly ignoring their duties owed to CIH and the other CIH Entities.

234. By reason of the foregoing actions, CIHLLC, Lutnick, Merkel and Amaitis engaged in self-dealing, did not act in good faith, and breached their fiduciary duties.

235. CIH and the other CIH Entities have been substantially damaged as a direct and proximate result of the breaches of fiduciary duties by CIHLLC, Lutnick, Merkel and Amaitis. Additionally, since, *inter alia*, CIHLLC, Lutnick, Merkel and Amaitis engaged in intentional,

willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

236.     Plaintiff has no adequate remedy at law.

## COUNT II
## (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST THE DEFENDANTS OTHER THAN CIHLLC)[10]

237.     Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

238.     Pursuant to the SAC Orders, this Count is brought against all Defendants other than CIHLLC, except that the Affiliated Transaction involving the transfer of CIH's assets to help Cantor Nevada create mobile gambling and the Midas program forms a basis of this Count only as against Cantor Nevada.

239.     As general partner of CIH, CIHLLC owed CIH fiduciary duties of good faith, care and loyalty.

240.     As officers and/or directors of one or more CIH Entities, Lutnick, Merkel and Amaitis owed the CIH Entities fiduciary duties of good faith, care and loyalty.

241.     The Affiliated Transactions siphoned substantial businesses and assets from CIH and the other CIH Entities for no or nominal consideration and deprived CIH and the other CIH Entities of substantial value.

242.     The Defendants other than CIHLLC knew that CIHLLC owed the fiduciary duties alleged herein to CIH and are liable for aiding and abetting CIHLLC's fiduciary breaches as set forth herein.

---

[10] As to Merkel, Plaintiff includes this Count II (Aiding and Abetting Breach of Fiduciary Duty Against the Defendants Other Than CIHLLC) , and references to it herein, solely in order to preserve the claim for appellate review.

243. The Defendants other than Lutnick, Merkel and Amaitis knew that Lutnick, Merkel and Amaitis owed the fiduciary duties alleged herein to the CIH Entities and are liable for aiding and abetting the fiduciary breaches of Lutnick, Merkel and Amaitis as set forth herein.

244. The Defendants other than CIHLLC colluded in or aided and abetted the breaches of fiduciary duties alleged herein, and were active and knowing participants in those breaches of fiduciary duties by, among other things, intentionally orchestrating and steering CIHLLC toward a corporate strategy of siphoning away businesses and assets from CIH and the other CIH Entities for their own benefit.

245. By and through the Affiliated Transactions, the Defendants other than CIHLLC received substantial proceeds and other benefits in connection with the Affiliated Transactions.

246. CIH and the other CIH Entities have been substantially damaged as a direct and proximate result of the actions of the Defendants other than CIHLLC in aiding and abetting the breaches of fiduciary duties alleged herein. Additionally, since, *inter alia*, the Defendants other than CIHLLC engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

247. Plaintiff has no adequate remedy at law.

## COUNT III
## (UNJUST ENRICHMENT AGAINST DEFENDANTS)[11]

248. Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

---

[11] As to all Defendants except Cantor Nevada, Lutnick, Merkel, and Amaitis, Plaintiff includes this Count III (Unjust Enrichment Against Defendants), and references to it herein, solely to preserve the claim for appellate review.

249. Pursuant to the SAC Orders, this Count is brought against all Defendants, except that the Affiliated Transaction involving the transfer of CIH's assets to help Cantor Nevada create mobile gambling and the Midas program forms a basis of this Count only as against Cantor Nevada, Lutnick, Amaitis, and Merkel.

250. By orchestrating and executing the Affiliated Transactions, and through the wrongful siphoning away of valuable businesses and assets of CIH and the other CIH Entities for no or nominal consideration, including in connection with breaches of fiduciary duty, aiding and abetting such breaches, conversion, waste and fraudulent transfer of assets as alleged herein, the Defendants have been enriched at CIH and the other CIH Entities' expense, and it is against equity and good conscience to permit Defendants to retain the valuable businesses and assets that belong to CIH and the other CIH Entities.

251. Defendants are therefore liable to the CIH Entities for unjust enrichment under New York law.

252. Plaintiff seeks restitution from the Defendants for the benefit of the CIH Entities and an order of this Court disgorging to the CIH Entities all payments, profits, fees, benefits, incentives and other compensation obtained by the Defendants as a result of their wrongful conduct. Additionally, since, *inter alia*, Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

253. Plaintiff has no adequate remedy at law.

## COUNT IV
## (WASTE OF ASSETS AGAINST CIHLLC, LUTNICK, MERKEL AND AMAITIS)

254. Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

255. By orchestrating and executing the Affiliated Transactions, and through the wrongful siphoning away of valuable businesses and assets of CIH and the other CIH Entities for no or nominal consideration, CIHLLC and the Individual Defendants engaged in waste of the CIH Entities' assets.

256. The CIH Entities have been substantially damaged as a direct and proximate result of the conduct of CIHLLC and the Individual Defendants.

257. Additionally, since, *inter alia*, CIHLLC and the Individual Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities.

258. Plaintiff has no adequate remedy at law.

**COUNT V**
**(BREACH OF PARTNERSHIP AGREEMENT AGAINST CIHLLC)[12]**

259. Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

260. Section 1.01 of CIH's Partnership Agreement provides, in pertinent part, that the partnership was formed to "own, operate, develop and invest in businesses which are connected with, or involved in, games, gaming, betting, lotteries, contracts for differences, futures, options and financial and commodity products (the 'Products')" and to "realize the income and gains to be derived from the Products, for the mutual benefit of the Partners."

261. CIHLLC orchestrated and executed the Affiliated Transactions, to siphon valuable businesses and assets away from CIH for no or nominal consideration and thereby prevented it from realizing substantial income and gains from such businesses and assets.

---

[12] Plaintiff includes this Count V (Breach of Partnership Agreement by CIHLLC), and references to it herein, solely to preserve the claim for appellate review.

262. The Affiliated Transactions were in violation of the Amended and Restated Limited Partnership Agreement and constitute a breach of the Amended and Restated Limited Partnership Agreement.

263. Accordingly, Plaintiff is entitled to judgment against CIHLLC and damages to be awarded to RGL and CIH in an amount to be determined at trial. Additionally, since, *inter alia*, CIHLLC engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for itself and for the benefit of CIH and the CIH entities.

## COUNT VI
## (CONVERSION AGAINST DEFENDANTS)

264. Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

265. Pursuant to the SAC Orders, this Count is brought against all Defendants, except that the Affiliated Transaction involving the transfer of CIH's assets to help Cantor Nevada create mobile gambling and the Midas program does not form a basis of this Count as against any of the Defendants.

266. The CIH Entities' valuable business and assets were the property of CIH and the other CIH Entities.

267. By wrongfully orchestrating and executing the Affiliated Transactions, and through the wrongful siphoning away of the CIH Entities' valuable businesses and assets for no or nominal consideration, Defendants engaged in conversion of the CIH Entities' assets under New York law.

268. The CIH Entities have been substantially damaged as a direct and proximate result of Defendants' conduct.

269. Additionally since, *inter alia*, Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of CIH and the other CIH Entities against Defendants.

## COUNT VII
## (FRAUDULENT CONVEYANCE UNDER N.Y. DEBTOR
## & CREDITOR LAW § 276 AGAINST DEFENDANTS)[13]

270. Plaintiff repeats and realleges the allegations set forth above, which are incorporated by reference as if fully set forth herein.

271. Plaintiff is appropriately deemed to have claims and is therefore a creditor in the context of this litigation in light of the claims and causes of action set forth herein.

272. Defendants acted with an actual intent to hinder, delay, and/or defraud RGL, CIH, and the other CIH Entities when they wrongfully orchestrated and executed the Affiliated Transactions, and wrongfully siphoned away all of the CIH Entities' valuable businesses and assets.

273. Defendants' actual intent is established by, *inter alia*, (1) the lack of or inadequate consideration received by Defendants through the transactions and/or transfers; (2) the close relationship between Defendants' and the transferees; (3) Defendants' retention of present and future benefits from the transactions and/or transfers; (4) the cumulative nature of the transactions and transfers, including Defendants' pattern of siphoning away and disposing of property belonging to CIH and the other CIH entities for no or nominal consideration; (5) the questionable nature of the transactions and/or transfers; and (6) the fact that Defendants conducted the transactions and/or transfers in secrecy, without RGL's knowledge, and without the consent of RGL as required under the Partnership agreement.

---

[13] Plaintiff includes this Count VII (Fraudulent Conveyance Under N.Y. Debtor & Creditor Law § 276 Against Defendants), and references to it herein, solely to preserve the claim for appellate review.

274. The CIH Entities and RGL have been substantially damaged as a direct and proximate result of Defendants' conduct.

275. Additionally since, *inter alia*, Defendants engaged in intentional, willful, reckless, oppressive and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for itself and for the benefit of CIH and the other CIH Entities against Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

(1) An order declaring that CIHLLC, Lutnick, Merkel, and Amaitis breached their fiduciary duties to CIH and the other CIH Entities in connection with the Affiliated Transactions;

(2) An order declaring that the Defendants other than CIHLLC aided and abetted the breaches of fiduciary duties alleged herein in connection with the Affiliated Transactions;

(3) An order declaring that the Defendants were unjustly enriched in connection with the breaches of fiduciary duty to CIH and the other CIH Entities by CIHLLC, Lutnick, Merkel, and Amaitis and the aiding and abetting of such breaches by the Defendants other than CIHLLC;

(4) An order declaring that Defendants' actions in connection with the Affiliated Transactions constituted conversion;

(5) An order declaring that the actions of CIHLLC, Lutnick, Merkel, and Amaitis in connection with the Affiliated Transactions constituted waste;

(6) An order declaring that Defendants' actions in connection with the Affiliated Transactions constituted fraudulent conveyances and/or transfers of assets;

(7) An order declaring that Defendants' actions with the Affiliated Transactions resulted in Defendants' unjust enrichment;

(8) An order declaring that, pursuant to Sections 9.08 and 9.12 of the Partnership Agreement, and Delaware Law, RGL is entitled to reasonable attorneys' fees and expenses;

(9)     An order awarding disgorgement of profits and/or monetary damages, including punitive damages, together with pre- and post-judgment interest, to CIH and/or the other CIH Entities for the foregoing breaches of fiduciary duty, aiding and abetting such breaches, unjust enrichment, breaches of the Partnership Agreement, conversion, waste, and fraudulent conveyances and/or transfers;

(10)    An order awarding RGL its reasonable attorneys' fees pursuant to the Partnership Agreement and Delaware law;

(11)    An order awarding RGL its costs and expenses incurred in this proceeding, including experts' and attorneys' fees; and

(12)    An order granting such other and further relief as this Court deems just and proper.


Dated: December 23, 2015

GRANT & EISENHOFER P.A.

Jay W. Eisenhofer
Geoffrey C. Jarvis
Nathan A. Cook
485 Lexington Avenue
New York, New York 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Special Litigation Counsel to*
*Refco Group Ltd., LLC*

## **VERIFICATION**

I, Marc S. Kirschner, the court appointed Plan Administrator for Refco Capital Markets, Ltd., the sole beneficial owner of and agent for plaintiff Refco Group Ltd., LLC ("RGL"), declare under penalty of perjury that I have reviewed the foregoing Verified Second Amended Complaint (the "Complaint"). The facts set forth in the Complaint that relate to my own acts and those of RGL are true to my knowledge. With respect to the facts set forth in the Complaint that relate to the acts and deeds of others, as to those matters, I believe them to be true.

I further verify that RGL was a limited partner of nominal defendant Cantor Index Holdings, L.P. at the time of the wrongs complained of in the Complaint, and that this action is not a collusive one to confer jurisdiction upon this Court that it would otherwise lack.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of December, 2015, in New York, New York.

Marc S. Kirschner, Plan Administrator for
Refco Capital Markets